UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  RALPH ROBERTS        .        Adv. No. 12-06131
        REALTY, LLC,         .
                             .        Detroit, Michigan
              Plaintiff,     .        January 21, 2014
        v.                   .        9:02 a.m.
                             .
        JON SAVOY, et al.,   .
                             .
              Defendants.    .
. . . . . . . . . . . . . .  .


HEARING RE. TRIAL
BEFORE THE HONORABLE THOMAS J. TUCKER
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Plaintiff:  Gold, Lange & Majoros, PC
                    By:  HANNAH MUFSON MCCOLLUM
                    24901 Northwestern Hwy., Suite 444
                    Southfield, MI  48075
                    (248) 350-8220

For the Defendants: Goldstein, Bershad & Fried, PC
                    By:  SCOTT KWIATKOWSKI
                    4000 Town Center, Suite 1200
                    Southfield, MI  48075
                    (248) 355-5300

Court Recorder:     Jamie Laskaska
                    United States Bankruptcy Court
                    211 West Fort Street
                    21st Floor
                    Detroit, MI  48226-3211
                    (313) 234-0068

Transcribed By:     Lois Garrett
                    1290 West Barnes Road
                    Leslie, MI  49251
                    (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1          THE CLERK:  Please rise.  This court is now in
 2   session, the Honorable Thomas J. Tucker presiding.  You may
 3   be seated.  Court will call the matter of Ralph Roberts
 4   Realty, LLC, versus Savoy, 12-6131.
 5          MS. MCCOLLUM:  Good morning, your Honor.  Hannah
 6   McCollum for Ralph Roberts Realty, the plaintiff.
 7          MR. KWIATKOWSKI:  Good morning, your Honor.  Scott
 8   Kwiatkowski on behalf of the defendants.
 9          THE COURT:  All right.  Good morning.  This is the
10   time for trial.  Parties ready to proceed?
11          MS. MCCOLLUM:  Yes, your Honor.
12          MR. KWIATKOWSKI:  Yes, your Honor.
13          THE COURT:  All right.  I'm looking at the exhibits
14   here, my copies of these exhibits.  We've got plaintiff's
15   exhibits.  Ms. McCollum, you went and renumbered all the
16   exhibits?
17          MS. MCCOLLUM:  I did.  And, your Honor, I apologize.
18   They didn't make any sense as they were originally presented
19   in the final pretrial order, so what I did was I regrouped
20   them with respect to each property, so now each exhibit tab
21   is one particular property.  The original final pretrial
22   order had some of the property information broken out and
23   some of it lumped together.
24          THE COURT:  Is this just a rearrangement?  Is there
25   any difference, additions, subtractions, from the final
```

1  pretrial order list of plaintiff's exhibits --

2          MS. MCCOLLUM:  No.

3          THE COURT:  -- to this set?

4          MS. MCCOLLUM:  No.

5          THE COURT:  So, Mr. -- now, of course, the parties

6  stipulated in the court order to the final pretrial order

7  that all the plaintiff's exhibits that were listed in there,

8  1 to 24, would be admitted into evidence at trial by

9  stipulation.  Mr. Kwiatkowski, you've had a chance to review

10  the plaintiff's renumbered, rearranged exhibits here, 1

11  through -- I guess they're now 1 through 15; right?

12          MR. KWIATKOWSKI:  Yes, your Honor.

13          THE COURT:  Do you agree that -- based on the final

14  pretrial order, that the -- all these trial exhibits --

15  plaintiff trial exhibits, 1 through 15, should be admitted

16  into evidence?

17          MR. KWIATKOWSKI:  Yes, your Honor.

18          THE COURT:  All right.  I assume that's what you

19  want, Ms. McCollum.

20          MS. MCCOLLUM:  Yes, please, your Honor.

21          THE COURT:  All right.  So Plaintiff's Exhibits 1 to

22  15 -- currently numbered 1 to 15 are admitted into evidence,

23  all of them.

24      (Plaintiff's Exhibits 1-15 received at 9:05 a.m.)

25          THE COURT:  So then we have defendant's exhibits.

1   In the final pretrial order they were A through R, as a

2   practical matter, A through Q.  A through R -- R was just

3   sort of a catch-all.  Mr. Kwiatkowski, do we have A through Q

4   here, or what do we have?

5           MR. KWIATKOWSKI:  Yes, we do, with the exception

6   there was no N, so I just omitted N and stuck to the

7   lettering that I had in the joint final pretrial order

8   because N was documents produced pursuant to discovery

9   requests.  There was no documents produced, so --

10          THE COURT:  All right.  So in the exhibits you're

11  representing here at trial, you've got A through M, O, P, and

12  Q; is that right?

13          MR. KWIATKOWSKI:  That is correct.

14          THE COURT:  All right.  And you want all of those

15  admitted into evidence, I presume?

16          MR. KWIATKOWSKI:  Yes, your Honor.

17          THE COURT:  Ms. McCollum, the actual exhibits marked

18  here for the defendant that we've been discussing are the

19  same as those that were listed in the final pretrial order;

20  is that right?

21          MS. MCCOLLUM:  It's actually not right.  The final

22  pretrial order lists for P a summary of expenses, and what

23  defendant has actually provided is the actual back-up for the

24  expenses, and the first time I've seen this is yesterday, but

25  given that we had stipulated that the summary would be

1   admitted, I don't really see that I have any grounds to
2   object to the actual back-up documentation being admitted as
3   well.
4           THE COURT:  All right.  So the plaintiff then agrees
5   that these exhibits presented as trial exhibits here today
6   for the defendant, A through M and O, P, and Q, should be
7   admitted into evidence; is that right?
8           MS. MCCOLLUM:  Yes, your Honor.
9           THE COURT:  And I assume that, again, that's what
10  you want, Mr. Kwiatkowski?
11          MR. KWIATKOWSKI:  Yes, your Honor.
12          THE COURT:  All right.  Those exhibits then are
13  admitted into evidence at trial here.
14     (Defendant's Exhibits A-M, O, P, and Q received at 9:07
15     a.m.)
16          THE COURT:  All right.  Is there anything else that
17  either of you thinks we need to talk about before we have
18  opening statements?
19          MS. MCCOLLUM:  Not on the plaintiff's side, your
20  Honor.
21          MR. KWIATKOWSKI:  No, your Honor.
22          THE COURT:  All right.  Ms. McCollum, on behalf of
23  the plaintiff, your opening statement.
24                          OPENING STATEMENT
25          MS. MCCOLLUM:  Thank you, your Honor.  As you know,

1　we're here because plaintiff, Ralph Roberts Realty, sued Jon

2　Savoy -- sorry -- Jon Savoy, Arnold Hassig, Adam Hassig,

3　Prime Residential Properties, Ryan Residential Properties

4　Group, Adam Residential Properties Group, and 1836 Brys, LLC,

5　on account of funds that plaintiff believes are owed to it on

6　account of the 16 properties that defendants acquired through

7　plaintiff's investor program.  Of the 16 properties that were

8　acquired by defendants, 3 were redeemed, 1 was sort of a

9　settlement, 4 were split and paid, 4 were sold and no split

10　was paid to defendant -- sorry -- to plaintiff -- defendants

11　allegedly lost money on those properties -- and 4 have not

12　yet been sold either because they're being sold on land

13　contract or because they simply have not been sold yet.

14　　　　　The defendants in their pleadings have admitted that

15　they were a part of plaintiff's investor program, and,

16　indeed, they did split and pay on four properties.  We

17　will -- plaintiff will show through the testimony of Ralph

18　Roberts and Ray Confer today that defendants were some of the

19　earliest participants in plaintiff's investor program, that

20　they understood the program, that they understood how splits

21　would be calculated in terms of properties that were flipped,

22　properties that were held and rented, properties that were

23　held and sold on land contract, that each property purchased

24　through the investor program was a separate transaction, and

25　that there were no offsets because, as plaintiff has stated

1  before and will state again, that there was no possibility

2  actually to lose money in this program, and, in fact,

3  plaintiff will show today that all of the houses in this

4  program that we're specifically discussing today were

5  profitable.

6         As a result, we will show and we believe that

7  defendants are liable in at least the amount of the $16,000

8  for acquisition fees as well as the amounts listed in the

9  final pretrial order and pleadings to date, and I think that

10 number is something like 80 or $90,000 in total on the four

11 houses that have been sold and that were not paid and on the

12 four properties that have not yet been sold and are still in

13 defendant's possession.  And I have nothing further in my

14 opening argument.

15        THE COURT:  All right.  Thank you.  Mr. Kwiatkowski,

16 you may make an opening statement now or if you wish you may

17 defer it until after the close of plaintiff's case in chief.

18 What is your preference?

19        MR. KWIATKOWSKI:  I would choose to defer.

20        THE COURT:  All right.  Plaintiff's first witness.

21        MS. MCCOLLUM:  Your Honor, I'd like to call Ralph

22 Roberts to the stand, please.

23        THE COURT:  All right.

24         RALPH ROBERTS, PLAINTIFF'S WITNESS, SWORN

25        THE CLERK:  If you can take a seat, please, and

1    state and spell your name for the record.

2            THE WITNESS:  Ralph Roberts, R-a-l-p-h

3    R-o-b-e-r-t-s.

4            THE COURT:  All right.  Good morning, Mr. Roberts,

5    and welcome.  Go ahead, Ms. McCollum.

6                        DIRECT EXAMINATION

7    BY MS. MCCOLLUM:

8    Q    Mr. Roberts, what's your relationship to plaintiff, Ralph

9    Roberts Realty?

10   A    I'm broker-owner of Ralph Roberts Realty, LLC.

11   Q    Who are Jon Savoy, Arnold Hassig, Adam Hassig, and their

12   companies, Prime Residential Properties, Ryan Residential

13   Properties, Adam Residential Properties, and 1836 Brys?

14   A    They're the defendants in this case and investors in my

15   program.

16   Q    How did you meet these defendants?

17   A    I knew Butch Hassig for a long time and knew his son, but

18   all from Butch for years of different things in Macomb

19   County.

20   Q    Tell me about your -- Ralph Roberts Realty's current

21   investor program.

22   A    We look for distressed properties being sold at discounts

23   through Wayne, Macomb, and Oakland County, and then we

24   research them and try to find stuff that has a lot of

25   problems with it but buy in first positions, and then we send

1  out an e-mail three different times a week to investors that
2  are in our program.  And then if they're interested they'll
3  e-mail back that I'm interested, tell me more information, or
4  I'm going to go drive by it and decide if I want to go
5  forward with it.
6  Q   When did you start this current -- I'm sorry.  When did
7  Ralph Roberts Realty start this current program?
8  A   Came up with the idea on May 19th of 2009 and then
9  started it on June 1st of 2009.
10 Q   How did Ralph Roberts Realty start the program on June
11 1st, 2009?
12 A   First I called a few investors.  I originally called --
13 Butch Hassig and Ray Confer were the first two that I called.
14 At the time, Butch was going through some throat procedure.
15 He wasn't able to actually talk, so we'd text.  And when I
16 talked to Ray Confer, Ray -- I told him what I wanted to do.
17 I wanted to buy these properties.  I wanted to get a $5,000
18 acquisition fee when the property was sold.  I'd want 50-
19 percent of the upside after the investor got their principal
20 investment back.  And he said, "I'll do it," you know, and so
21 we drove around.  He drove -- actually, Ray -- when we
22 started, Ray Confer drove around in the truck with me, and
23 ultimately he bought like 35 properties, and so it was really
24 started with Ray as like the first investor and sometime
25 during that was able to meet with Butch.  Butch probably was

1  the second or third investor, and he didn't have any funds

2  himself, so he brought in Jon Savoy, who had funds to invest

3  in the program.

4  Q    How does Realty identify properties that it sends to its

5  investor list?

6  A    We research divorces, bankruptcy, probate, foreclosures,

7  and then scrub that list each week -- there's one day a week

8  that each county is done -- and look for opportunities

9  through lots of research.

10 Q    What makes a house a good investment potential for an

11 investor?

12 A    Good neighborhood, buying it, you know, 50 percent or

13 less than what its value is, and having, as we say, hair on

14 the dog, having federal tax liens, state tax liens, second

15 mortgages, any kind of additional encumbrances which would

16 make the property harder to redeem for someone else but also

17 make it more likely that we would acquire it as the investor

18 because we put the money up at, you know, the sheriff sale or

19 the clerk sale for the property.

20 Q    Normally, having additional encumbrances is not a

21 benefit.  Why is it a benefit in a sheriff sale or

22 foreclosure sale situation?

23 A    If a house is, say, worth a hundred thousand and you can

24 buy the first mortgage for 50 and it's got a second mortgage

25 for 50, it's got a federal tax lien of 20 and a state tax

1    lien of 5,000, pretty much the only way to acquire that
2    property is to get it at the sheriff sale so you can buy the
3    first lien position.  If you get the first lien position,
4    your principal is safe.  If they are able to redeem it, you
5    get your money back, but we look for opportunities that have
6    a less likely chance to be redeemed.
7    Q    And in that situation, what happens to the other liens on
8    the property after redemption runs?
9    A    Second mortgages, third mortgages fall off.  Tax --
10   federal tax liens and state tax liens, you have to be careful
11   that they were given proper notice.  They have to be given
12   notice 30 days before the sheriff sale, and we check that in
13   advance, so if they were given notice properly, then those
14   would also fall off after the six months and one day have
15   run.
16   Q    Do you personally do the research on all these
17   properties?
18   A    I personally check the research.  There's others.
19   There's one person for each county that does the research for
20   me.  Then they present files to me.  I then take those files
21   and review every document and verify what's there or have
22   them go check something else, but personally I do audit every
23   file.
24   Q    How long have you been involved in the real estate
25   business?

1    A    1975.

2    Q    Have you ever missed second liens, tax liens, situation

3    with a property?

4    A    Sure.

5    Q    How often?

6    A    A handful of times in my -- since 1975, but I have for

7    sure.  I'm human like everybody else, so I for sure have

8    missed things.

9    Q    How many investors are in the program?

10    A    Currently there's 50 investors that are active in our

11    program.

12    Q    How many houses have been purchased by these investors

13    through the investor program?

14    A    Since -- approximately a thousand.

15    Q    How many of them are being held by investors right now?

16    A    Around 500.

17    Q    What happened to the other 500?

18    A    Sold or redeemed.  You know, either they're redeemed or

19    we've taken them and owned them and then have flipped them.

20    Q    Tell me about the investor program itself.  What

21    comprises the investor program?

22    A    There's really two parts to it.  When I originally

23    thought -- started the program, what I thought was going to

24    happen was people were going to flip the properties, so the

25    main thing I was looking for was flipping the properties.

1    And when I was putting a business plan together trying to

2    come up with what to do in my reinventing myself, I looked at

3    selling a $20,000 house and there being a six-percent

4    commission and couldn't make the budget work with my CPA, Joe

5    Sirianni, so I devised where I needed to get an acquisition

6    fee of $5,000 when we bought that house for 20.  That would

7    be how I'd run the business for cash flow and stuff.  And

8    then when the investor sold the property, we would share in

9    50 percent of the upside.  And with Ray Confer being one of

10   my first investors, that's the flip side.  Ray was one of the

11   first -- was actually the first investor in the new program.

12   He and I had been working together maybe 25 or 30 years.  He

13   has over 70 houses.  I've helped him buy houses forever.  And

14   in the new program, he's got 35, and he's never -- he's never

15   flipped one yet.  He's just held them.  So with the flip

16   program, if you buy it, all your expenses and different

17   things are added up, and when we sell the property, we take

18   the cost, divide up what's left 50-50.  On the rental

19   program, it's -- if the investor decides to rent it for

20   whatever reason, then the costs are not part of the split.

21   The costs then -- I don't take any rent, so if you bought a

22   house for 40,000 and you rented it for a thousand a month for

23   three years, it's 36,000 in rent.  You keep all the rent

24   money, but then you also pay taxes, interest, insurance,

25   repairs as the landlord, and then at some point in the future

1  when the property is sold, the split is done off the

2  acquisition cost, not the other cost, just the acquisition

3  cost.

4  Q    So the 40 plus what in that hypothetical?

5  A    The commissions, closing fees, the transfer tax,

6  things -- normal closing costs but no expenses.

7  Q    Is there -- in a rental situation like that, is there --

8  can an investor deduct any expenses at all related to

9  insurance or improvements?

10  A    No.

11  Q    Even ones they did right prior to renting the property?

12  A    No.

13  Q    What about the situation where an investor sells a

14  property on land contract?

15  A    So we sell a property on land contract.  You would

16  just -- you'd buy a house for 24,000, sell it for 84,000, and

17  let's say there's no other commissions or anything.  Then you

18  have a $60,000 profit.  Once the investor gets their 24,000

19  back plus their 30,000, then the land contract would be

20  turned over to Ralph Roberts Realty or the 30,000 would be

21  turned over to Ralph Roberts Realty, whichever the investor

22  preferred to do.

23  Q    What happens to expenses and taxes and that in a land

24  contract situation?

25  A    In a land contract situation, the occupant, the land

1    contract purchaser, is paying the interest.  The land

2    contract purchaser is paying the taxes.  The land contract

3    purchaser is paying the insurance.  So it doesn't have -- it

4    doesn't have those expenses.

5    Q   Is a land contract purchaser like a homeowner buying a

6    house on a mortgage?

7    A   Yeah.  I feel it as -- view it as the same.  It's called

8    seller financing.  Instead of it being financed by ABC

9    Mortgage Company, it's being financed by an investor in our

10    program.

11    Q   Who owns the properties that are purchased through your

12    investor program?

13    A   My investors own them individually or they own them in

14    LLC's that they own.

15    Q   Does Realty own any of the investor properties?

16    A   No.

17    Q   Do you consider that Realty has an ownership interest in

18    these properties?

19    A   I feel that it really has an upside, you know.  It has an

20    interest in the sale side of it.  Its business model is to

21    share in the profits of the properties when they're sold, so

22    it does not have an ownership interest, but it has an

23    interest in the future of that asset.

24    Q   How do investors find out about Ralph Roberts Realty's

25    investor program?

1  A   I made a few calls at the beginning, Butch Hassig and Ray

2  Confer, and then after that everybody has come in from word

3  of mouth.  From someone else who's been in the program is how

4  we get -- how we've got everybody.

5  Q   Tell me about the difference between the investor program

6  in 2009 versus the investor program today.

7  A   In 2009 it was just an idea.  It was me and one other

8  person in the office.  I basically had four or five

9  investors, but four of them were Butch and Jon's group, and

10  then there was Ray, so I had -- I didn't have -- you know, at

11  the beginning, it was just two investors.  Then as time went

12  on, maybe about, you know, a couple weeks later someone else

13  came in or a couple months later, and it just slowly from

14  June 1st of 2009 till January of 2014 is now at 50 investors.

15  It's just slowly added as we've gone along.

16  Q   Do you have any kind of investor meetings or investor

17  sessions now?

18  A   Yeah.  When we first started my -- I would have dinner

19  with Jon and Butch every so often, two times a month, one

20  time a month, sometimes every week for a month, and then

21  later on I switched.  I started having an investor meeting on

22  Wednesday nights, and there was Ray Confer and a couple other

23  people.  We met.  There was maybe four of us met for a year,

24  six months or a year, and then other people started coming to

25  it.  And we'd try to teach something at the investor

1    meetings, share an opportunity, share what just happened and

2    let investors know about what we've done and what we're

3    trying to do in the future.

4    Q    In 2009, describe how your group of investors -- how

5    Realty told the group of investors about potential property

6    opportunities.

7    A    We do it the exact same way.  We would still send out an

8    e-mail, but with Jon and Butch, if I would go meet them, we

9    would go to a restaurant like J. Baldwin's is where we met

10   most the time.  I would literally take the files there two

11   nights before the sale or the night before the sale and go

12   through the opportunities that were coming up for that week,

13   the documents, all the research, the pictures, and go over

14   it, and also by that time Butch or Jon would have driven by

15   the property and know which ones that they would be

16   interested in, and we'd discuss them that night and make

17   decisions on what we were going to go for or not go for.

18   Q    Tell me about the kind of due diligence the investors

19   normally do on properties that they purchase through your

20   program.

21   A    We send them out, and all the investors go to the

22   properties themselves.  They go to it.  It's important that

23   they see it because it's going to be their money.  It's going

24   to be in their name or it's going to be in their LLC.  It's

25   important that they know what they're getting and that they

1  want to get that property, so I don't believe we've ever
2  bought a property that the investor didn't go by and approve
3  of the sale themself.
4  Q   Before the -- before it was purchased at the sheriff
5  sale?
6  A   Before the purchase, yeah, before the sheriff sale.
7  Q   Do you know what kind of -- what kind of due diligence,
8  if you know, did Jon Savoy and Butch Hassig do on the
9  properties that they bought?
10 A   Jon is fortunate.  He has a real estate company, so he
11 also has a lot of knowledge of real estate, and he would
12 actually do CMA's and additional research that he would share
13 with us.  Jon probably did more research than any other
14 investors we've worked with even up till now.  He's got
15 access to stuff that other investors don't have access to.
16 Q   Are there any investors that are given the opportunity to
17 look at properties before other investors in your program?
18 A   Sometimes it happened.  I mean that could happen, but how
19 we do it is at the investor meeting even if you've seen it,
20 we go over the house.  We pass the houses out, and then after
21 we pass the houses out, we draw numbers out of a container,
22 so then the high number or low number, whatever we're going,
23 then that's how we determine what order they -- because
24 there's 50 investors now, right, so we want to try to keep it
25 as transparent and as fair as we possibly can.  In the

1  beginning, Jon, Butch, Ray, they all got first at the

2  property because they were the only -- it was only them.  I

3  mean they were the first people, and there was no one else to

4  see it, but then it grew.  Other people came on, and we kept

5  doing it the same way.  We sent everybody a blind copy e-

6  mail.  Everyone gets the property.  We try to get the

7  property to everybody at the exact same time.

8  Q    And then what happens?

9  A    They reply in.  If it's not from the meeting, they reply

10  in from the e-mail, yes, I'm interested, and if -- you know,

11  at first -- and when we first started, Ray doesn't even

12  answer off the e-mail, so his would have to be with telephone

13  calls, but then we went to the e-mail, and then you'd reply

14  in that, yes, I want it, and then you'd go by and look at it

15  and either stay on it or get off of it is kind of what

16  happened at the beginning and still happens to this day.

17  Q    Is it common that an investor will go see a property and

18  remove him or herself from the e-mail, from the first choice?

19  A    Yes, absolutely.

20  Q    Why would that happen?

21  A    They didn't like it for some reason or they didn't like

22  the house next door for whatever reason, or they checked with

23  their spouse or their bank and they couldn't get the cash in

24  the next 24 hours, so they -- a lot of different reasons you

25  opt out and a lot of different reasons that you opt in.

1 Q   Has Realty ever promised any investor a right of first

2 refusal or a right to be first in picking properties?

3 A   No.

4 Q   What happened when the investor program expanded beyond

5 Ray Confer and Butch Hassig and Jon Savoy?

6 A   And there's been a little bit of conflict with people,

7 you know, on the properties and stuff, but for the most part

8 we've taken people who are like mind and they're not bidding

9 against each other.  We're not like -- five people aren't

10 going bidding on the same house.  Five people want the house.

11 One gets it.  Everyone seems to be happy with that person

12 getting it.  Next week, you know, maybe they're first, so

13 it's kind of -- everybody wants everybody to succeed.

14 Sometimes at the meeting they'll say, "I really want to get

15 one over there, that house, because I got one on the next

16 street.  It would be easy for me to drive by and check on

17 it."  "Okay.  You take my spot," so the group is a very

18 friendly group.

19 Q   In order to bid, how -- how far in advance does an

20 investor have to give you -- Realty the money?

21 A   You could either have the money already in our trust

22 account or you can wire it in the day before or the morning

23 of as long as we get it before ten o'clock or you can bring a

24 cashier's check into the office before the sale or the day

25 before the sale or the morning of the sale or some investors

1  will actually get the cashier's check, the opening bid

2  amount, and come to the -- meet me at the sale and have the

3  checks there to bid right at the sale.

4  Q   Do investors ever bid at the sale?

5  A   Maybe a -- sometimes, yeah, but most -- 95 percent of the

6  time I'm the one bidding.  They might be there with me, but

7  I'm the one -- I'm the one bidding.

8  Q   Do you bid in the investors' individual names, or do you

9  bid in a company name?

10  A   Their direction.  We'll bid -- some have LLC's already

11  set up.  Some want to buy them in their own personal name.

12  Whatever their pleasure is with that.

13  Q   What happens if an investor buys it in his or her

14  individual name and then wants to form a company to hold it?

15  A   Then we would help them transfer.  We have to either have

16  their Social Security number or their tax ID number.  Now,

17  things over in the last four years has changed a little bit.

18  If we have the money and the e-mail from the investor and

19  what they want to bid and we don't have their information,

20  we'll bid in another one of our company names because the

21  sheriff has to have a Social Security number or a tax ID

22  number that goes along with the purchaser, so sometimes we'll

23  buy it in one of our entities, and then we'll transfer it to

24  the investor's entity.

25  Q   Did that ever happen with any of defendants' properties?

1    A    I don't believe -- not at the purchase.  I believe all

2    the properties that Jon and Butch bought were done in

3    Jon's -- if I remember correctly, I believe they all were

4    done in Jon's individual name --

5                MR. KWIATKOWSKI:  Pardon me.

6                THE WITNESS:  -- and then at some point Jon would --

7    Jon and his wife would transfer them to the LLC that Jon

8    wanted them to have.

9                MR. KWIATKOWSKI:  Excuse me, your Honor.  I notice

10   someone else joined the courtroom, and if that's a witness

11   that's going to be called in the case, I would ask for him to

12   be sequestered.

13               MS. MCCOLLUM:  That's Mr. Confer, your Honor.

14               THE COURT:  All right.  Any opposition to that?

15               MS. MCCOLLUM:  Your Honor, I have no opposition.

16               THE COURT:  All right.  I'll order the witnesses

17   sequestered except parties or party representatives.  Each

18   party may appear and stay in the courtroom at all times in

19   person or have one representative, the same person at all

20   times.  Otherwise witnesses will have to remain outside the

21   courtroom until they testify.  Mr. Confer --

22               MR. CONFER:  Thank you.

23               THE COURT:  -- good morning, and we'll see you a

24   little later on.

25               MR. CONFER:  Thank you, your Honor.

1          THE COURT:  Yep.

2    BY MS. MCCOLLUM:

3    Q   What's Nail Construction, LLC?

4          THE COURT:  I'm sorry.  What was the name?

5          MS. MCCOLLUM:  Nail Construction, LLC.

6          THE COURT:  Thank you.

7          THE WITNESS:  Nail --

8          MS. MCCOLLUM:  Am I close enough to the mike?  Are

9    you hearing me okay?

10          THE COURT:  Yeah.

11          MS. MCCOLLUM:  Okay.

12          THE COURT:  I just didn't understand the word you

13    said.

14          MS. MCCOLLUM:  Okay.

15          THE COURT:  Thank you.  Go ahead.

16          THE WITNESS:  Nail Construction is one of my LLC's

17    that I own.

18    BY MS. MCCOLLUM:

19    Q   Have you ever used Nail to purchase properties at sheriff

20    sale?

21    A   I don't believe so.  We use Nail Construction like if

22    we're doing cash for keys.  We'll have the property deeded to

23    Nail Construction instead of to the investor's LLC.

24    Q   Why?

25    A   If I had the cash for keys deal done and deed it to the

1  investor and that party had second mortgages, tax liens, or

2  other encumbrances on the property, my investor would now be

3  responsible for that additional cost, so by deeding it to

4  Nail Construction, when my investor's deed expires in six

5  months and one day, Nail Construction's interest is wiped

6  out.

7  Q   And when you're talking about the investor's deed, are

8  you talking about the sheriff's deed?

9  A   Yes.  That's correct.

10  Q   And then what happens after the investor sheriff's deed

11  expires?

12  A   They then would have perfected title.  They would have

13  clear title to the property in their name.

14  Q   That they can then transfer to whomever they wish?

15  A   Correct.

16  Q   You previously talked about the $5,000 acquisition fee.

17  What does this fee cover in terms of Realty's expenses,

18  overhead, profit, that sort of thing?

19  A   Basically the acquisition -- our acquisition fees and the

20  commissions we get from transactions cover all of our

21  overhead.  Pretty much from our acquisition fees and

22  commissions, the company basically breaks even paying all,

23  you know, rents and payroll and commissions and all the stuff

24  that come with running a business.

25  Q   Is it possible for Ralph Roberts Realty to make a profit

1  if it just got its acquisition fee?

2  A    No.

3  Q    If it just got acquisition fee and commission?

4  A    No.

5  Q    Is the profit dependent on the investor split?

6  A    Yes.  Our profits all come -- pretty much we're a break-

7  even company, and you add the profit splits is where the

8  profits come from for Ralph Roberts Realty.

9  Q    Does Ralph Roberts Realty do any rental management for

10  its investors?

11  A    Yes.

12  Q    Did Ralph Roberts Realty manage any of Jon Savoy or Butch

13  Hassig -- any of the defendants' properties?

14  A    No.

15  Q    They rented them themselves if they rented them?

16  A    I believe they rented them.  I'm not sure who rented

17  them, but --

18  Q    Are the terms of the investor program the same for all

19  investors or do they differ?

20  A    They're currently the same for all investors.

21  Q    And what are those current terms?

22  A    A $5,000 acquisition fee and 50 percent of the upside

23  when it's split.  If it's a rental property, we do not share

24  in the rental cash flow, and we also do not share in the

25  expenses as far as calculating profit.  If it's a flip

1   property, $5,000 acquisition fee, and then all the cost

2   within reason -- we get the cost in advance before a closing

3   and tell them what's allowed, what's not allowed and

4   different things, but approved costs are then added to the

5   cost that the property -- there's a 50-50 split.

6   Q    Did defendants have different terms than what you just

7   described?

8   A    They did.

9   Q    Why?

10  A    They were like the second investor in my program, and

11  when I got to Butch about my program, I didn't know that he

12  didn't have any funds, and he wanted to bring Jon in, who

13  told me he had unlimited funds.  And I didn't have anybody

14  else, so they wanted to go a third, a third, a third, and

15  they wanted to get a $5,000 fee that the two of them would

16  split on the sale of each property.  It ultimately turned out

17  to be 30 percent on our side and 70 percent on their side,

18  and they got a $5,000 fee.  No one else has got that deal,

19  and no one else would ever get that deal now that I have

20  other investors.

21  Q    How long is the redemption period in Michigan?

22  A    It's three different redemptions in Michigan.  The main

23  one is six months, 180 days, but there could be a 30-day

24  abandoned -- if it's an abandoned property, it could be --

25  the redemption could be 30 days.  And since we started, the

 1   law has changed a little bit about farmland and stuff, but if

 2   it's a farmland, it could -- and it's actually farmed, there

 3   could be up to a 12-month redemption.

 4   Q    Is there any situation where a -- sort of a normal

 5   homeowner would get a 12-month redemption period?

 6   A    There was before if the house was like 35-percent paid --

 7   principal paid down from original principal balance, but I

 8   don't believe that one exists anymore.  It's now property

 9   that's farmed.

10   Q    Who makes the sale decisions about investor properties,

11   properties purchased through the investor program?

12   A    Which sale?  When we flip?  When they're flipped?

13   Q    Any sale decision.

14   A    The investor makes that decision.

15   Q    Does Realty have any say in that decision?

16   A    Most of the time.  They would for sure consult with us in

17   what to do, what repairs to do, you know, will this increase

18   the value or not increase the value, should we rent it

19   till -- you know, till we can -- is it going to improve

20   valuewise, yeah, so we try to kind of coach and consult on

21   those decisions, but at the end of the day it's the

22   investor's money.  It's their LLC.  They get to make the

23   decision when it's sold.

24   Q    Do you ever disagree with investors' sale decisions, you

25   personally or the company?

1    A    Yes, I do, absolutely.  That's why we're here.  I
2    disagree with this investor's situations.
3    Q    On the thousand properties purchased through your program
4    by investors, have there ever been -- has there ever been an
5    investor loss?
6    A    You had me check that last -- you know, through last
7    year, and till -- through December 31st of 2013, there has
8    not been a loss.
9    Q    Other than that asserted by defendants?
10   A    Correct.  I mean they say there's a loss.  I don't
11   even -- I don't believe there's losses, but there's not been
12   a loss, no.
13   Q    Have you ever testified about investor losses in your
14   bankruptcy case?
15   A    Yes, I have.
16   Q    Can you tell me when that was and in what context?
17   A    In the Roger Roberts case, I testified about investor
18   losses.
19   Q    What did you say?
20   A    That Realty shares in the upside, whatever percentages,
21   and that if there was a downside, Realty would share in the
22   downside, according to their percentage.
23   Q    What do you mean by downside?
24   A    If there was a loss on a property, if they lost some of
25   the principal.  The goal is -- the most important thing when

1   people invest in something different is that they -- we have

2   to protect the principal.  A lot of the people that are

3   investing with me did real estate different ways before, but

4   some also have joined us who never did anything in real

5   estate other than maybe a home or two for themselves, so the

6   most important thing is, you know, to protect the principal,

7   so do everything we can to put that principal to work at the

8   most profitable opportunity it can possibly have.

9   Q    Did you sign an affidavit in this adversary proceeding?

10  A    Yes.

11  Q    Did you sign it in connection with the summary judgment

12  motion?

13  A    I did, yes.

14  Q    Did you make any statements in that affidavit about loss

15  sharing?

16  A    I did.

17  Q    Do you remember what those statements were?

18  A    Not exactly but with Butch and Jon being the first

19  investors, losses were never talked about, and the way they

20  were getting properties and how the money -- there was not a

21  chance that they could lose, so I would say there would be

22  no -- there would be no loss.  Couldn't be a loss with the

23  way we were doing it.

24  Q    Has any investor ever come to you and said that they've

25  lost principal?

1  A    No.

2  Q    How many -- approximately how many property split payoffs

3  has Realty received?

4  A    North of a hundred.  I don't know the exact number, but

5  north of a hundred.

6  Q    As part of your bankruptcy, you started entering into

7  written contracts with your investors.  Tell me about how

8  those contracts work.

9  A    I think, if I understand the question properly, they work

10  just how I explained the program.  It just puts more of it in

11  writing of how the program is going to -- how the program is

12  going to work, how the money is going to be shared in the

13  program.

14  Q    Before your bankruptcy, did you have written contracts

15  with any of your investors?

16  A    I did not.

17  Q    Why?

18  A    I knew everyone I was doing it with.  I knew them and

19  figured I could trust them all and why would they not live up

20  to their agreement because if they didn't live up to their

21  agreement, they wouldn't get any more opportunities, so just

22  trusted them and was so busy trying to stay in business, stay

23  alive, support my family that the most important was the next

24  deal, the next acquisition fee.  It wasn't the next signed

25  agreement.  Plus I only had a -- you know, a handful at first

1   when I started.

2   Q    Do your investors have one overarching contract with

3   you -- with Ralph Roberts Realty, or do they have a separate

4   contract for each house?

5   A    Some have just one.  Recently we did an agreement with a

6   group that's -- signed agreement for all of them.  Some have

7   each house, and there's still a whole bunch that don't have

8   any agreements because it just hasn't got there yet.  It's

9   just -- so there's -- obviously you've helped us with that.

10  There's a lot of work to get that all done.

11  Q    In general, how does Realty treat each house, separately

12  or together?

13  A    Every house is a separate project.  Every house is, you

14  know, a separate transaction.  If someone has got 30 houses

15  with us, it's 30 different projects.  It's not one project

16  with 30 houses in it.

17  Q    Do you explain the terms of your investor program to all

18  potential investors?

19  A    Yes.

20  Q    Did you explain these terms to Jon Savoy and Arnold

21  Hassig and the defendants?

22  A    Absolutely, yes.

23  Q    When did you explain those terms?

24  A    Multiple times.  I mean, as I told you, being one of the

25  first, I had, you know, lunches with them, dinners with them,

1  going over on a regular basis.  We'd have meetings where we'd

2  have -- either at my office or Butch's house where we would

3  go over the whole portfolio of all the different properties

4  in all the different LLC's that they had and make decisions

5  on what's going to happen next on different properties.

6  Q    Did you ever talk about set-off with them?

7  A    Absolutely not, no.

8  Q    Do you know what set-off is?

9  A    I do.

10  Q    Can you explain it?

11  A    Set-off is where you have something that created a loss

12  and you would set it off against something else.

13  Q    Why wouldn't -- why didn't you talk about set-offs with

14  defendants?

15  A    With my research and with their knowledge in real estate

16  and construction, there'd be no chance that we could actually

17  have a loss.

18  Q    Do you know if Arnold Hassig and Jon Savoy are partners?

19  A    I know they're friends, and obviously they're partners in

20  the stuff that I did with them.  I'm not -- is that -- I

21  don't know.  Did I answer that or not?

22  Q    I'm sorry.  The question wasn't clear.  I meant do you

23  know if they're business partners in the houses that they

24  purchased through your program?

25  A    Yes, they are.

1  Q   Do you know how many properties they purchased?

2  A   I helped them with 17 properties, 16 in this group, and

3  then I helped Adam get a house for himself.

4  Q   How did defendants pay their acquisition fee to Ralph

5  Roberts Realty?

6  A   Two different ways.  Sometimes Jon would write a check

7  for the acquisition fee, and then later on he set up a

8  program with, I think, Ann Arbor State Bank where we filled

9  out information, and he would direct the bank to cut us

10 checks or maybe they wired it to us, but those are the two

11 different ways we got money from Jon Savoy's group.

12 Q   Did the defendants pay their $5,000 acquisition fee all

13 at once or in installments?

14 A   They had a different arrangement than our current

15 program.  They would pay 2,500 at the time we purchased it at

16 sheriff sale, and then they would pay the other 2,500 of the

17 5,000 when we acquired title.

18 Q   Why did you set up that separate arrangement with them?

19 A   I didn't have anyone else to sell the properties to at

20 the beginning, so I had to take what I could get and adjusted

21 it to make it work for them as I was trying to acquire other

22 investors and find other opportunities.

23 Q   Other than the 30-percent split and the $5,000 seller's

24 fee, was there any difference in defendant's program from the

25 rest of the Ralph Roberts Realty's investors?

1  A    With them being a -- at first it was just them looking at

2  stuff, so if they didn't buy it, I didn't get a chance to go

3  get the deal done, so at first they were the only ones

4  looking at it, so that pay -- how they paid the acquisition

5  fee, 30-percent split, and then they also negotiated that

6  since I was getting the 5,000 acquisition fee, Butch and Jon

7  would get 5,000 that they would share, which was different

8  than everybody else.  And then there was one other thing.

9  Jon owns Lee & Associates in Southfield, and he's got Kelly

10  Savoy that works for him.  And we agreed to give her $500 on

11  each closing, and we -- I agreed -- you know, it's one of the

12  things they wanted to do, and then I agreed to do that also

13  because it would cost me, you know, a third.

14  Q    Who's Kelly Savoy?

15  A    She works for Jon.  I believe it's his sister-in-law, who

16  works at Lee & Associates.

17  Q    Did defendants -- were they entitled to any interest?

18  A    On a property -- yeah.  They were entitled to -- we

19  negotiated that they would get their interest on the

20  properties that were flipped.  It would be part of the cost.

21  So Jon -- because Jon was putting the money up.  I believe

22  the interest ultimately went to Jon because Jon was the one

23  loaning the money to the LLC's, possibly Jon and his wife at

24  the beginning, and then later on I believe just Jon.

25  Q    What was the time period they got interest on?

1    A    Well, they'd get -- if it was a property going to be

2    flipped, they would get interest from the time they put the

3    money up until the property was flipped.  That would be one

4    of the expenses that would be approved to be -- for the

5    allocation of how you split the profits.  If it was property

6    they were going to -- was sold on land contract, they

7    wouldn't get the interest because the interest was being paid

8    to them by the land contract purchaser or if they were

9    renting the property, there wouldn't be an interest because

10   they're getting the rental income, which will create --

11   instead of the interest.

12   Q    Did you explain this to defendants?

13   A    Yeah.  Absolutely, yes.

14   Q    Were there any conditions on the $5,000 seller's fee as

15   to when defendants could get it and when they couldn't?

16   A    No.  When they sold the property, they were going to get

17   the $5,000 fee on every property.

18   Q    Was it an expense?  Did they actually spend 5,000 on each

19   property?

20   A    It's an -- it's more of an accounting question.  It for

21   sure was a cost to the property, you know, income to the two

22   of them.

23   Q    Do you know if defendants filed claims in your -- in

24   Realty's bankruptcy case?

25   A    I know that they did not file any claims in my

1  bankruptcy.

2  Q   Did they object to the fifth amended combined plan of

3  reorganization and disclosure statement?

4  A   They didn't object to my plan at all, no.

5  Q   Did they show up at confirmation?

6  A   They did not.

7  Q   Tell me about the properties that were redeemed before

8  defendants could perfect title.

9  A   I don't know if I could tell them from memory.  Is

10 there -- but --

11 Q   If I said the names Breckenridge, Palm Beach, and

12 Ursuline, would that help?

13 A   Yes.  Those properties we bought at sheriff sale.

14 Breckenridge was a condo lien, and it ultimately got

15 redeemed.  Ursuline also was a mortgage foreclosure that got

16 redeemed.  Palm Beach was a property that also got redeemed.

17 Those three were redeemed, and the acquisition fees were

18 credited back on those properties.

19 Q   Did defendants receive interest when they were -- when

20 the properties were redeemed?

21 A   They would get whatever their interest was on the note at

22 the time, so they would get -- when they got the sheriff sale

23 payoff, they would get their principal back plus any taxes

24 that they paid, insurance that they paid, and any interest

25 that was due on that, so they would get all their money back,

1    a hundred percent of what they paid, plus interest, and then

2    they would get -- we would credit them back the acquisition

3    fees.

4    Q    Turn to Exhibit 1 in the plaintiff's book.

5    A    There's two books.  There's one here and --

6    Q    The one with the red cover.

7    A    Red cover?  Okay.

8    Q    Yeah.  And that would be --

9            MS. MCCOLLUM:  Your Honor, that would be the one

10   that actually says Exhibit 1, Exhibit 2, Exhibit 3 and the

11   tabs.

12           THE WITNESS:  Okay.  I'm there.  I got it.  What tab

13   do you want me to go to?

14   BY MS. MCCOLLUM:

15   Q    Tab 1, please.

16   A    Okay.  Okay.

17   Q    What is this document?

18   A    This is a calculation worksheet for Eastland property.

19   Q    Did you prepare it?

20   A    I did not.

21   Q    Did defendants prepare it, if you know?

22   A    Yes, they did.

23   Q    Tell me about Eastland.

24   A    Eastland was a property that we bought at sheriff sale,

25   and John Selby, an agent who works for me, was able to go

1    there and did a cash for keys on this property, and the
2    people signed the property over to Nail Construction.  Later
3    on during some -- a short period of time, they -- either
4    their family was going to loan them money or they found a way
5    to come up with money on their own, and they wanted to undo
6    the situation.  And ultimately they retained an attorney and
7    filed a lawsuit to undo the transaction that was done.  I
8    believe that we gave them a lease option or a rental
9    agreement, some sort of home saver program that at the time
10   they agreed to.  Later on they didn't think they got a good
11   deal.  So ultimately what happened is this property was sold
12   back to the owners, and everybody was made whole.  And it
13   was -- the lawsuit was even settled in Macomb County Circuit
14   Court, so I don't know why there's a calculation worksheet
15   that shows a $14,000 loss and a fee going to Butch and Jon of
16   10, which makes up part of that 14, when there wasn't -- this
17   was a transaction that was undone, approved by all of us and
18   filed in Macomb County Circuit Court.
19   Q    Can you turn to Exhibit 15, and the second page, which is
20   labeled at the bottom 15-2?
21   A    Okay.
22   Q    The fourth paragraph down, does that --
23   A    Wait.  I'm sorry.  I got Exhibit 15, Number 2, written on
24   it, but --
25   Q    No.  The second page of Exhibit 15.  I'm sorry.

1  A   Oh, I got it.  Okay.  Sorry about that.

2  Q   Fourth paragraph down.  Does that talk about Eastland?

3  A   Yes, it does.

4  Q   Do you think defendants agreed to the settlement that you

5  just described?

6         MR. KWIATKOWSKI:  Objection.  Mr. Roberts doesn't

7  know what the defendants are thinking.

8         THE COURT:  That's overruled.  Go on.

9         THE WITNESS:  They did for sure because it was

10  settled in court, and they filed a settlement with the

11  Circuit Court in Macomb County.

12  BY MS. MCCOLLUM:

13  Q   Was the lawsuit dismissed?

14  A   Yes, it was.

15  Q   Are defendants owed anything on this property?

16  A   No, they are not.

17  Q   Was there any loss?

18  A   Absolutely not.

19  Q   Please turn to Plaintiff's Exhibit 2.

20  A   2.  Okay.

21  Q   And this is the same face page as Defendant's Exhibit I.

22  Tell me what this document is.

23  A   This is a calculation worksheet for Raymond, 31805

24  Raymond in Warren.

25  Q   Did Ralph Roberts Realty prepare this?

1   A   No, we did not.

2   Q   Tell me about the Raymond transaction.

3   A   Raymond was a condo that we bought at 14 and Hoover.

4   Title ultimately became perfected in Adam Residential

5   Property's name.  And upon viewing the property, Kelly had a

6   friend, I believe, that ultimately made an offer to buy it,

7   so see how Kelly gets a closing fee of 500?  That's on every

8   property.  But she also got a commission on this because she

9   was the one that found the buyer.  And since this was a flip,

10   like the interest and the insurance would be part of the

11   cost, and this closed, and Jon, Butch, and the group paid us

12   as agreed.

13   Q   Is this a typical -- what you would consider a typical

14   transaction for a flip?

15   A   How it was calculated is typical, but every price is

16   different in every different house, but this is typical for

17   Jon and Butch, but it's not typical for anyone else because

18   no one else got the fee.  No one else -- the $5,000 fee.  No

19   one else got a closing fee to one of their employees.  No one

20   else would get interest on the money that they invested.

21   Q   If you turn to Exhibit 2, is this -- what is this?  I'm

22   sorry.  Exhibit 2, second page.

23   A   That's the closing statement, revised closing statement

24   for this property.

25   Q   Is this the sort of document that the investor would

1   normally get at a closing where there'd be a split?

2   A   Yes.

3   Q   How would the split normally be calculated?  On this or

4   on the HUD or on some other document?

5   A   It's usually put on the closing statement.  This is a

6   cash deal, cash transaction.  There's no HUD.  But if it's a

7   mortgage deal, it's put on the HUD.  But you see the equity

8   disbursement was paid.  It's on here, the $5,700.

9   Q   Please turn to Plaintiff's Exhibit 3.

10  A   Okay.

11  Q   What is this document?

12  A   This is a calculation worksheet for 2630 Antonio --

13  Antonia in Warren, and this we actually -- from knocking on

14  the door, we ultimately sold this house to the owner, who

15  lost his brother, so the family could save the family house,

16  and this was the -- this was the -- this is the calculation

17  of how -- what the profit was on this transaction.

18  Q   There are more expense lines on this one than there were

19  on the Raymond.  Why is that?

20  A   You know, I didn't see this before this litigation.  I

21  don't know why.  If I would have seen it, I would have -- on

22  this particular one, I think everything is fine except for

23  accounting fees, license fees, office supplies.  I have no

24  idea why that would be put on a calculation worksheet for a

25  property.

1   Q   Have you ever -- has Realty ever paid office supplies for

2   any other investors?

3   A   No.

4   Q   Do you know if Antonia was rented, or was it a flip?

5   A   It was a flip.

6   Q   Please turn to Exhibit 4.  What is this document?

7   A   This is the calculation worksheet for 38944 Lowell Court

8   in Sterling Heights.

9   Q   Tell me about this, about the 38944 Lowell Court

10  transaction.

11  A   This party -- we tried working something out with the

12  lady in the home, and ultimately we didn't.  She ultimately

13  left the property.  We listed it for sale, and we flipped

14  this property.

15  Q   Do you know if anybody had to sue the homeowner or the

16  resident to evict?

17  A   No.

18  Q   You don't know, or they didn't have to sue?

19  A   It did not, did not happen, no.

20  Q   Do you know why there's legal fees on this calculation

21  worksheet?

22  A   I didn't see this before, but if I would have, I would

23  have objected to accounting fees, office supply, legal,

24  license.  I would have objected to those because they're

25  just -- they're not part of this transaction.

1  Q   But you were paid -- but you or Kathleen Roberts, your

2  wife, was paid the 11,102.38 that's reflected on here?

3  A   That's correct, yes.

4  Q   Was this a flip?

5  A   Yes, it was.

6  Q   Even though it was held for 285 days?

7  A   Yeah.  The person was -- I think this was a little

8  different.  I think we let her stay there for a little period

9  of time, and in exchange we got the property in good repair,

10 so it was 180 days for the redemption, and then there was a

11 little bit more time where she -- we worked with her.  I kind

12 of think it was like -- we gave her a few months, and then we

13 put it on the market, took time to sell it, took time to

14 close, so that's why there's 285 days of interest in.  Per

15 our agreement, they would be entitled to the interest on this

16 because it was a flip.

17 Q   What about the repairs and maintenance?

18 A   If they actually did the repairs and maintenance, they

19 would be entitled to it.  I do not -- and I do not know what

20 that's for.  I don't know what -- I was at this house.  I

21 don't know what repair it could have possibly needed.  It was

22 just in great condition.

23 Q   Did you dispute this at the time?

24 A   I never -- I didn't see this.  I just assumed when I was

25 told my number was 11 -- the number was 11,000 something that

1  that was correct and didn't -- I didn't say anything about

2  it.

3  Q   Was this early?  Did you get -- did Ralph Roberts Realty

4  get this split early in the investor program?

5  A   Yeah.  This came in -- these were -- Jon and Butch's

6  properties were the first ones.  I mean there was like -- it

7  was actually -- maybe Realty didn't even have a checking

8  account, everything was so new, so, yes, it was early on.

9  Q   Please turn to Exhibit 5.  Is the first page the same

10  profit calculation worksheet similar to the other ones?

11  A   Yes, it is.

12  Q   What property is this for?

13  A   50335 Foxcrest.

14  Q   Tell me about this property transaction.

15  A   This was a property bought at sheriff sale.  It was also

16  probate.  We paid the estate some money for cash for keys,

17  and then Butch rehabbed this property, and then this property

18  was sold.

19  Q   It says it was held for 175 days.  That's less than 180,

20  which is the redemption.  What can you tell me about that?

21  A   What happened is we got the estate to take money and sign

22  off early, so we got possession of it sooner, so we got the

23  property, say, within the first 60 days.  So we owned it

24  then -- or not we, the -- Jon and Butch's company owned it

25  then, so we were able to start the repairs on this one.  This

1  one needed work, and we got -- the work got done.  We got it
2  on the market, and we sold the property.
3  Q    Do you remember what cost 38,000 -- nearly $39,000?
4  A    I don't.
5  Q    Did you dispute this at the time?
6  A    I did not, no.
7  Q    Were you paid everything you were owed on this property?
8  A    If the 38,000 was the correct number and this made
9  10,000, then, yes, we -- Kathleen received the check for the
10  3,000-something, yes.
11  Q    Were you paid everything you were owed on Antonia and
12  Raymond as well?
13  A    Yes, I was.
14  Q    Assuming that these calculations are correct.
15  A    Yes.
16  Q    Okay.  Turn to Exhibit 6.  What is this document?
17  A    This is from Ralph Roberts Realty, open invoices that are
18  owed by Jon Savoy and Jon Savoy's group, and the -- this is
19  acquisition fees except for two numbers.  If you look at the
20  top number, cash for keys, Jimmy Court, Jon and Butch
21  approved for us to pay the lady a thousand dollars to get her
22  to sign off the house.  They told me to cover it, and they
23  would reimburse me.  I covered it, and to this day I've not
24  been reimbursed for that thousand.  And then if you go to the
25  second one on Adams Residential Property for Raymond, you'll

1    see I paid $906.80 for some tax that -- I was asked if I

2    could pay it, cover that, and they would -- I would get

3    reimbursed.  The other 15,000 on here is unpaid acquisition

4    fees or unpaid second half of acquisition fees.

5    Q    And the documents behind that, what are they?

6    A    That's all the back-up documents showing credits and

7    debits on the properties to show what brings it to these

8    totals.  That's the detail on each one of these accounts.

9    Q    Have defendants ever provided you a different accounting

10   of the acquisition fees owed?

11   A    They have not, no.

12   Q    Have they ever provided you any back-up for their

13   position that they don't owe you any acquisition fees?

14   A    They have not provided it to me.

15   Q    Turn to Exhibit 7.  I'm sorry.  Let me ask you a question

16   before that.

17   A    Okay.

18   Q    All the properties we discussed up until now were either

19   paid or redeemed, and you don't believe you're owed anything;

20   correct?

21   A    They were paid, redeemed, or settled because Eastland was

22   a little different.  And I mean I've been paid.  I agree that

23   I've been paid in full and those are all settled, yes.

24   Q    Other than the acquisition fees and the taxes?

25   A    That's correct.

1  Q   What happened between those properties and the next set

2  of properties where defendants sold them and didn't pay

3  anything?

4  A   You mean what I think happened or -- I mean I don't --

5  Q   From Realty's perspective, what happened?  What do you

6  know happened?

7  A   Nothing happened on Realty's side.  Something happened on

8  Jon and Butch's side.  Something happened with them.

9  Q   How did you find out that something happened?

10  A   Because Jon wanted to use a different broker, wouldn't

11  return calls, wanted to hire someone else, thought someone

12  else could do it better, and even though we had had a great

13  track record, he decided to try to do something -- do it

14  different, so as the investor and the owner of the

15  properties, you know, that was his -- that was his choice.

16  We undid listings.  He hired another broker.  He promised

17  that he would send the stuff in advance so we could go over

18  what the numbers were, told me I would be paid at closing

19  just like the other properties.  Then he -- then it went

20  complete dark, silence, no return phone calls, wouldn't talk

21  about it, and it -- you know, the communication between our

22  groups broke down to zero.

23  Q   Do you know what happened to cause that?

24  A   At some point they decided to open up a flea market out

25  on Groesbeck and Frazho, and they said they were going to use

1  money there, and then they were going to be able to buy a

2  couple a month from me if they could get this place going,

3  and it would create great cash flow.  Ultimately, it closed.

4  Jon went through a terrible divorce and had to ultimately pay

5  his wife a million dollars over five- or six- or seven-year

6  period of time, so those two things happening at the same

7  time caused them to want to use money for other things

8  instead of paying Ralph Roberts Realty.

9  Q    Turn to Exhibit 7.  Is this another one of the profit

10  calculation worksheets that defendants came up with?

11  A    Yes.  This is a calculation worksheet for 36403

12  Ledgestone.

13  Q    Had you ever seen this before this litigation started?

14  A    I have not, no.

15  Q    Tell me about this property.

16  A    This is the property that they -- when they took this

17  property -- got the possession of this property, they rented

18  this.  This was a rental property, so this went into their --

19  into rental for Jon and Butch, and that's what I know about

20  this particular property.

21  Q    Was this a flip?  No.  I'm sorry.  You just testified

22  this was rental.

23  A    It was a rental.

24  Q    Strike that.

25  A    Yeah.

1   Q   Strike that.  Tell me about this -- the expense items

2   here.

3   A   If I would have seen this in advance, there shouldn't be

4   insurance.  There shouldn't be interest.  There shouldn't be

5   legal.  There shouldn't be office supplies.  There shouldn't

6   be professional fees.  There shouldn't be repairs and

7   maintenance; shouldn't be service charges.  There shouldn't

8   be property tax.  There shouldn't be utilities.  There should

9   be title, should be Kelly, and there shouldn't be bad debt

10  either.  And there shouldn't be -- I don't know what the fee

11  was for Jon and Butch on this one.  You can't read it.

12  Q   If you take this other book, Defendant's Exhibit J --

13  A   Okay.

14  Q   -- is the same as this calculation worksheet, and I -- is

15  clearer.

16  A   Oh, okay.  So it's 10,000.  That should be -- that should

17  be 5,000, not 10,000.

18  Q   Where did they get ten from?

19  A   Well, I think in this litigation they said at some point

20  they decided to raise their fee from five to ten, so

21  that's -- they decided to do something outside of our

22  agreement.

23  Q   Did they ever ask you about that?

24  A   No.

25  Q   Did you ever agree to ten rather than five?

1  A   No.

2  Q   If you turn to Defendant's Exhibit P, 5 of 5.

3  A   I'm not sure what defendant or -- is there -- because

4  this says plaintiff, and --

5  Q   Yeah.  These are them.  This is P-1 --

6  A   Okay.

7  Q   -- 2, 3, 4 -- this one, 5.

8  A   Okay.

9  Q   And this isn't subnumbered or anything, so you're going

10  to have to bear with me as I flip through it.  The third page

11  in --

12  A   Okay.

13  Q   Have you ever paid any of your other investors for

14  preparing their own income tax returns --

15  A   No.

16  Q   -- as an expense on a transaction?

17  A   No.  It's not part of our program.

18  Q   If you go to the sub-tab that says "Insurance" -- was

19  this property rented?

20  A   Yes.  We're talking about Ledgestone; right?

21  Q   Yes, Ledgestone.

22  A   Yeah, yeah.  Ledgestone was a rental property, yes.

23  Q   That was acquired, according to this document, on 12-14,

24  2009.  I'm sorry.  Defendant's Exhibit J, our Exhibit 7, says

25  acquisition date, 12-14, 2009.  Do you have any reason to

1  argue that that was the acquisition date?

2  A   That's not correct because if you go to the next page, if

3  this is the sheriff deed, it was acquired on 12-11, 2009 --

4  Q   Okay.

5  A   -- not 12-14.

6  Q   If you go back to Defendant's Exhibit P, part 5, and you

7  go to the insurance sub-tab, if the property was acquired on

8  12-11, 2009, when would redemption run?

9  A   Six of 2010, June of 2010.

10 Q   Do you know when defendants rented this property?

11 A   Right around the time -- it was vacant, so they would

12 have rented it right away.

13 Q   After redemption expired?

14 A   Correct.

15 Q   Why are they charging you for interest significantly

16 after the redemption period?

17 A   I don't -- I have no idea.

18 Q   How would that normally be treated by your investor

19 program?

20 A   Because the rental property, all the expenses, insurance,

21 maintenance, taxes, insurance -- insurance, are paid by the

22 landlord, not by -- not by the property.

23 Q   Except for insurance during the redemption period?

24 A   Correct.  The insurance for the redemption period would

25 be a cost of the property; correct.

1  Q   Okay.  So if you turn to the insurance sub-tab -- I'm

2  sorry -- the interest sub-tab --

3  A   What page is that one?

4  Q   There's no page numbers.  I don't know.

5  A   No.  I know.

6  Q   It says 63400 interest.

7  A   And it's in this group?

8  Q   It's in this group, yeah.

9  A   Oh, it's got a tab.

10 Q   Yeah, it's got a handwritten tab.

11 A   Okay.  Oh, there it is.  Okay.  Got it.

12 Q   Is any of this --

13          THE COURT:  I'm sorry.  Where are you in this?  It's

14 page 5 of 5 of Exhibit -- 5 of 5 of Exhibit P, but where in

15 there are we?

16          MS. MCCOLLUM:  There's a sub-tab 63400 interest.  If

17 yours is tabbed on the side, it's a handwritten tab that says

18 "interest."

19          THE COURT:  Hold on.  Okay.  I believe I see the

20 page you're referring to.  Thank you.  Go ahead.

21 BY MS. MCCOLLUM:

22 Q   Is any of this interest payable to defendants under your

23 investor program?

24 A   Looks like they paid some Ryan person.  I don't know what

25 that means.

1    Q    If you turn to the next page, does that help you at all?

2    A    No.  I've never -- I've never heard that name before.

3    Q    If you turn to the tab that says "legal," do you know who

4    Marc D. Landau is?

5    A    I do.

6    Q    Who is he?

7    A    He's a landlord lawyer.  He does landlord-tenant stuff.

8    Q    So if you turn not to the --

9    A    But I can't find -- I don't -- I still have not found

10   that page.

11   Q    There's a sub-tab that says "legal."  There's a tab on

12   the side that says "legal."

13            THE COURT:  Is that before or after the interest

14   one?

15            MS. MCCOLLUM:  That is after the interest one.

16            THE WITNESS:  Office supplies, professional fees.

17            MS. MCCOLLUM:  There's one that specifically says

18   "legal."

19            MR. KWIATKOWSKI:  It's the next page after the

20   "interest."

21            MS. MCCOLLUM:  The next page after the "interest."

22            THE WITNESS:  Okay.

23            MS. MCCOLLUM:  Oh, it's not tabbed.  Okay.  Sorry,

24   it was not tabbed on the witness copy.  It says "Legal, Marc

25   Landau."

1  BY MS. MCCOLLUM:

2  Q   If you turn to not the page --

3         THE COURT:  Hold on.  All right.  I believe I see

4  the page you're referring to.  Thank you.

5  BY MS. MCCOLLUM:

6  Q   Not the page after that but the page after that --

7  A   Okay.

8  Q   -- what's this document?

9  A   It looks -- oh, this is not -- I'm sorry.  This is a bill

10  from Marc Landau for filing a complaint against Michelle

11  Welker, and total charge is $316.

12  Q   Do you know if she was the tenant in this property?

13  A   I do not know that, but I'm assuming so from what this

14  says, but I don't have firsthand knowledge of that.

15  Q   If an investor had to evict a tenant, would that investor

16  normally be able to charge against the profit split for

17  that -- the legal fees that that cost?

18  A   No.

19  Q   There's a separate tab here if you go about three tabs

20  further for professional fees.

21  A   Professional -- professional fees.

22  Q   It's a couple of tabs further.

23  A   Has it got a tab?

24  Q   Yeah, it does have a tab.

25  A   Okay.  Professional fees.

1   Q   Who's Swad & Company?

2   A   I do not know.

3   Q   If you flip two pages down or two pages further, what

4   does that document say Swad & Company did for the defendants?

5   A   There's different invoices here.  It looks like there's

6   two.  They did month financial -- I mean March's accounting,

7   1099's, 1096's, annual report, sales tax reports, and then

8   the next one is for $1,267.50.  It was for services from

9   February of 2011, partnership income and Michigan business

10   tax returns for the LLC.

11   Q   Has Realty ever paid these kinds of fees for any of its

12   other investors?

13   A   No.

14   Q   Did you ever agree -- did Realty ever agree to pay those

15   fees for defendants?

16   A   No.

17   Q   Do you know why they're including them in these -- in

18   this list of expenses?

19   A   Trying to manipulate the numbers to show losses.

20   Q   Can you turn -- one more tab down is the repairs and

21   maintenance tab.

22   A   Okay.

23   Q   If redemption expired in June of 2010, wasn't the

24   property rented after that?

25   A   Yes.

1  Q    Are any of these expenses -- these repairs and

2  maintenance expenses, are any of those, I guess, compensable

3  as an expense under your program?

4  A    No, because if it was a flip, they would have been, but

5  not as a rent -- not a rental property.

6  Q    So defendants are renting it and paying somebody to

7  maintain the lawn.  Realty -- does Realty pay for that?

8  A    No.

9  Q    Has Realty ever paid for any of that?

10  A    Not on a rental, no.

11  Q    Would it pay if defendants needed to mow the lawn on a

12  property they were going to flip?

13  A    Yes.

14  Q    I think about 25 pages later, if I've counted

15  correctly --

16  A    Twenty-five pages later?

17  Q    Yeah.  There's no -- I'm sorry.  There's no subnumbers.

18  It's an invoice from Hassig & Sons to Ryan, LLC, for $839 of

19  labor.

20  A    Oh, I'm sorry.

21        THE COURT:  Do you really want me to count 25 pages,

22  or do you have a better way?

23        MS. MCCOLLUM:  No.  I will just ask.

24        THE COURT:  Do you have a better way for me to find

25  this thing?

1          MS. MCCOLLUM:  Hang on.  Let me see if it's better.

2          THE WITNESS:  Okay.  I found it.

3          MS. MCCOLLUM:  It's six pages from the next tab, so

4     if you go to the next tab and you count six pages back --

5     BY MS. MCCOLLUM:

6     Q   Did you find it?

7     A   Yes, I did.

8          THE COURT:  All right.  Hold on.  The next tab being

9     what?

10         MS. MCCOLLUM:  The next tab is --

11         THE COURT:  Service charges?

12         MS. MCCOLLUM:  Yes.

13         THE COURT:  And it's six after that, you say?

14         MS. MCCOLLUM:  Six back.

15         THE WITNESS:  Six before that.

16         THE COURT:  Before that.

17         MS. MCCOLLUM:  Yes, six before that.

18    BY MS. MCCOLLUM:

19    Q   Who is this invoice from?

20    A   It's from Butch Hassig's to -- yeah.  It's from Butch

21    Hassig's company.

22    Q   Does this say -- is this the kind of document that you

23    would ask an investor to provide to you if they wanted to be

24    reimbursed for something?

25         THE COURT:  I'm sorry.  Describe the page.  I'm not

1  finding it.

2          MS. MCCOLLUM:  It is a invoice from Hassig & Sons to

3  Ryan, LLC, for the amount of $839.  It looks like this.

4          THE COURT:  Okay.  I see it.  Thank you.

5          MS. MCCOLLUM:  You're welcome.  Thank you for your

6  patience.

7  BY MS. MCCOLLUM:

8  Q    Is this the -- I'm going to ask the question again.  Is

9  this the kind of documentation you require from an investor

10 when they want to be reimbursed for something, or do you need

11 more than this?

12 A    No.  We wouldn't -- this wouldn't be reimbursable.  This

13 would not because if this -- you read it's correction for

14 violations.  It's for a license to rent the property in the

15 City of Clinton Township, so this is not something that would

16 be part of the figuring out for cost.

17 Q    Why is that?

18 A    Because this property was rented.  This is a rental

19 expense, and I don't share in the rental income, so I don't

20 share in the cost of the rental property.

21 Q    Turning back to Plaintiff's Exhibit 7, which is

22 Defendant's Exhibit J, does this property -- even with all

23 these expenses that you say are not compensable, does it show

24 that there's a profit?

25 A    If you reduce the fee for Jon and Butch, this would show

1    approximately to what we've agreed to.  We agreed to 5,000.

2    It would have a thousand dollar profit.  And if you took off

3    the expenses that should not be allowed, the profit on this

4    would be 23,000, and Realty would be entitled to 30 percent

5    of the 23,000.

6    Q    Do you know how much this property was rented for?

7    A    I don't think they ever provided the lease to us on this

8    one.

9    Q    Okay.  Turn to Plaintiff's Exhibit 8 --

10   A    Plaintiff.

11   Q    -- our Exhibit 8.

12   A    Yep.

13   Q    Is this the same profit calculation worksheet that we've

14   been -- similar to what we've been talking about?

15   A    It is.

16   Q    What property is this for?

17   A    32404 Firwood in Warren.

18   Q    Tell me about this property.

19   A    This property -- a foreclosure.  This one was a year

20   redemption, and this property -- once the party took

21   possession and eviction was done, this property was flipped.

22   Q    So because it was a flip, are these expenses permissible?

23   A    Well, most of them are, but legal would not be, license

24   would not be, professionals would not be.  Repair and

25   maintenance is very high for a thousand -- you know, this

1    size house, so that --

2    Q    Let me interrupt.  How big is the house?

3    A    Approximately a thousand or 1,100 square feet.

4    Q    So if you took off the expenses that you think are not

5    compensable, what's the profit?

6    A    $12,000 would be the profit.

7    Q    Not the 56 that they're showing here?

8    A    No.  They're actually showing --

9    Q    They're showing -- the bottom line is they're showing

10   8,000, but if you go up two lines, there's a number in a box.

11   A    Okay.  I'm going off the profit they show as a loss, the

12   8,000.

13   Q    Okay.

14   A    You take -- say this cost that shouldn't be on there plus

15   a high repair and maintenance, probably about -- and 5,000

16   off the $10,000 fee that they've increased, it would put this

17   at about a $12,000 profit.

18   Q    It shows here that they -- that defendants owned this

19   property for 712 days.  Is that what this shows?

20   A    It does, yep.

21   Q    But it wasn't rented?

22   A    I don't believe -- I don't believe so, no.

23   Q    Vacant for almost two years?

24   A    Well, it was a one-year redemption.

25   Q    Oh, oh, oh.

1  A   And it was a one-year redemption, and then it was

2  rehabbed, and then this is when we -- Jon decided to -- as a

3  real estate broker, to fire us and go with somebody else, so

4  that was -- other stuff was going on in the background, but

5  that is how long it took.

6  Q   What is your opinion of the price that it was sold for?

7  A   Really low now because, you know, it's probably a

8  $120,000 house today, but I don't really know.  I thought it

9  was worth more than the 84,9, but the seller gets to sell it

10  for what they want.

11  Q   I'm sorry.  What do you -- what did you say you thought

12  that the profit should have been?

13  A   12,000.

14  Q   So you would be owed how much of that 12 --

15  A   Thirty percent of 12,000.

16  Q   Okay.  So about $3,000, $4,000?

17  A   Yep, yes, 4,000.

18  Q   Do you think that this property was profitable?

19  A   Yes, I do.

20  Q   Even with all these numbers?

21  A   Yes.

22  Q   Okay.  There's an Exhibit 8.  Pages roughly 10 to 15 are

23  other properties.  What are these properties?

24  A   These are properties that we were -- we did these in

25  October of last year just showing you the value of properties

1  in that neighborhood, and then 8 of 15 is I had -- I listed

2  it for 99,9, and then Jon asked us to not have it listed so

3  he could go with somebody else.  That's a copy of the listing

4  when I listed it for 99,9.

5  Q   Did defendants -- how did they communicate that they

6  fired you on this property, if you remember?

7  A   Phone calls to the agent and then also e-mails.

8  Q   And they sold it for $15,000 less than you listed it for?

9  A   Correct.

10 Q   Do you know why?

11 A   I don't.

12 Q   If they had asked you, would you have told them to sell

13 or to hold?

14 A   I would have not sold it for 84,9.  I would have -- you

15 know, maybe 94,9, but -- and then looking at the numbers, if

16 the numbers were correct, which I don't believe they were, I

17 would have probably rented this for another 24 months so we

18 could recover.  We'd be where we're at now, and we'd have

19 $130,000 property that we could share on the upside.

20 Q   Turn to Exhibit 9.  What property does this discuss?

21 A   This is Trailwood.

22 Q   Tell me about this property.

23 A   This is a house that I bought at sheriff sale, and I'm

24 just checking.  I believe -- I ultimately did a lease for Jon

25 and Butch that's included in here, page 9, for $1,200 a month

1　back from the people who had lost it at foreclosure sale.  We

2　did a lease with them for 1,200 a month.

3　Q　Page 11 of Exhibit 9?

4　A　Correct.

5　Q　Okay.  This was a rental?

6　A　This was -- yes.  This was a rental, yes.

7　Q　Walk me through the expenses then and what would be

8　permissible and what wouldn't.

9　A　Obviously the acquisition fee would be permitted because

10　that was paid.  That was the first part.  Association dues

11　would not be.  The commission at 17,000 is way too much.  I

12　mean it's six percent.  The commission should be 10,000, not

13　17,000.

14　Q　Do you know why it's listed at 17?

15　A　I don't.  Insurance would not be because it was a rental

16　property.  Professional fees is nothing to do with the

17　property.  Repair and maintenance would not be because it was

18　a rental property.  Property taxes would not be part of the

19　calculation because it's a rental property.  Utilities and --

20　would be the same.  Recording fees and title fees would be

21　part of the cost for the closing, and Kelly's fee would be

22　permitted.  And then also down at the bottom you wouldn't

23　have Butch and Jon's fee of 10,000.  It should be five is

24　what we agreed on, and there should not be an interest

25　calculation on this property.

1  Q   So with all of that, what do you think the profit on this
2  property was -- or should have been?
3  A   The profit should have been like 81,000, and we would be
4  entitled to 30 percent of that.
5  Q   Okay.  And, again, you never agreed to this $10,000 fee.
6  A   Absolutely not, no.
7  Q   Please turn to Exhibit 10.
8  A   Okay.  Ten.  All right.
9  Q   Tell me about this property.
10  A   This is a calculation worksheet for 7376 Engleman in
11  Center Line.  It's a five-bedroom, basement, garage house in
12  Center Line, Michigan.
13  Q   Brick?
14  A   Frame.
15  Q   Okay.  What happened?
16  A   I have no detail on what happened.
17  Q   If you go to Exhibit P, Defendant's Exhibit P, 2 of 5 is
18  the back-up detail, but --
19  A   In this stuff here?
20  Q   Yeah.  Part 2 of 5 is the back-up detail.
21  A   What letter is that again?
22  Q   I'm sorry.  P, part 2 of 5.
23  A   P.  This is 4 of 5.
24  Q   So going back to Plaintiff's Exhibit 10, which is the
25  same as Defendant's Exhibit E, this property was purchased

1  for how much?

2  A   Was purchased by when we bought it?

3  Q   Yeah, yes.

4  A   Purchased in the name of Jon Savoy on 9 -- October 9 of

5  2009 for $17,627.

6  Q   So the face page, the first page of Exhibit 10, the date

7  is wrong.  You just testified that the sheriff's deed said it

8  was the 9th day of October, and the first page says that the

9  acquisition date was September 18th.  Is that correct?

10  A   Yep.  They made up numbers, and they made up dates, yep.

11  Q   So the calculation of the interest would be wrong?

12  A   Yep, it would be.

13  Q   So how much did they spend repairing a property that they

14  bought for $17,000?

15  A   It says that they spent 18,000, over 18,000.

16  Q   How much do investors typically spend in terms of a

17  percentage to rehab houses?

18  A   Twenty to thirty percent, but a house, buying it at 17,

19  you could probably spend -- because that's a really low

20  purchase price -- probably 8,000, half of it.  You could

21  probably spend 50 percent of what you paid for it.

22  Q   Would you ever spend more than the purchase price

23  rehabbing it?

24  A   I wouldn't, no.

25  Q   For this particular house, do you think that 18,000 is a

1  reasonable amount to spend to rehab it?

2  A   I think it's extremely high, and I also think that you

3  would not rehab a property and then sell it for a loss.  The

4  two don't make sense, you know.  You'd rehab it and make a

5  profit or you'd rehab it and rent it, but you wouldn't rehab

6  it and sell it if you were going to lose $40,000.

7  Q   Was it rented?  Do you know if defendants rented this?

8  A   It was a rental property, yes.

9  Q   If you turn to Exhibit P, part 2 of 5, the tab that says

10 "Repairs and Maintenance" --

11 A   Repairs and maintenance.  Inspection fees, taxes, service

12 fees.

13 Q   It's after office supplies and professional fees.  It's

14 the next tab.  Be careful on the binder clips.  I cut myself

15 this morning.

16 A   Thank you.  I'm having trouble.  Sorry.

17 Q   Well, because your exhibit isn't tabbed at all.  Oh, here

18 it is.  That's helpful.

19 A   Wow.

20 Q   If the property was bought in October of 2009, when did

21 redemption expire?

22 A   October, November -- April.  It would be April of 2010.

23 Q   Do you know if this property was rented?

24 A   It was a rental property, yes.

25 Q   Do you know how much the monthly rent was?

1  A   I don't.

2  Q   Do you know when it was rented, approximately?

3  A   I do not know that.

4  Q   If you look back at Exhibit P, part 2 of 5, if redemption

5  expired in April of 2010 and it was a rental, what of these

6  expenses would be chargeable against the split?

7  A   Well, the acquisition fee, the commission.  Insurance

8  would not be.  Inspection would not be.  Licensing would not

9  be.  Professional fees would not be.  Repair and maintenance

10 would not be.  Property taxes would not be.  Utilities would

11 not be.  Title fees and Kelly would be, and Butch and Jon's

12 fee should be 5,000.

13 Q   Interest?

14 A   Interest would not be.

15 Q   So if you take all that off, is this house profitable?

16 A   Yep.  It's about at least 30 -- I'm doing it in my head,

17 but 35,000 in overcharges, so the property would be

18 profitable for a tune of about $9,000.

19 Q   So not a huge profit?

20 A   Not a huge profit but a profit.

21 Q   Did defendants lose their principal on this house?

22 A   No, they did not.

23 Q   Do you know if they had to evict a tenant or had any

24 unusual expenses, or were you fired before?

25 A   Well, I'm looking at this transaction detail that they

1    provided to us yesterday.  The person they evicted out of a
2    property we talked about already is the person that -- same
3    name as the one that painted this property, Michelle Welker,
4    also was a tenant on Edgewood -- Edgestone.
5    Q    Why would you pay somebody on one property that you
6    evicted on another?
7    A    I don't know.
8    Q    Turn to Exhibit -- Plaintiff's Exhibit 11, please --
9    A    Okay.
10   Q    -- and Defendant's Exhibit A.
11   A    Defendant's Exhibit A.  Okay.
12   Q    Before yesterday, had you ever seen this document before?
13   A    I have not.
14          THE COURT:  Which one?  A or 11?
15          MS. MCCOLLUM:  Defendant's Exhibit A.
16          THE COURT:  All right.  Sorry.  Go ahead.
17          THE WITNESS:  I have not seen it before, no.
18   BY MS. MCCOLLUM:
19   Q    Tell me about 33221 Duncan.
20   A    It's in Fraser.  We bought it, became the owner of it.
21   We put this one on the market shortly after and sold it right
22   away on a land contract.  The guy was a contractor in
23   landscaping and stuff, and he bought it on a land contract,
24   put a large down-payment down, agreed to make large payments.
25   I believe the price was -- my memory says like 84,000.

1  Q    Turn to Exhibit 11, page 12.

2  A    Page 11, 12.  Okay.  I'm there.

3  Q    Is that the land contract for 33221 Duncan?

4  A    Yes.  We sold it for 84,9.  We got $25,000 down.  The

5  balance of the land contract was 59,900, and the buyer agreed

6  to pay seven-percent interest.

7  Q    And by "we" you're talking about defendants?

8  A    Yeah.  Defendants.  I listed this property and handled

9  this transaction.

10 Q    So this was before the break-up?

11 A    Yes.

12 Q    Turning back to Defendant's Exhibit A, tell me about this

13 exhibit.

14 A    Basically it's a calculation worksheet for 33221 Duncan

15 in Fraser.  It tells us what the land contract balance is.

16 It says as of today's date.  We got this -- that might be a

17 December date or -- but we got this yesterday.  It shows

18 different costs, and I would think the first stuff, the

19 Realty commission is fine, Jon and Butch fee of 5,000.

20 That's what we agreed to.  Commission is fine.  Insurance.

21 We flipped it.  That's fine.  This interest -- if this

22 interest -- I don't know.  There's two interests here, but

23 there shouldn't be 273 days of interest because we sold the

24 property, and we get the interest from the land contract

25 purchaser.  Legal should come out, 7,000.  We had no legal on

1  this property. $7,400. There was no legal.

2  Q   Have you ever seen any back-up for that?

3  A   No. It's not part of a property. Legal for a company or

4  other stuff that Jon and Butch have is not part of the

5  property transactions. Licensing fees would come out. Meals

6  and entertainment would come out. Office supplies.

7  Professional fees would come out. Repair and maintenance, if

8  they did something to the property, that would be fine.

9  Service charges would come out. Taxes would be fine because

10  it was a flip. Title would be fine. Kelly's fee, utilities.

11  Website. Why is there a charge for website? I mean these

12  numbers were manipulated to show they owe Realty zero, which

13  is not true. This property owes Realty -- I think this made

14  60,000, so we would be entitled to 30 percent of 60, which is

15  $18,000.

16  Q   Up at the top it's showing a land contract of today's

17  date of 21,097. Correct?

18  A   Correct.

19  Q   Is that correct, or should it be a different number?

20  A   I don't know. I'd have to see the amortization schedule,

21  but if that is correct, this should be just transferred to us

22  because the -- you know, we're entitled to 30 percent of the

23  upside, and if that 30 percent is left, either cash should

24  come to us for the 18,000 or this land contract which would

25  have close to an 18,000 balance, should come to us.

1  Q   Why is this showing the land contract balance rather than
2  the total sale price of 84,9?  Do you know?
3  A   I have no idea.
4  Q   If you showed the total sale price, then you would come
5  up with your $18,000 number about?
6  A   Eighteen to twenty, yes.
7  Q   Now, you did say that this was a flip, but if you look at
8  Exhibit 11, page 14 --
9  A   Okay.
10       THE COURT:  I'm sorry.  What again?
11       MS. MCCOLLUM:  Plaintiff's Exhibit 11, page 14.
12       THE COURT:  Thank you.
13  BY MS. MCCOLLUM:
14  Q   What does additional clause M and additional clause N say
15  with respect to taxes and insurance?
16  A   The purchaser is paying all taxes.  Purchaser is paying
17  all insurance.
18  Q   So that stuff, even though this is a flip, should that
19  come off of this calculation, or do they still get to charge
20  off some of the interest and taxes -- sorry -- insurance and
21  taxes?
22  A   I would say interest and taxes would come off.
23  Q   Is Duncan one of the properties you consider that has not
24  yet been sold?
25  A   It's been sold, but it hasn't been -- they haven't paid

1    the 30 percent owed to Ralph Roberts Realty, and the

2    agreement was they wouldn't pay it until the contract paid

3    off if it was 30 percent, or if the contract got to what was

4    owed to us, it would be assigned, and we would take the rest

5    of the payments, or it could be paid in cash.

6    Q    Do you know if this property was sold as is to the

7    purchaser?

8    A    We sell everything as is.

9    Q    Turn to Plaintiff's Exhibit 12, please.

10   A    Okay.

11   Q    And also turn to Defendant's Exhibit D.

12   A    D.

13         THE COURT:  Ms. McCollum, I think at this time I'd

14   like to take a mid-morning break.  It's 11 o'clock or almost

15   11, so we'll take ten minutes, and then I'll come back out.

16         THE CLERK:  All rise.  Court is in recess.

17       (Recess at 10:57 a.m., until 11:12 a.m.)

18         THE CLERK:  All rise.  Court is back in session.

19   You may be seated.

20         THE COURT:  All right.  Thank you.  Go ahead,

21   Ms. McCollum.

22   BY MS. MCCOLLUM:

23   Q    Please turn to Plaintiff's Exhibit 12 and Defendant's

24   Exhibit D.

25   A    Okay.

1  Q   What's Exhibit D?

2  A   Exhibit D is a calculation worksheet for 5054 South Jimmy

3  Court in Chesterfield.

4  Q   Tell me about this property.

5  A   It's a property we bought at sheriff sale.  After it

6  being not redeemed -- we actually did cash for keys on this

7  one for a thousand dollars.  We sold this property on a land

8  contract to a Ms. Kim Sikorski.

9  Q   If you turn to Exhibit 12, page 17 --

10  A   Oh, wow.  I misspoke.

11  Q   Is she the person that rented it first before purchasing

12  it?

13  A   Yep.  She rented it for a year and then bought it on land

14  contract.  I forgot about that part.

15  Q   Turning back to Exhibit D, have you ever seen this profit

16  calculation worksheet before, before yesterday?

17  A   No.

18  Q   Tell me about the expenses on this profit calculation

19  worksheet in terms of the alleged profit or no profit.

20  A   Well, the Realty would be fine.  Jon and Butch fee of

21  5,000 is fine.  There would not be association dues, would

22  not be insurance.  There would not be interest, would not be

23  late fees.  There would -- 7,000 in legal fees.  There was no

24  legal fees on this property.  Would not be licensing fees.

25  Would not be meals and entertainment.  Would not be office

1    supplies.  Would not be professional fees.  Would not be

2    repairs and maintenance.  Would not be service charges.

3    There would not be property taxes.  There would be title and

4    recording for the closing.  There would be Kelly's fee.

5    There would not be utilities, and there would not be a

6    website.

7    Q    Is that because it was a rental or because it was a land

8    contract or both?

9    A    Because it was a rental property.

10   Q    So am I correct in saying that the total expenses are

11   more like $11,000?

12   A    Correct.

13   Q    If that's the case, what's the profit on this property?

14   A    The profit would be like 25,000.

15   Q    And you'd be entitled to a third?

16   A    Correct.

17   Q    If you look at the number of days on Exhibit --

18             THE COURT:  Is it a third or 30 percent?

19             THE WITNESS:  I'm sorry.  I answered "yes" to a

20   third, but 30 percent is what it is.

21             THE COURT:  All right.  Thank you.

22   BY MS. MCCOLLUM:

23   Q    So 30 percent of -- I'm sorry -- 23,000?  Is that what?

24   A    Twenty-five.

25   Q    Twenty-five.  If you look at the number of days on here

1 that's being used for the interest calculation, do you know

2 where that number comes from?

3 A    I don't.

4 Q    If you turn to Exhibit 12, page 11, what does it say with

5 respect to the purchaser under the land contract, duties to

6 pay taxes and insurance?

7 A    Under 11?

8 Q    Yeah.  Exhibit 12, page 11.

9 A    The taxes would be paid by the land contract purchaser,

10 and the insurance would be paid by the land contract

11 purchaser, and also the maintenance fee would be paid by the

12 land contract purchaser since the land contract you're the

13 owner.  You're the one living there.

14 Q    Kind of like if you're buying a house on a mortgage.  You

15 own the property --

16 A    That's correct.

17 Q    -- subject to the mortgage.  Please turn to Plaintiff's

18 Exhibit 13 and Defendant's Exhibit G.  What property do these

19 two exhibits relate to?

20 A    This is for the property on Irene in Warren.

21 Q    Is the acquisition date listed on Exhibit G correct?

22 A    No.  It's not even close.  It's a made up -- the

23 acquisition date is just made up.  They bought it in --

24 November 13th of 2009.

25 Q    At a sheriff sale?

1  A    At a sheriff sale.

2  Q    Walk me through Exhibit G in terms of the expenses.  I'm

3  sorry.  Before that, is Irene being rented currently?

4  A    As far as I know, it's rented.  We originally rented it

5  to the homeowner who lost it in foreclosure.

6  Q    If you turn to Exhibit 13, page 15, is that a copy of the

7  lease or a lease with respect to this property?

8  A    This is -- yeah.  That's the -- Dave and Karina, that's

9  the tenant.  This is January.  We actually bought it in

10  November, got them to sign off, and they started paying rent

11  in January of 2010 like 60 days after the foreclosure sale.

12  Q    If you turn to Exhibit 13, page 19, who's the agent for

13  defendants on this lease?

14  A    Ralph Roberts.  I was the agent for Adams Residential

15  Property.

16  Q    Did you prepare this lease?

17  A    I did, yes.

18  Q    Now, turning back to Defendant's Exhibit G, given that

19  this is a rental, walk me through the permissible and

20  nonpermissible expenses on this sheet.

21  A    Well, you would take the insurance out.  You'd take

22  interest out.  You'd take legal out; licensing fees; take out

23  office supplies; take out postage and delivery; professional

24  fees of 3,500; 15,649.14 in taxes; repairs and maintenance,

25  10,504.90; service charges of $3.33.  Like seller's

1  concession, I mean that's just so made up, 3,540.

2  Q   Because the property hasn't been sold yet?

3  A   That's correct.  Title and recording you would have.  I

4  mean this is like an estimate that they're trying to

5  calculate, but you would have title.  You would have Kelly's

6  fee.  You would not have utilities.  You would not have a

7  website, so this -- this would be -- and 118, it's worth more

8  than that right now.  I would say it's worth like 128.  So

9  that would be 10 plus 52 in made-up costs taken off there,

10 62 -- that would put the profit on this property at about

11 $81,000, and we would be entitled to 30 percent of 81,000.

12 Q   Have you ever received back-up documentation for any of

13 these expenses listed here on Irene?

14 A   I have not.

15 Q   Did you ever -- and I apologize for not asking you

16 before.  Did you ever receive back-up documentation for

17 Defendant's Exhibit A for Duncan in Fraser?

18 A   Absolutely not, no.

19 Q   Did you ever receive back-up documentation for

20 Defendant's Exhibit D, Jimmy Court?

21 A   No.

22 Q   Is Irene currently being rented?

23 A   As far as I know, it's still rented to the same people

24 from the original lease I did.

25 Q   Please turn to Exhibit 14.

1      THE COURT:  Excuse me if I may interrupt.  The Irene
2  property has not yet been sold; is that correct?
3           THE WITNESS:  That's correct.
4           THE COURT:  Okay.  I thought that was the case, but
5  I want to be sure.  Thank you.  Go ahead.  I'm sorry.
6  BY MS. MCCOLLUM:
7  Q   Actually, go back to Exhibit 13 -- I apologize -- and
8  Defendant's Exhibit G.
9  A   13.  Okay.
10 Q   I'm sorry.  Defendant's Exhibit G is where I want to be.
11 A   Okay.
12 Q   What does it say by number of days?
13 A   That they believe we should calculate interest for 1,365
14 days into their cost.
15 Q   Why?
16 A   So they don't have to pay me anything, I guess.
17 Q   And now turn to Plaintiff's Exhibit 14 and Defendant's
18 Exhibit B.
19 A   B?
20 Q   Yes, B like boy.
21 A   Okay.  14.  Okay.  I'm there.
22 Q   What property is this for?
23 A   This is for Teppert in Eastpointe, 23795 Teppert.
24 Q   Is the acquisition date listed on Defendant's Exhibit B
25 correct?

1  A    No.  The acquisition date was actually September 18th of

2  2009, not March 19th of 2010.

3  Q    Do you know why there's that discrepancy?

4  A    I don't know.  They're making up numbers, so they made up

5  dates, I guess, too.

6  Q    Is Teppert -- has Teppert been sold by the defendants?

7  A    Not that I know of because we rented this one to the

8  person who lost it at sheriff sale.

9  Q    If you turn to Exhibit 14, page 13 --

10  A    Okay.  Okay.

11  Q    Is that the lease with the person that lost it at sheriff

12  sale?

13  A    It is.  This is the lease that I did for Jon Savoy's LLC.

14  Q    So this is currently being rented and still owned by

15  defendants?

16  A    That's correct.

17  Q    So walk me through Defendant's Exhibit B in terms of the

18  permissible expenses and the nonpermissible expenses.

19  A    The calculation worksheet -- it's an estimate because

20  this house has not been sold yet, but Butch and Jon's fee

21  would be fine.  Our fee would be fine.  Commission would be

22  fine.  There would not be insurance.  There would not be

23  taxes.  There would not be 7,000 in legal, would not be

24  licensing fees, would not be meals and entertainment, would

25  not be office supplies, would not be professional fees, would

1  not be repairs and maintenance, would not be service charges.

2  There would be no taxes.  Kelly's fee would be fine because

3  that's what we agreed to.  Transfer and title would be about

4  $900 on this property, not 1,800.  There would be no

5  utilities, and there'd be no website, and there would --

6  yeah.  That would --

7  Q   So what does that mean in terms of the profit on this

8  property if it were to be sold today?

9  A   That the profit would be about -- if it was sold today,

10  we would -- or I was getting paid off today, it would be like

11  22,000, and we'd be entitled to 30 percent of 22,000.

12  Q   Do you think that defendants' estimate of the value of

13  this property is right at 45,000?

14  A   I would think that's pretty accurate for this property,

15  yes.

16  Q   Would you advise defendants to continue to hold onto it

17  and rent it or to sell it?

18  A   Advise them to pay me my 30 percent and let me move on.

19        MS. MCCOLLUM:  I have no further questions for Mr.

20  Roberts on direct.

21        THE COURT:  All right.  Mr. Kwiatkowski.

22        MR. KWIATKOWSKI:  Thank you.

23                   CROSS-EXAMINATION

24  BY MR. KWIATKOWSKI:

25  Q   Good morning, Mr. Roberts.

1  A    Good morning.

2  Q    You testified that the investor program started in 2009;

3  is that correct?

4  A    May 19th of 2009 is when I came up with it, and I started

5  the program in -- June 1st of 2009.

6  Q    When was your first meeting with the defendants?

7  A    I don't know the date.

8  Q    Approximately?

9  A    I don't know the date.  In 2009, though.

10  Q    All right.  What were the terms of the deal specifically

11  with the defendants?

12  A    On flip properties, we would take the cost.  We would get

13  a $5,000 acquisition fee.  Jon and Butch would get a $5,000

14  fee.  When we first bought the property, we'd get 2,500.

15  When we perfected title, we'd get 2,500 of our acquisition

16  fee.  Then when we sold the property, we would get 30 --

17  Ralph Roberts Realty would get 30 percent, and Butch and Jon

18  would get 70 percent.

19  Q    How is the 30 percent calculated?

20  A    When earlier I -- I went to Butch, and it turned out

21  Butch didn't have any money, so he went to Jon because Jon

22  had money.  And then ultimately we met, and they wanted to go

23  three ways.  So originally I thought it was a third, a third,

24  a third.

25  Q    I'm sorry.  I was -- I guess you didn't understand my

1   question.  I was asking how is the 30 percent calculated, the

2   profit split?  Does that make it easier?

3   A   Okay.  It could.  And we're talking about on the flip --

4   I mean there's -- on the flip -- there's different -- I

5   have --

6   Q   Well, in 2009, was there only one program?

7   A   It's the same program.  There's flips.  Then there's

8   rentals.  It's the same.  It's the same program.

9   Q   Is that how it was explained to the defendants in this

10   case?

11   A   Yes, yes.

12   Q   And that's how it's been explained to every single

13   investor, that there's only one program?

14   A   No.  There's one program.  There's an investor program.

15   Everybody pays a $5,000 acquisition fee, and everyone --

16   Q   But I'm not -- I'm sorry to interrupt you, but I'm not

17   asking about the acquisition fee at this time.  I asked you a

18   specific question.  Is there only one program?

19   A   There is one program that has different pieces to it,

20   yes.

21   Q   In 2009, did it have different pieces?

22   A   Yes.

23   Q   So in 2009 when the program was explained to the

24   defendants, you explained that there was a flip and a rental

25   deal.

1  A   Yes; correct.

2  Q   So isn't, in essence, that two programs?

3  A   Well it all starts from the same place, and then they can

4  decide if they're going to rent it or they're going to flip

5  it.

6  Q   So when we go back to where we started, the defendant's

7  30-percent profit split that's payable to the plaintiff here,

8  how do you calculate the profit split?

9  A   On a rental property or on a straight flip?

10 Q   Start with a rental.

11 A   So on a rental, Ralph Roberts Realty agreed to not keep

12 any of the rental income.  We're not splitting the rental

13 income 50-50 or in this case 30 percent to us, so the

14 investor would keep all the rental income, and they would

15 then be -- pay all the expenses, repairs, maintenance,

16 insurance, taxes, any -- so when the property is sold, we

17 don't add the rent back into the calculation, and they don't

18 add the expense back into the calculation.  That's separate

19 with the landlord outside of the split.  So we take the

20 acquisition price plus the cost of sale to sell it for the

21 closing, and if there's 40,000, you times that times 30.

22 Then Ralph Roberts Realty would get $12,000.

23 Q   How many profit splits have you received in 2013?

24 A   Probably 30.

25 Q   How many since July of 2013?

1  A    I don't know the breakdown of that.

2  Q    How many would you say you've gotten prior to July of

3  2013?

4  A    I don't know what the number is prior to July of 2013,

5  but I testified earlier I think there's been about a hundred

6  flips.

7  Q    I'm just trying to get to finite from July to now.  Would

8  you say the number is less than ten?

9  A    No.  It's more.  It's more than ten.  I know in December

10 there was probably seven or eight just for December.

11 Q    Okay.  So even at best 20?

12 A    Sure.  Okay.

13        MR. KWIATKOWSKI:  I'd like to introduce as a

14 rebuttal exhibit -- I think this would be Exhibit R.

15        MS. MCCOLLUM:  Do you have a copy of that exhibit

16 for me?

17        MR. KWIATKOWSKI:  Yeah.  She's marking it.

18     (Defendant's Exhibit R marked at 11:34 a.m.)

19        MS. MCCOLLUM:  Is this the same that was attached to

20 your trial brief that was filed on Friday at Document 55?

21        MR. KWIATKOWSKI:  Correct.

22 BY MR. KWIATKOWSKI:

23 Q    Mr. Roberts, I'd like you to flip to page 31.

24 A    Okay.

25 Q    If you could read line 7 through line 10 out loud.

1 A   "Prior to filing your bankruptcy case, how many investor

2 splits had Realty gotten?"  Question.  Answer:  "Ten or

3 twelve.  It wasn't a lot over from 2009 until May 25th of

4 2012.  About a dozen."

5 Q   So do you want to correct possibly the testimony you had

6 just given that you received a hundred profit splits because

7 that would mean from May 25th, 2012, through today you've

8 gotten 88?  And you testified that in 2013 you maybe got 30,

9 so that puts you at about 42.

10 A   I told you 2013 I didn't know how many I've had.

11 Q   You approximated it at 30, though; is that correct?

12 A   I didn't.  You tried to give me the approximate at 30.  I

13 still think this is correct because --

14 Q   So you did 88 profit splits --

15 A   If I did only --

16 Q   -- in 2013; is that correct?

17 A   If I did --

18            MS. MCCOLLUM:  No.

19            THE WITNESS:  What?

20            MS. MCCOLLUM:  Objection.  That mischaracterizes the

21 testimony.

22            THE COURT:  Overruled.  You may answer.

23            THE WITNESS:  Okay.  Could you repeat it, please?

24 BY MR. KWIATKOWSKI:

25 Q   Based on the testimony in your prior trial --

1   A    Um-hmm.

2   Q    -- you testified that from the inception of the investor

3   program until May 25th of 2012, you did 12 profit splits.

4   You had -- Realty received 12 profit splits.  That would mean

5   from 2012, May, through today, you've done 88.

6   A    All right.  So this number here from this testimony is

7   probably a number directly from my bankruptcy case.  We

8   exactly would have had that number, so for sure the testimony

9   here is correct, and my testimony is still the same.  I think

10  I've done about a hundred flips now.

11  Q    Okay.  So is the answer to your question --

12  A    I don't have --

13  Q    -- to the question that in 2013 you did 88 splits?

14  A    No.  The answer to my question, from May 25th of 2012 to

15  now, I've done enough to bring the number up to approximately

16  a hundred splits, yes.

17  Q    So you've done three or four times the usual -- five

18  times what you did in three years in the last year?

19  A    Absolutely.

20  Q    What was the deal in 2009 with the defendants regarding

21  acquisition fees?

22  A    I testified earlier that -- and it's still the same --

23  that they would pay 2,500 at the acquisition, the sheriff

24  sale, and they would pay 2,500 when title was perfected like

25  if the sheriff deed expired or we got cash for keys done or

1  whatever to make sure that the property was not going to be

2  redeemed.

3  Q   Did any of the acquisition fees ever get paid at closing

4  of properties?

5  A   Possibly the balance of an acquisition fee could have,

6  yes, but I don't have --

7  Q   Was that part of the deal you made with the defendants?

8  A   It was just trying to get paid.  If that's what

9  happened -- I don't know that that happened, but that could

10  have happened.

11  Q   Was that part of the initial agreement when you sat down

12  that they could pay at closing?

13  A   That was not ever part of the agreement.  If we got paid

14  at closing, that would mean they just hadn't paid when they

15  were supposed to.

16  Q   So that wasn't part of the deal?

17  A   That was not part of the deal.

18  Q   In the investor program, is there a provision for

19  splitting of losses?

20  A   When Jon and Butch and I started and Ray Confer started,

21  no, there was --

22  Q   That's not what --

23  A   Huh?

24  Q   In 2009 in the program --

25  A   There was no -- it was never even discussed.  It was no

1    splitting of losses because if you're buying stuff 20, 30, 40

2    percent of -- how do you lose money?  You can't lose money,

3    so we never even discussed losing money, so it wasn't

4    discussed.  It was not part of the program.

5    Q   So it was never discussed.  Your testimony is you never

6    discussed the investor program having a splitting of losses

7    with the defendants?

8    A   I have never, no.

9    Q   Is it part of the investor program?

10   A   It wasn't when we did these deals.  It was not, but since

11   then it has come up that we get 50 percent of the upside, so

12   we should share in 50 percent of the downside, but until --

13   in all the houses we've sold, okay, approximately a hundred

14   since the program started, there's not ever been a loss until

15   Butch and Jon have said now that after they fired me -- first

16   they always made profits.  Then they fired me, and now they

17   all lose.

18   Q   Maybe that's why they fired you.

19   A   Because they want to not make money?

20   Q   No.  They started to lose money, so they fired you.

21   A   They never lost, no.  They never lost money with me

22   before they fired me, not once.

23   Q   Could they have fired you because you didn't find them

24   profitable properties?

25   A   No, it's not, because that's not true.

1  Q   So there's been a thousand properties, correct, purchased

2  by Realty?

3  A   That's correct.

4  Q   And you've received a hundred splits; is that correct?

5  A   Approximately a hundred splits; correct.

6  Q   So there's 900 that you hadn't been paid on?

7  A   That's not true.

8  Q   Okay.  How many have you not been paid on?

9  A   Earlier I testified there's about 500 properties.

10 Q   There's 500?

11 A   About 500 got redeemed, so there's not a thousand in

12 inventory.  It's less than -- the number is less than 500.

13 Q   So there's 500.

14 A   Yes.

15 Q   And before May 25th, 2012, you testified, because you

16 said that in your prior trial that it had to be accurate, you

17 received 12 splits; is that correct?

18 A   That's correct.

19 Q   So you had about 488 outstanding splits out there?

20 A   Yes.

21 Q   Why didn't you sue any of those people --

22 A   Why would I --

23 Q   -- to make them pay you the splits?

24 A   Because they're not going behind my back selling houses

25 and trying -- they're not cheating me yet, you know.  They're

1    not doing that.  People are honoring their agreement.

2    There's only been a handful of people who haven't.

3    Q   But you're suing my clients for houses that aren't sold.

4    A   That's correct.

5    Q   And there's -- part of your agreement doesn't require

6    them to sell the properties, does it?

7    A   No.  The idea was to sell everything within five years,

8    but I can't force them to do that.

9    Q   When you started the program, was it your intention to

10   ever rent properties?

11   A   I thought everybody would want to flip except for Ray

12   Confer.  I've sold him houses for 30 years.  He's never

13   flipped one house that I know of, so other than Ray, I

14   thought everybody else would flip, but --

15   Q   So if you thought everyone would flip at the beginning of

16   your program, why did you have a rental provision in the

17   investor program?

18   A   Because right away as we -- because Ray rented his

19   properties obviously, but right away we --

20   Q   But you knew Ray -- sorry for interrupting, but --

21   A   Yeah.

22   Q   -- you knew Ray, and you knew that was always his plan --

23   A   Right.

24   Q   -- because Ray has never paid you a split?

25   A   That's correct.

1  Q    Does Ray ever have to pay you a split?

2  A    Hopefully when he's flipped stuff, yes.

3  Q    So Ray is part of the program?

4  A    Yes, he is.

5  Q    And he will pay you a split someday?

6  A    Absolutely.

7  Q    And so the deal that Realty set forth with the new

8  investors, even though it was Realty's intention that they

9  would flip the properties, you still set up for -- this

10  investor program for rentals?

11  A    I did.

12  Q    Even to your first investors?

13  A    Right away, yes.

14  Q    How did you explain it to Mr. Savoy, the rental aspect,

15  or -- strike that -- the defendant -- how did you explain it

16  to the defendants?

17  A    I'm not -- I don't understand what you're asking me.

18  Q    How did you explain the rental procedure with the

19  defendants?

20  A    I would explain it the same way I explained it to

21  everybody.  If you rent the property, we're not going to

22  share in the cash flow, and we're not going to share on the

23  expense side of it.

24  Q    Can you please -- excuse me -- please flip to page 32 of

25  Exhibit R?

1  A   Okay.

2  Q   Please read line 1 through 5.

3  A   Okay.  "If you're" -- through 5.  Okay.  "If you're

4  buying it and fixing it, flipping it, all expenses are

5  against it.  If you're buying it and renting it, then there's

6  taxes, insurance we don't count against it, but anything that

7  has to take the property to be able to sell would be an

8  expense within reason."

9  Q   And then please -- and then skip to line 10, please, and

10  read that through 14.

11  A   Okay.

12          "Are there any expenses that you -- aren't

13          included that you would include?

14          Answer:  The investor's personal time.  There's

15          no expense for the investor's time, but everything

16          else that's paid to someone -- verified and paid to

17          someone is an expense.

18          Question:  Do you explain this to your" --

19  Q   That's enough.  I'm sorry.  I told you to stop at 14.

20  A   All right.  Sorry.

21  Q   And these lines I had you read out of your testimony from

22  a former trial in this --

23  A   Um-hmm.

24  Q   -- in your bankruptcy case; is that correct?

25  A   That's correct.

1  Q   And you recognize this testimony?

2  A   That's correct, yep.

3  Q   And you admit this was you testifying?

4  A   Yes.

5  Q   And in the discussions from the lines -- we'll call it 1

6  through 14 on page 32, what's being discussed here?

7  A   One through what?

8  Q   One through fourteen.

9  A   What's being discussed here is a property in Roseville

10  that --

11  Q   No.  I'm asking -- I'm sorry.  I'll rephrase the

12  question.  What specifically are we talking about here?  Are

13  we talking about profit splits and the expenses?

14  A   We're talking about one property in Roseville that Roger

15  Roberts bought.  That's what I was testifying about, one

16  property.

17  Q   In lines 1 through 14 on page 32, are you discussing that

18  property, or are you discussing the investor program in

19  general?

20  A   I was testifying about the property with Shirley and

21  Roger Roberts.  That what I was for sure thinking of when I

22  was testifying at this time.

23  Q   Okay.  So lines 1 through 14 on page 32, that's not about

24  the investor program?  That's strictly on Roger Roberts?

25  A   It's for sure about the investor program also, but I

1   would -- this is one property, one case that we were -- I was

2   being questioned on.  I was only thinking about --

3   Q   But you have one program is your testimony, so it should

4   be the same for everyone.

5   A   No, I didn't.  That's not -- I have two -- and to answer

6   you, I have two programs.  I think I have one with a rental

7   version and a flipping version, but -- so I have two.  I have

8   a rental version and a flipping version if that can keep us

9   so that I can clear -- give you good answers on the questions

10  that you have.

11  Q   Prior to your testimony today regarding the rental

12  version and the flipping version, did you ever allude to that

13  in any of the motion practice or pleadings in this case?

14  A   I don't know the answer to that.

15  Q   Did you ever read the complaint in this case?

16  A   I did.

17  Q   And when it discussed the -- do you remember what it

18  said?

19  A   I don't, no.

20  Q   I'll go back to that, but I'll move forward for a moment.

21  You discussed that the program with Mr. Savoy never had

22  mention of splitting the losses; is that correct?

23  A   That's correct.

24  Q   However, the program does split losses; is that correct?

25  A   No.  The program does not split losses.

1    Q    Your program doesn't -- the investor program does not

2    split losses?

3    A    We've never had one.

4    Q    Is it in the program to split losses?

5    A    It is now.  I feel that I'm entitled to 50 percent of the

6    upside, and if --

7    Q    And you share in 50 percent of the downside.

8    A    -- 50 percent if there's a downside, but there's not been

9    a loss.

10    Q    That wasn't my question, though.

11    A    Okay.

12    Q    The question is if there was a loss, you would share in

13    it?

14    A    Currently, yes.

15         MR. KWIATKOWSKI:  Can I approach the bench to mark

16    Defendant's Exhibit S as a rebuttal exhibit?  It's the

17    affidavit.

18         THE COURT:  Go ahead.

19      (Defendant's Exhibit S marked at 11:51 a.m.)

20    BY MR. KWIATKOWSKI:

21    Q    Page 4 --

22    A    Okay.

23    Q    -- line 23, states, "The investor program does not

24    contain any provision for the splitting of losses on

25    properties," so is that a truthful statement, Mr. Roberts?

1   A    Yes.

2   Q    How?

3   A    It's truthful with Jon and Butch.  That's the agreement

4   we had.

5   Q    But that's not what this says.

6   A    Yes.  That's what that --

7   Q    This says the investor program.

8   A    All right.  When I did this affidavit, it was for this

9   case.  I never had a splitting of losses arrangement with Jon

10  and Butch.  I currently now in my program believe that if

11  there's a loss, I'm responsible for 50 percent.  If there's a

12  gain, I get 50 percent.  But that did not exist when the

13  program was started.  As I said earlier, the important piece

14  to me is there's never been a loss, so --

15  Q    That's not the question, and that's not what this says.

16  This doesn't say -- your affidavit doesn't say, "I didn't

17  have an agreement with Mr. Savoy."  It says, "the investor

18  program," so we both know that the investor program is

19  whatever deal is in place right now.  You described the

20  investor program in detail.  You just admitted on the stand

21  that you share losses.  You just filed an affidavit.

22  A    I did not admit on the stand I share losses.

23  Q    Really?

24  A    I said on the stand there's never been a loss.  I've

25  testified that if there is a loss, I feel I'm responsible for

1  my 50 percent if there's a downside like I'm entitled to 50

2  percent of the upside.

3  Q   Correct.  Isn't that -- well, isn't that sharing losses?

4  If you're entitled to the upside, and you just testified that

5  you're entitled to the downside, isn't that sharing losses?

6  A   Is that a question?

7  Q   Yes.

8  A   Okay.  Can you repeat it, please?

9  Q   If you share in the upside --

10  A   Um-hmm.

11  Q   -- you testified very clearly --

12  A   Um-hmm.

13  Q   -- share in the upside, you share in the downside.  Isn't

14  that sharing losses?

15  A   Yes.

16  Q   Thank you.

17  A   Well, if the --

18  Q   That's all.

19  A   Okay.

20  Q   Just answer the questions --

21  A   Yeah.

22  Q   -- "yes" or "no."

23  A   Okay.

24  Q   Can you show me in this affidavit that describes your

25  procedural posture and dealings with Mr. Savoy where it talks

1   about the rental agreement?

2   A    I don't know.

3   Q    Take a second and review it.  I know it's a surprise to

4   hear the -- about this agreement today.

5   A    Okay.  So what was the question?

6   Q    I'll withdraw that question.

7   A    You had me read this, so I can't answer it then?

8   Q    I'm just going to move on.

9   A    Well, 31 says if investors rented the property, the

10  rental income would be credited against any expenses incurred

11  by the investor on the property.

12  Q    What steps did Realty take to protect the principal of

13  the investors?

14  A    Which -- on which property?

15  Q    Just in the general program.

16  A    We would make sure we're buying first positions.  We'd

17  make sure our investors got insurance on them right away and

18  anything else that's required, giving them advice, recommend

19  what they should do to maximize the return on any particular

20  property.

21  Q    How did you know what was a good property?

22  A    Finding properties that are -- can be acquired at a

23  distressed price, at a discount, which have the potential

24  of -- have good upside on them, so buying properties below 50

25  percent of what they're worth is a good opportunity and still

1   is.

2   Q   And you provided that information to your investors?

3   A   I do provide that information to my investors.

4   Q   Dealing specifically with Mr. Savoy's group, we'll call

5   it -- sorry.  Dealing specifically with the defendants'

6   group, what due diligence was done regarding the Ledgestone

7   property?

8   A   From what point?  From when we -- from when we purchased

9   it?

10  Q   From the beginning.

11  A   What -- your exhibit -- what number is Ledgestone?

12  Q   You can refer to the plaintiff -- or the defense Exhibit

13  J.

14          MS. MCCOLLUM:  Ledgestone is also Plaintiff's

15  Exhibit 7.

16          THE WITNESS:  Okay.  I remember this property.  We

17  researched it.  There was a family that had -- was going

18  through a divorce, and there was -- also had been through a

19  bankruptcy.  They were at two different -- they were at two

20  different locations.  I don't remember how many mortgages it

21  had at this time, but I thought it had great potential to

22  send it out.  Jon and Butch opted in for it, bought it,

23  and --

24  BY MS. MCCOLLUM:

25  Q   What information did you tell them specifically that it

1  was a good deal?

2  A    I can't remember.  I've sent out thousands of properties.

3  I can't remember what I said about this particular property.

4  Q    Did you go to the property?

5  A    I did not go to this one at that time.  Someone else who

6  worked for me, John Selby, went to the property, took

7  pictures as we're assessing title, taxes, insurance,

8  different things behind the scenes, bankruptcy, divorce,

9  state liens, federal liens.  Someone was doing a field

10  inspection.  And we take that information, and then we send

11  that out to the investor group.

12  Q    You testified earlier that you've been in real estate

13  since 1975; is that correct?

14  A    That's correct.

15  Q    And you've only made a handful of mistakes.  Was

16  Ledgestone in there as one of the mistakes?

17  A    Absolutely not.  Ledgestone was not a mistake.

18  Q    You didn't -- did you advise the defendants of a looming

19  tax foreclosure?

20  A    There was taxes owed on this property?

21  Q    That's not the question.  Please answer the question.

22  A    I informed -- on all properties we inform when there's

23  taxes owed on the property.  Yes, we did.

24  Q    Did you do that before or after they bought it?

25  A    Before.

1  Q   Can you flip to Plaintiff -- or I'm sorry -- Defendant's

2  Exhibit O, page 1?  Read the first line.

3  A   First line.  "There is delinquent property tax owed on

4  this property.  We should go ahead and pay them and then file

5  a tax affidavit."

6  Q   And when was the sheriff sale on Ledgestone?  Do you

7  recall?

8  A   Ledgestone was -- Ledgestone -- Ledgestone was December

9  11th of 2009.

10  Q   And your e-mail, Exhibit O, references that you're

11  notifying them regarding delinquent taxes in January.  Is

12  that after they purchased the property?

13  A   That e-mail is after purchasing the property.  That

14  doesn't mean we didn't notify them before.  It's normal

15  course of business.

16  Q   But you don't have any documents to show you told them

17  before.

18  A   I for sure told them before.

19  Q   Everything was on the table when they decided --

20  A   Absolutely.

21  Q   -- to buy a property --

22  A   Absolutely.

23  Q   -- that had $9,000 of taxes of owing?

24  A   It's distressed real estate bought at discounted prices.

25  That's part of this investing in sheriff sale business.

1 Q   Firwood was another property you purchased for Mr. Savoy,

2 is that correct, or Mr. Savoy's group?

3 A   Yes.

4 Q   What type of due diligence was done prior to purchase of

5 Firwood?

6 A   Same thing.  We would start with the mortgage, see what

7 else is out there.  This particular property was a 12-month

8 redemption.  The party who lived there was -- wouldn't answer

9 the door.  We tracked the previous owner down through his

10 sister and his brother-in-law.  House was -- had great

11 upside.  It was a 12-month redemption, but if you do 12-month

12 redemptions, you get long-term capital gain versus short-term

13 capital gain, so there's some other benefits there.  And we

14 determined that we did not think the person who owned it

15 would have the wherewithal to be able to redeem plus since he

16 was kind of a hermit, we felt that no one else would ever be

17 able to get to him to bump us off and take our transaction,

18 sent it out to the group.  Jon and Butch wanted it.  Jon and

19 Butch went by and assessed it.  Jon and Butch checked the

20 numbers, and they decided to go forward with the purchase.

21 And till today I thought they thought that was a good

22 investment and a great buy at the time.

23 Q   So losing $8,000 is a great buy?

24 A   They did not lose $8,000.

25 Q   What evidence do you have to support the fact that they

1  didn't lose $8,000?

2  A   Well, one is that they paid themselves ten.  It's pretty

3  easy.  If they really did lose eight and paid themselves ten,

4  they did not lose eight.  And I believe the numbers are

5  fabricated.

6  Q   What evidence do you have to support the fact that the --

7  that it's fabricated other than your testimony?

8  A   My 30-some years' experience of doing this, and that's

9  what I have.

10  Q   What numbers are fabricated on Firwood?

11  A   Repairs and maintenance, licenses, legal, professional

12  fees, utilities.

13  Q   But those are expenses that were paid and credited on

14  past sales; isn't that correct?

15  A   For other investors or for Jon and Butch?

16  Q   For Jon and Butch.

17  A   If they're verified and real good numbers, yes, but not

18  if they're fabricated and made up.

19  Q   So you paid legal.  You paid accounting fees.  You

20  paid --

21  A   No.  No, I did not.

22  Q   -- license fees.

23  A   No, I did not.  Not knowingly, I did not.  I'm not -- why

24  would I pay accounting fees?  Why would I pay legal fees for

25  their companies?

1    Q    Because it was part of the deal.

2    A    It's not part of the deal.

3    Q    It was part of the investor program.

4    A    Never seen it.

5    Q    Any and all expenses.

6    A    Never seen that before.

7    Q    Is that because you didn't have many profit splits?

8    A    I'm talking about with Jon and Butch.

9    Q    They never e-mailed these to you?

10   A    No, they did not.

11   Q    The title company didn't have them?

12   A    Before we were fired, we did get numbers, and we --

13   Q    Right.

14   A    -- did know what we were going to get paid, and the title

15   company paid us at closing.

16   Q    So like for instance on --

17   A    After Jon fired us, he never shared anything anymore.  He

18   went dark on us.  He didn't return phone calls.

19   Q    So -- excuse me -- on 2630, let's take a look at

20   Plaintiff's -- or I'm sorry -- Defendant's Exhibit H.

21   A    H.  Okay.

22   Q    Realty and Savoy's fee, no dispute.

23   A    No dispute.

24   Q    Kelly, closing fee, no dispute.

25   A    No dispute.

1  Q   Interest credit, no dispute.

2  A   Nope.

3  Q   Initial insurance prepaid, no dispute.

4  A   No.

5  Q   Accounting fees, no dispute.

6  A   No.  That's not true.

7  Q   Well, wait a minute.

8  A   I would --

9  Q   Excuse me.

10 A   I dispute accounting, licensing, and office.  Now, I'm

11 not -- I did pay it on this, but I didn't see this in advance

12 to be able to approve this or not.

13 Q   Title company didn't have this?

14 A   No.

15 Q   You never saw this?

16 A   I took their word that the number we were getting,

17 $3,347.01, was the correct number.  I would have never agreed

18 to pay those last three items.

19 Q   But you did.

20 A   Why would I -- why would I pay for office supplies for a

21 house?

22 Q   Because it was part of the deal you cut with the

23 defendants.

24 A   That's not true.

25 Q   But your course of conduct shows it is.

1  A   Of course.  This was hidden from me.  If I didn't see it,

2  I couldn't --

3  Q   How was it hidden?  You were paid.

4  A   I was never given the back-up.  I trusted Jon and Butch

5  to pay me what I was entitled to.

6  Q   Why didn't you ask?  Seems to be a pertinent idea.  I'm

7  doing a sophisticated business transaction.  I need to see

8  how much I'm getting paid.

9  A   I thought they were honorable, I could trust them, and

10 they were paying and not cheating me.  Okay?  I will give you

11 I did pay this but unknowingly.  I did pay it.  I'm not

12 asking for it back.  I paid it.  I believe it was wrong that

13 they charged me, but I did pay it.

14 Q   But you don't think they're entitled to these fees

15 even --

16 A   Why does a house need pens, tape -- you know, tape,

17 Scotch tape?  It's a house.  Why does it need a license?

18 What license?  There's no license for that house.  And

19 accounting, there's no accounting for that house.  Maybe the

20 LLC had accounting, but that's the LLC's cost, not Ralph

21 Roberts Realty cost.  I pay my own accounting.  I pay my own

22 office supplies.  I pay my own licensing fees.

23 Q   It's an expense of the LLC.

24 A   That's correct.  I don't -- I never agreed.  I'm not part

25 of the LLC.

1  Q    That wasn't part of your deal?

2  A    Absolutely not.

3  Q    Expenses, can't take that off the profit split?

4  A    No.  You can't pad the expenses so you can pay me less.

5  That's not fair.

6  Q    But you were paid the $3,347 with no complaints.

7  A    That's correct.

8  Q    Now you want to complain; correct?

9  A    That's not true, Scott, because I'm not asking for it

10  back.  You're the one questioning it.

11  Q    No.

12  A    I'm not --

13  Q    Only because you said that -- you said that these

14  wouldn't be allowed, but they were allowed; right?

15  A    They were taken from me without my knowledge, yes.

16  Q    You accepted payment as -- payment in full on Antonia;

17  correct?

18  A    I did, yes.

19  Q    With all the deductions?

20  A    Without knowing the deductions, I accepted the $3,347.01.

21  I'm not asking for anything back.  I'm happy with that

22  number.

23  Q    Because it's the right number.

24  A    That's not correct.

25  Q    But you accepted it anyways.  Was Antonia rented?

1  A   No.

2  Q   So it was just a flip.  It was never rented?

3  A   I don't believe so.  Could have rented it for a few

4  months, but I don't think so.

5  Q   This was what I would like to call the honeymoon time.

6  Wouldn't you know what's going on with the -- you know, early

7  on in your investors in this relationship with Jon and Butch?

8  You were meeting every week.  "Yes" or "no"?

9  A   It was a thousand houses ago, Scott.

10  Q   500.  500 were redeemed.  Let's look at I, Defendant's

11  Exhibit I.  Realty or Kathleen was paid $19,000, 150 --

12  $19,155.95; is that correct?

13  A   No, it's not.

14  Q   Oh, I'm sorry.  Thirty percent of that, so $5,746.64.

15  A   That's correct.

16  Q   Expenses in line, happy with?

17  A   These expenses are absolutely fine, yes.

18  Q   So insurance is okay in this one?

19  A   Yes.  It was a flip.

20  Q   All right.  How many days do you determine if it's a flip

21  or a rental?

22  A   I don't understand the question.  Sorry.

23  Q   How many days do the defendants have to own it before --

24  for you to make this determination if it's a flip or a

25  rental?

1  A    I don't determine whether they flip it or rent it.  They
2  determine that.
3  Q    So you talked with Jon, Butch, Adam and discussed
4  expenses, profit splits regarding rentals?
5  A    Early on, yes.
6  Q    So you told them that if they rehab a house and they rent
7  it, they don't -- that's not part of the cost, the profit
8  split?  Doesn't come off the net at the end?
9  A    If you're fixing it to rent it, those costs don't come
10 off at the end.  If you're fixing it to flip it, those costs
11 do come off.
12 Q    And this was crystal clear to them, always part of your
13 deal with them?
14 A    Always part of the deal with them and everybody else.
15 Q    Does the deal ever change?
16 A    I don't know.  I'm not sure.
17 Q    Does the -- do you ever negotiate terms in the investor
18 program?
19 A    I'm not -- I don't understand what you're trying to ask
20 me.
21 Q    Do you negotiate the terms of the investor program with
22 any investors?
23 A    There's been a few times, yes, that we've done something
24 where we would say, okay, instead of a -- that house is --
25 we're paying 200,000 for it.  It might be worth 400.

1    Investor might say, "All right.  I'll do this one.  Can we

2    make it 35 percent instead of 50 percent?"  Yes.  We'd do

3    some of that for sure.

4    Q    And you did a lot of things different with Jon and Butch

5    and the defendants; is that correct?

6    A    For sure.  They had the best deal.  No one else has ever

7    had a deal like they've had, yes.

8    Q    Why is that?

9    A    I was just getting started trying to take care of my

10   family and trying, you know, to --

11   Q    You were desperate?

12   A    Yeah.  That's -- I was.  I was desperate.

13   Q    You needed them to help you survive; is that true?

14   A    I did.  I needed them and others to survive for sure.

15   Q    And they were one of the first people you dealt with?

16   A    Yes, they were.

17   Q    And we've already discussed the acquisition fees.  I mean

18   that's a principal part of your program; is that correct?

19   A    We get an acquisition -- we're entitled to $5,000 when we

20   buy a property for an investor, yes.

21   Q    And in the defendants' case, that 5,000 was split at the

22   time of the sale and/or when it vests and/or whenever it was

23   paid?

24   A    That's correct.

25   Q    And then the next part of the deal with the sellers --

1   with the defendants was the seller's fee?

2   A    That's correct, $5,000.

3   Q    And then they got interest on any money they invested.

4   A    On the flip properties, yes.

5   Q    So they didn't get anything on the rentals?

6   A    No.

7   Q    So they shouldn't have got interest on the Antonia

8   property if it was rented; is that correct?

9   A    If it was only rented for a couple months, I don't call

10  that putting it in his rental.  I mean Antonia I told you the

11  interest was fine, so if we rented it for a couple months,

12  that was just to get to the closing.  That wasn't they were

13  going to make it a rental property.  There's a difference in

14  a short period of time and renting something for a year or

15  two.

16  Q    Early on in the program, however, you testified that you

17  didn't expect anyone to rent.

18  A    No.  I didn't think -- maybe I was so financially

19  desperate myself that -- I had no money -- that I thought

20  other people were the same, and it turned out I was in -- I

21  was completely wrong.  There's a lot of very successful

22  people on the sidelines that have been doing this that

23  decided if they can rent a -- buy it for 40, rent it for a

24  thousand, that's a lot better than flipping it for 80 and

25  splitting 40 with me.

1  Q   So you didn't know that at the beginning when you started

2  the program?

3  A   No.  In 2009 I thought -- I don't know.  I was very, very

4  financially in trouble.

5  Q   So how did you have that discussion with Jon and Butch

6  and -- regarding rentals if that was never part of the

7  thoughts of your program then and they were the first people

8  involved?

9  A   Well, Ray was going to rent everything at the beginning,

10 too; right?  Ray was going to rent every property.  He was

11 never going to -- he has never --

12 Q   But you just testified it was never part of your plan.

13 A   I understand I testified it wasn't part of my plan, but

14 that is -- I've dealt with Ray for 30 years.  That's how he

15 was going to do it.  Jon and Butch told me they were in

16 the -- they were going to flip houses, but then you get to a

17 house -- to get the people to sign off on Irene, they would

18 sign off if they could lease it, so Jon and Butch said, yes,

19 let's do that.  Let's make it a rental property.  We'll take

20 the rent.  And the numbers returned to Jon and Butch are

21 great.  I guess we could have looked at doing the program the

22 other way.  I could have split the rent with the investors.

23 Q   But you didn't do that.

24 A   No.  We didn't do that, no.

25 Q   And you didn't think about the rental aspect till after

1  the program was started, well after.

2  A    Not well after.  Within the first 30 days it was already

3  learning that there was going to be rental properties.

4  Q    How is that?  How is that possible?

5  A    It is.  Ray rented all his.

6  Q    Within the -- but it doesn't --

7  A    Maybe --

8  Q    -- logistically make sense.  If you started the program

9  on -- let's just pick a date.  Let's just --

10 A    May 19th of 2009.

11 Q    Okay.  So let's pick June 1st.

12 A    Okay.

13 Q    And you start tracking sheriff sales.  How do you know

14 within 30 days then that people aren't going to flip?  The

15 redemption period is six months long.

16 A    From communicating with people, and we get people to sign

17 off.  And knocking on the doors starting on June 1st of 2009,

18 people were wanting to stay in their houses, so the people

19 would sign off.  If they were paying 2,000 a month, they

20 couldn't afford it.  They would say, "Hey, I'll agree to pay

21 a thousand a month for two years or five years or three

22 years, and I'll sign off the property," so that was a trade-

23 off.  That's what happened.  We could get more people to do

24 the cash, sign off their house, if they could stay in it at

25 an affordable payment.

1  Q   Okay.  But that doesn't really answer how, when you only

2  had Ray and Jon -- and you said Jon and the defendants were

3  going to flip houses, and --

4  A   Um-hmm.

5  Q   -- Ray you knew what he was going to do, and he's never

6  paid you anyways --

7  A   Um-hmm.  When I first started the program, I was the

8  one --

9  Q   How did you have this discussion with --

10  A   Because I knocked on every single door.  I talked --

11  Q   But how did -- let me finish.  How did you have this

12  discussion with Jon and Butch and the defendants about rents

13  if that was never part of the program when you were meeting

14  with them?

15  A   It was never part of the program on May 19th of 2009.

16  Started buying properties June 1st of 2009, was knocking --

17  Q   Who was buying properties June 1st?

18  A   I started finding properties to buy on June 1st, 2009.

19  Q   When was the first property bought?

20  A   I think it might have been on that day.

21  Q   So the first -- so was --

22  A   June 1st of -- yeah.

23  Q   We know it wasn't the defendants.

24  A   It wasn't.  It was Ray.

25  Q   So Ray started buying properties June 1st, 2009?

1  A   Yes.  Ray would go with me to the doors.  We would knock

2  the doors together.  As soon as I was -- that was right at

3  the beginning of the program -- hearing what people were

4  saying, what the homeowners were saying --

5  Q   Did Ray ever have any dealings with the defendants that

6  you're aware of?

7  A   Yes.

8  Q   Regarding the investor program?

9  A   No.  Ray did work for Jon on his building down on

10  Groesbeck.

11  Q   So he was like a contractor?

12  A   Yes.

13  Q   But he wasn't -- Jon and the defendants, they didn't have

14  a relationship regarding the investor program.  They were --

15  A   Well, that's not what you asked me, though.

16  Q   Right.  I'm asking you something different now.

17  A   Yeah.

18  Q   So they had no dealings within the investor program?

19  A   I don't understand.  Can you repeat, please?

20  Q   Did Ray Confer and the defendants have dealings within

21  the investor program --

22  A   I don't believe they had --

23  Q   -- to your knowledge?

24  A   They both are doing the same program, but I don't believe

25  they directly had worked together, not that I know of.

1    Q    How much do you think the defendants owe you?

2    A    Probably north of a hundred thousand.

3    Q    At what time frame from -- strike that.  Other than we

4    know that Duncan, Jimmy, Irene, and Teppert are unsold -- is

5    that correct?

6    A    No, it's not.

7    Q    Considering land contract as --

8    A    That's not correct.

9    Q    Okay.  Irene and Teppert are unsold?

10   A    That's correct.

11   Q    Duncan and Jimmy are being sold pursuant to a land

12   contract?

13   A    That's correct.

14   Q    The other properties, Eastland, Engleman, Firwood,

15   Teppert -- I'm sorry -- not Teppert -- Trailwood, and

16   Ledgestone are the properties in question.  We'll call them

17   the five.

18   A    I don't think Eastland is because that was fully settled,

19   and they don't owe me anything on Eastland, and I don't owe

20   them anything.

21   Q    That's your position.

22   A    We settled a case in Circuit Court.  We all agreed to it.

23   Q    So if -- pardon me for one second.  Just want to run

24   through a little chronology if that -- so Raymond was sold

25   and paid to you in -- let's call it May 28, 2010; is that

1   correct?

2   A   Raymond was paid, and I'm satisfied with the number, but

3   I don't know when I got it, but there's no problem with

4   Raymond.

5   Q   The date is kind of important, so let's take a look at

6   the date.

7   A   I've got it open, but it doesn't have the date.

8   Q   Well, if I want -- will you take a look at the

9   Plaintiff's Exhibit Number 2?  There's a closing statement

10  for Raymond.

11  A   Okay.  Number 2, Plaintiff's Number 2.  Okay.  I got it.

12  Q   Have you seen it?

13  A   Yep.  The closing date was May 28th of 2010.  I was

14  supposed to get $5,746.04, and I got that number, and this

15  file is fine.

16  Q   So it was paid on or about the 28th of 2010; is that

17  correct?

18  A   That's correct.

19  Q   Lowell Court also paid -- I'll just use in 2010.  Does

20  that work?

21  A   Well, not if it closed in 2011.

22  Q   Well, do you remember when it closed?

23  A   I don't.

24  Q   Okay.

25          THE COURT:  Which one is this?

1    MR. KWIATKOWSKI:  Lowell Court.

2    THE COURT:  Thank you.

3 BY MR. KWIATKOWSKI:

4 Q   It's Plaintiff Exhibit 4.

5 A   It closed June 28th of 2010.

6 Q   And then Foxcrest --

7 A   Foxcrest.

8 Q   -- which is Exhibit 5?

9 A   Closed June 30th of 2010.

10 Q   Duncan is being sold on land contract, so we understand

11 that.  Antonio -- Antonia.  That's Exhibit 3.

12 A   Exhibit 3?  Okay.

13 Q   Yes.

14 A   Antonia closed on 8-18, 2010.

15 Q   Okay.  And then we know that Eastland happened in 2011,

16 and I believe we'll just say that the case was settled.

17 A   Okay.  Yeah.  That's correct.  The case was settled.

18 Q   And then we have Ledgestone, which closed -- it's Exhibit

19 7.  I don't think there's -- do you remember when Ledgestone

20 closed?

21 A   No.  I was fired from taking care of that property, so I

22 don't -- I wasn't part of that closing.

23 Q   Does around April of 2011 ring a bell?

24 A   Yeah, because we bought it in -- December 11th of 2009.

25 They rented it for a year and a half.  Yeah, that makes

1  sense.

2  Q   And then there was the Trailwood, which sold in June of

3  2011?

4  A   Yeah.  Trailwood was bought May of 2010, rented to the

5  people to get them to -- and then -- yeah, that's correct.

6  Q   And then Firwood was sold in August of 2011?

7  A   Firwood.  I wasn't part of that closing, but I'm looking,

8  trying to find it in your exhibits here.

9  Q   So you would assume --

10  A   I don't have anything in this exhibit that shows when it

11  closed, so --

12  Q   August 2011?

13  A   Don't know.

14  Q   Would you have ever made a statement that -- in September

15  of 2011 that plaintiffs didn't owe you any money?

16          THE COURT:  I'm sorry.

17          THE WITNESS:  Can you repeat?

18          THE COURT:  Repeat that question for me.

19  BY MR. KWIATKOWSKI:

20  Q   Would you have made a statement that the defendants do

21  not -- did not owe you any money in 2011?

22  A   Would I have made that statement?  No, I would not have

23  made that statement.

24          MR. KWIATKOWSKI:  Excuse me.  I would like to mark

25  this as Exhibit T.  I tried to find the other copy.  I

1    thought I had two.  I had them all here.

2         (Defendant's Exhibit T marked at 12:32 p.m.)

3              THE WITNESS:  Thank you.

4    BY MR. KWIATKOWSKI:

5    Q    Mr. Roberts, take a look at Exhibit T --

6    A    Okay.

7    Q    -- the second half where it says "Ralph Roberts to Butch

8    Hassig," cc:  Jon Savoy," says, "Butch, sorry about the

9    confusion.  I appreciate you getting back to me.  The

10   outstanding monies owed cleaned up when we met.  That's what

11   we said was going to be done."  And that's dated September

12   27, 2011.  Does that mean that as of that date you didn't owe

13   the -- the defendants owed you no money?

14   A    No.  That's not what it says.

15   Q    What does it mean?

16   A    Jon -- Butch contacted me.  He said that -- I was telling

17   him I appreciate him getting back with me.  The

18   outstanding -- he told me he would look into getting the

19   outstanding monies cleaned up and that what we said he was

20   going to be done.  Jon told me he would have everything to me

21   within ten days before closing.  I'm also telling him the

22   last two closings I've not received anything in advance, so

23   I'll wait to hear back from you once you go over everything.

24   It's not saying that there's no money owed.

25   Q    Doesn't it say, "the outstanding monies owed cleaned up"?

1  A   I didn't type this e-mail, but that's not -- you know,

2  it's not what the intent of this e-mail is.

3  Q   What was the intent?

4  A   To tell Jon to tell Butch thanks for contacting me, but

5  he would get with his -- Jon took care of all the money.

6  Butch didn't.  So we were --

7  Q   Sounds like the money was taken care of right here.  It

8  says all the outstanding money was cleaned up.

9  A   Doesn't say all the outstanding money was cleaned up.  It

10  doesn't say that.

11  Q   "The outstanding monies owed cleaned up when we met."

12  That doesn't mean you were paid?

13  A   Does not.

14  Q   What does it mean then?

15  A   It means Butch was going to look into getting the

16  outstanding monies taken care of.  That's what this means.

17  Q   So -- okay.  So "cleaned up," and, "That's what we said

18  was going to be done," doesn't mean payment?

19  A   That's correct.  There was no payment made.  That's not

20  what this is saying, and you know --

21  Q   Does it mean that they provided you with the fact that

22  there were losses and that there was no money owed so you

23  weren't entitled to any money?

24  A   You know they never provided that.  We just got stuff

25  with made up numbers.

1   Q   I don't know what they provided you.

2   A   They never provided that.

3   Q   They never told you they were losing money on properties?

4   A   Never.  They never lost money when they were

5   communicating with me.  We made money on every house I took

6   care of.  They lost money because --

7   Q   That's not exactly true, though.

8   A   It is true.

9   Q   Just let me finish.  Don't interrupt.  You picked out

10  the --

11          THE COURT:  Excuse me.  Mr. Kwiatkowski, you're

12  interrupting the witness.

13          MR. KWIATKOWSKI:  Sorry.

14          THE COURT:  You've done that several times.  You let

15  him finish his answer, and, Mr. Roberts, then you let him

16  finish his question before you talk.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Now, let's both clean that up a little

19  bit.

20          MR. KWIATKOWSKI:  Sorry, your Honor.

21          THE COURT:  Mr. Kwiatkowski, go on with the

22  question.

23  BY MR. KWIATKOWSKI:

24  Q   Not exactly true, though.  You picked the properties that

25  they purchased; isn't that correct?

1  A   No, it's not.

2  Q   Did you advise them as to which properties to purchase?

3  A   No, I did not.

4  Q   So how did they know which properties to purchase?

5  A   I would send them, say, ten properties.  They would

6  decide which ones they'd go by.  They would then report back

7  to me on which ones they wanted to go for is how our program

8  works.

9  Q   So you didn't sit down with them and explain which one

10  was a good deal or which one was a bad deal or this had the

11  best upside?

12  A   When we would sit down, we might have ten properties.

13  They might be willing to bid on one for that week or two for

14  that week.  We would go over the ten opportunities.  Jon has

15  got 30-plus years experience in real estate, too.  Butch has

16  got experience in real estate investing.  They were very

17  active in making their own decisions of which ones they were

18  going to bid on.

19  Q   But you're the one -- you or your entity is the one that

20  provided the opportunities?

21  A   We would find the ones that they should consider, yes.

22  Q   And then you would discuss which ones had the greatest

23  upside?

24  A   Sometimes we would if we met on those weeks, yes.

25  Q   And you would tell them the facts and the due diligence

1  you had done on the properties that made them even better

2  deals?

3  A   We'd try to be -- get as much information on each

4  property as we possibly could, yes.

5  Q   So you picked the properties from your -- they pick --

6  strike that.  The defendants picked the properties they

7  purchased from the list you provided.  Is that accurate?

8  A   Yes.

9  Q   So the testimony is that they always made money on the

10  properties I chose.  That's not exactly true.

11  A   They always made money on the properties that I was

12  involved in until they fired me from being the real estate

13  broker.  Every property -- as you look at the closings, every

14  property was profitable.  Jon then fired me as the real

15  estate broker.  Then all of a sudden every property is not

16  profitable.

17  Q   But those properties they owned prior to you being fired.

18  A   Right.

19  Q   Is that because you weren't doing your job?

20  A   Absolutely not.

21  Q   So things were going great, and they owned all of these

22  properties, so isn't it an easy -- isn't it clear that the

23  easy properties you sell fast?  The easy flips, those are the

24  ones you do right away.  Isn't that normally how it goes?

25  A   I've never -- I'm not sure what you're asking of that.

1   That's not how I think about it.  I don't know what an easy
2   flip would be.  I don't think any of them are easy.  They all
3   take work.
4   Q    Understandable.  You were fired when?
5   A    I don't know.
6   Q    All the properties were owned before you were fired;
7   isn't that correct?
8   A    Correct.  We took them off the list for -- we quit
9   sending stuff to them for future transactions.
10  Q    Is it possible that they fired you because they were
11  unsatisfied with the properties that they purchased?
12  A    They never said that, not once.  There's other investors
13  that would have taken them.  They never said, "Hey, can I --
14  can you take this property back?"  They never once complained
15  about a property until they decided not to pay me.  Now
16  they're complaining about properties because they want to
17  manipulate the numbers so they don't have to pay Ralph
18  Roberts Realty.
19  Q    Or that you provided properties that were not profitable?
20  A    Not correct.
21  Q    You never put up any cash to purchase the houses for the
22  defendants, did you?
23  A    Not to purchase, but I put up cash to pay expenses for
24  them.
25  Q    So all the money -- they were the owners?

1  A   Yeah.   The investors in my program, they put up all the

2  money.

3  Q   The defendants put up all the money?

4  A   No.  All investors, including the defendants, put up all

5  the money.

6  Q   And the defendants can choose whether to sell a property,

7  hold a property.  Realty has no say into what their decision-

8  making is; is that correct?

9  A   That's correct.

10 Q   And Realty can't make them sell a property; is that

11 correct?

12 A   That's correct.

13 Q   On a land contract sale, when is Realty owed the money?

14 A   If we take Duncan as an example and our part -- let's say

15 it's 60,000 profit, and we should get 30 percent of that, so

16 let's say 18,000.  We should get the -- when the balance of

17 the land contract gets to 18,000, they should pay us in cash

18 or sign the balance of the land contract payments to us

19 because that's what we're owed.

20 Q   So you're due 30 percent of the balloon payment, in

21 essence?

22 A   No.  I'm -- no, because you can't go by the balloon

23 payment because they could pay down, and there could be no

24 balloon payment.  I'm owed the difference in what we paid for

25 it and what it sold for.  This thing sold for 89,000.  We

1  paid 24 for it.  So there's commissions and things, some

2  costs in there, but I'm entitled to the difference, 30

3  percent of that difference, which I believe is about $60,000.

4  Q   Did you personally do the follow-up with the defendants,

5  or did you have your office do it?

6  A   On what?  Follow-up on what?

7  Q   Showings, rentals, any type of follow-up.  Was it handled

8  by you or by your office?

9  A   It was handled by me and my office, but every listing

10  would have a listing person that would help with it, and they

11  would do the task of listing it, MLS, getting that stuff

12  done.

13  Q   Other than the defendants and Ray Confer, what other --

14  how many other investors did you have in 2009?

15  A   I don't -- not very many, but I don't know the number.

16  Q   Well, five?

17  A   I really don't know the number.

18  Q   Ten?  No idea?

19  A   I don't know the number.

20  Q   Today you have how many?

21  A   About 50.

22       MR. KWIATKOWSKI:  I have no further questions.

23       THE COURT:  All right.  Thank you.  Before --

24  Ms. McCollum, I assume you're going to have some redirect or

25  not?

1         MS. MCCOLLUM: Very brief, yes.

2         THE COURT: Yeah. How brief do you think? We're

3 going to take a lunch break, but if it's going to be brief,

4 we can --

5         MS. MCCOLLUM: About five to ten minutes.

6         THE COURT: All right. Let's see if we can get

7 that -- get Mr. Roberts finished testifying at this stage

8 before we have lunch. Go ahead.

9         MS. MCCOLLUM: Thank you, your Honor.

10                     REDIRECT EXAMINATION

11 BY MS. MCCOLLUM:

12 Q   When you talk about the houses in Ralph Roberts Realty's

13 investor inventory, are those properties subject -- are any

14 of those properties subject to redemption?

15 A   Yeah. Some of them could be, yes.

16 Q   So if you said that the inventory is 500 houses at any

17 given time, some of those are subject to redemption?

18 A   They could be, yes, for sure.

19 Q   So of those 500 houses, not all of them are, quote,

20 eligible for split?

21 A   Correct. They got to -- the ones that are still in

22 redemption have to go through redemption before you can

23 determine if you're going to split or rent.

24 Q   When you talk about losses, are you talking about an

25 investor's expenses with respect to a property, or are you

1  talking about a loss of principal?

2  A   The whole thing is to protect their principal, protect

3  their principal to make sure they get their principal back,

4  so anytime we're talking about losses, we're talking about

5  principal, getting their principal back to them.

6  Q   Not expenses associated with the property?

7  A   I don't know.  The expenses could be part of the

8  principal if they wrote checks for certain things.  As long

9  as it wasn't rented and there wasn't other cash flows on it,

10 they would be entitled to that as part of their principal,

11 too.

12 Q   To discuss your investor program, when you send your

13 standard form e-mail, what is typically included in that e-

14 mail when Realty sends that e-mail to investors?

15 A   Picture of -- multiple pictures of the property, Google

16 map so they can see where it's at, three bedrooms, two

17 bedroom, basement, garage, people's name that's losing it in

18 foreclosure, and whatever information we have right then, and

19 then there's always follow-up because you don't have all of

20 it done.  You want to get it out in front of them so they can

21 get out and look at it themselves.

22 Q   How many investors typically respond with respect to any

23 individual property?

24 A   Two to ten depending on where it's at and what its

25 opening bid is.

1    Q    If a property is going to foreclosure sale but there's a

2    tax foreclosure, what kind of -- tell me about the

3    interrelationship there.

4    A    Each year in March you could lose a property if you don't

5    pay taxes from three years ago, so it's something that we

6    have to watch as part of the cost of buying the property,

7    what the investment is going to be, but we can't have the

8    taxes not get paid and then you lose a property, so we advise

9    our investors to pay the taxes, get us the receipt, or let us

10   pay them for you, and then we'll record the affidavit

11   attached to the sheriff deed so you would get your money

12   back.

13   Q    If a property is redeemed, does the redemption -- does

14   the person paying the redemption in that situation also have

15   to pay for the taxes that were paid?

16   A    They have to pay the principal, taxes, insurance, and

17   interest on those three items back to the investor.

18   Q    Did the defendants do drive-bys on all the properties

19   that they bought?

20   A    They did for sure.

21   Q    How many former investors have you sued?

22   A    I think it's three.  There's four total.  There's four

23   total with this group here.

24   Q    Even the ones we settled with?  Were there more?

25   A    Oh, I'm not counting those.  The four, yeah.

1  Q   So it is true that you pursued more investors than the

2  Savoy defendants?

3  A   Absolutely.  After I filed bankruptcy, it seems like

4  people thought they didn't have to honor their agreement with

5  me, their verbal agreement if it's just verbal.

6  Q   And what steps are you taking going forward to ensure

7  that investors in your program live up to their commitments?

8  A   Having them -- having signed agreements and as we do

9  things everything -- more of a paper trail with them,

10  receipts and what they owe and so there's no questions later

11  on.

12         MS. MCCOLLUM:  I have no further questions.

13         THE COURT:  Any recross, Mr. Kwiatkowski?

14         MR. KWIATKOWSKI:  No, your Honor.

15         THE COURT:  All right.  Thank you, Mr. Roberts.  You

16  may step down.

17     (Witness excused at 12:49 p.m.)

18         THE COURT:  At this point, we'll take a lunch break.

19  I have 12 -- I have ten minutes to one as the current time.

20  We'll resume in one hour at ten minutes to two.  Thank you.

21         THE CLERK:  All rise.  Court is in recess.

22     (Recess at 12:49 p.m., until 2:00 p.m.)

23         THE CLERK:  All rise.  Court is back in session.

24  You may be seated.

25         THE COURT:  All right.  Good afternoon, everyone.

1    Ms. McCollum, your next witness for plaintiff.

2              MS. MCCOLLUM:  I'd like to call Ray Confer to the

3    stand, please.

4              THE COURT:  All right.

5              RAYMOND A. CONFER, PLAINTIFF'S WITNESS, SWORN

6              THE CLERK:  If you can take a seat and state and

7    spell your name for the record, please.

8              THE WITNESS:  Thank you.  My name is Raymond A.

9    Confer, R-a-y-m-o-n-d A. C-o-n-f-e-r.

10             THE COURT:  All right.  Good afternoon, Mr. Confer.

11             THE WITNESS:  Good afternoon, your Honor.

12             THE COURT:  Go ahead, Ms. McCollum.

13                        DIRECT EXAMINATION

14   BY MS. MCCOLLUM:

15   Q   How long have you known Ralph Roberts?

16   A   Ralph Roberts, about 30 years.

17   Q   What do you do for a living?

18   A   I do contract sweeping, shopping centers, office

19   buildings.

20   Q   Are you also a real estate investor?

21   A   Yes.

22   Q   Are you a real estate broker or real estate professional?

23   A   No.

24   Q   How long have you been investing with Ralph Roberts

25   personally, not his company, just Ralph?

1   A   With Ralph I did -- well, actually probably '84 is when I

2   probably did my first deal with Ralph.

3   Q   Have you been --

4   A   1984.

5   Q   Have you been investing with Ralph ever since then?

6   A   We did some back then.  Then the market went a little

7   crazy, and then probably 2009 is when the market was -- time

8   to do it again.

9   Q   Were you involved when Ralph started his investor program

10   in 2009?

11   A   Yes.

12   Q   Tell me about that.

13   A   2009 Ralph called me.  It was after his daughter passed

14   away, and I'd been trying to get ahold of him for probably a

15   couple years.  And he finally called me and says, "Hey, I

16   want to talk to you about some investing," so I went and

17   talked to him.  He came up with this idea about buying

18   foreclosures at a discount price and that he would do the

19   work of groundwork of getting the properties, go to the

20   sheriff sale, which I'm not that good at, so it worked out

21   pretty good, and that's what we did.

22   Q   Were you one of the first investors?

23   A   Yes.

24   Q   Do you know when that program started?

25   A   I want to say maybe sometime in June of 2009 maybe.

1  Q   Are you a current investor with Ralph Roberts Realty?

2  A   Yes.

3  Q   How many properties have you purchased through this

4  investor program?

5  A   From Ralph, probably 38, 39, somewhere in there.

6  Q   Have you ever had a property redeemed?  Have you ever had

7  a homeowner redeem a property that you tried to purchase?

8  A   Yes.

9  Q   How many times has that happened?

10  A   Percentagewise?

11  Q   Is it common or is it not common?

12  A   Sometimes it's 50-50, you know, all depends.  We're home

13  savers.  If the people can save their home, that was great.

14  If they didn't, then we stepped in and helped them, and a lot

15  of times I'd just rent it back to them.

16  Q   What are the terms of Ralph's investor program?

17  A   For his program, he does all the legal work.  He goes to

18  the auction, sheriff sale, and we put up the money for the

19  house.  You have to have cash the day of the auction.  He

20  does a split with us that we take the house, and for me, my

21  thing, I rent my houses out.  I don't actually -- I don't

22  flip them because I don't want the income on it, and I want

23  to wait till the market goes up, so he would take 50 percent

24  of the sale price of the house.

25  Q   Does the investor program have an acquisition fee?

1  A   Yes.  It's $5,000 per house that we have to pay above and

2  beyond the cost of the sheriff sale.

3  Q   Do you know why Ralph Roberts Realty charges that $5,000?

4  A   Yes.  And as I explained to people that I brought into

5  the group, he's got probably a dozen people in his office

6  that they research and research and research.  And there's a

7  lot of prep work that's done before behind the scene to get

8  the property, so that's kind of like awash really in my eyes

9  because he's got his overhead and he's got his bills.  And

10  some people can't see that, and I tell them the program is

11  not for you.

12  Q   Do you know if there's a commission piece to the program?

13  A   Sorry?

14  Q   Do you know if there's a commission piece to the program?

15  A   Commission piece?  What do you mean?

16  Q   Meaning if an investor sells the property, do they owe

17  Ralph a commission?  How does that work?

18  A   If the investor sells the property, if he's flipping it

19  right in the beginning, if an investor flips the property

20  right in the beginning, you fix the house up, and all the

21  bills you put into it will come off of the sale, and Ralph

22  would sell the house for us, and we split the commission on

23  it -- we split the profits from the house.

24  Q   Do you -- when you are --

25  A   Did you want -- the second part is if you rent, like I

1  do, you fix the house up, and all the bills that go into the

2  house, that's your responsibility.  And I usually -- I rent

3  them out I want to say from five to seven years before I try

4  to flip them, and then I'm just responsible about it, but I

5  get all the rent.  I get all the rent from it then.

6  Q   On a flip situation, though, an investor can credit off

7  expenses against the split?

8  A   Yes, yes.

9  Q   But not in a rent situation?

10  A   Not in a rental, no.

11  Q   Why?

12  A   Well, in a rental, when you rent it, example, you rent it

13  for a thousand dollars, which is probably the average rent,

14  and you rent it for, say, five years.  You get 60,000 back.

15  And say you paid 30,000 for the property, you got income that

16  he don't touch, and you get to keep it.  And then at the end,

17  then when you sell it you just split it then.

18  Q   So that property that you were just talking about, say,

19  you bought it for 30 --

20  A   Um-hmm.

21  Q   -- you rented it for five years, and you got 60 for the

22  rental --

23  A   Yeah, 60,000.

24  Q   -- and then you sold it for a hundred, what would you owe

25  to Ralph on a split?

1   A   If I --

2   Q   If you bought it for 30 and sold it for a hundred but you

3   got 60 in the middle in rent, what would you owe to Ralph?

4   A   Well, you take the 30 from a hundred, so that would be

5   70, and you split that.

6   Q   Okay.  No expenses or anything?

7   A   Not if you flip, no.

8   Q   Not if you rent, you mean?

9   A   Oh, if you rent.  I'm sorry.  Yes.

10  Q   Okay.

11  A   Not if you rent.

12  Q   Of your properties, of the 38 or so that you own, how

13  many of them are currently rental properties?

14  A   All of them.

15  Q   Have you ever split a property -- have you ever sold a

16  property such that you owe a split to Ralph?

17  A   Not yet, not yet.  I'm waiting for the market to go up.

18  Q   Tell me about how Ralph Roberts Realty notifies you as

19  one of its investors of potential property opportunities.

20  A   For buying a house?

21  Q   Yes.

22  A   There's an e-mail that goes out to everybody at the same

23  time, and the first-come, first-serve -- whenever you see e-

24  mail, you go on a list.  You can be one, two, three, four on

25  a list, and then if you're on the list, when they do the e-

1    mails like that, you have to come up with an overpayment, say

2    an overbid, it would be called.  So if someone wanted to bid

3    5,000 overbid, then -- and if you're the first guy and you

4    don't want to bid any, so if it's in the -- because the

5    auction goes as an auction, so right away if you don't want

6    to bid any and somebody else starts bidding it, that means

7    the second person has got the option.  And if you only wanted

8    to go five and it goes past the five, then the next person

9    that may want to go seven would get it then.  And then when

10   we have our meetings, typically the e-mails go out for

11   Oakland County and stuff like that, but when we have our

12   meetings, we have -- we have a box that goes around, and you

13   put your hand in.  You pull a number out for the house, and

14   whoever has the highest or lowest number -- they switch back

15   and forth -- will have first right on the house.

16   Q    Is there any situation where an investor would be given

17   an e-mail about a particular property before any other

18   investor got it?

19   A    No, no.  It goes out to everybody.  I think that they

20   just push a button.  It goes out to everybody.

21   Q    Has this been the case since the program was started in

22   2009?

23   A    Well, in the beginning there was just me.  There was just

24   me in the beginning, and we did -- it was like a test

25   program.  I already had a fair amount of houses.  I was just

1  trying to help Ralph out a little bit, so -- because I had a

2  lot of investors that wanted to do real estate but didn't

3  know how to do real estate, were scared to get into it, and

4  you were buying 20 cents on a dollar stuff.  It was like a

5  no-brainer to get into it then, so --

6  Q   Have you ever had a loss on a house?

7  A   A loss on a house?

8  Q   A loss.

9  A   No.  I never sold one, so I never had a loss.  I mean --

10 Q   Have you ever put more money into a property to fix it

11 than you paid for it?

12 A   There was only one property, but I bought it right, and I

13 know I could sell it for three times as much.  And it had a

14 little mold, and I went to the point where I just decided to

15 gut the property, but I get 1,595 a month rent for it now, so

16 I get my money back, and I'll get it when I sell it, so --

17 Q   Did you know about the problems when you bought the

18 house?

19 A   Yes.

20 Q   Did Ralph or his company tell you about them?

21 A   I could see through the window, you know, of what it was,

22 so -- and typically some pipes broke, busted.  I mean that's

23 usually what happens, you know, but drywall, repair the

24 pipes, and this one here was sitting for awhile, though.

25 This one was sitting, plus I had a year redemption, so --

1  which was tough on me, so --

2  Q   Do you normally do a drive-by visit to properties before

3  you buy them?

4  A   Um-hmm.

5  Q   Always?

6  A   Well, not always, no, no.  I shouldn't say always.  No.

7  When I can, I do.  Typically, if the price is right, I mean

8  you can look at the picture, and if -- usually if the outside

9  is fairly nice, the inside is fairly nice.  That's how it

10  usually goes, so -- and some you just don't have time to look

11  at, but when you're buying 20, 25 cents on a dollar, all

12  you're doing is going in there and putting make-up on them,

13  so --

14  Q   How long does it take you to re-rent -- to rent a

15  property after you've bought it?

16  A   After I bought it, probably -- I could probably flip them

17  in a month, month and a half probably, a month, all depending

18  on how many I get at one time.  You know, if I get --

19  sometimes you get two, three at a time, so --

20  Q   And what typically do you have to do to make a property

21  rentable?

22  A   We go in, and we -- well, I mean there's some I just do

23  the carpet, clean the carpet and rent.  I mean some are like

24  that.  And then you get some you have to go in, you got to

25  replace the carpet, a couple other minor things, and then

1    there's other ones where you have to go in.  There's holes in

2    the drywall.  Typically it's just drywall repair.  You paint,

3    put new carpet in, and you just put make-up on it.

4    Q    Is there anything you can tell me on average about the

5    houses you buy?  Are they generally in good shape, generally

6    in bad shape, or is it just all over the place?

7    A    Generally they're in decent shape where you -- I mean to

8    me holes in the wall, that's no big deal.  Drywall can do

9    wonders, and it doesn't take that long, so that's basically

10   what it is.

11   Q    Do you -- when you receive an e-mail from Ralph's

12   company, is that the information that leads you to want to

13   make a bid on a house?

14   A    Yes.

15   Q    Do you do other independent investigation?

16   A    Such as?

17   Q    You already said you sometimes drive by the houses.  Do

18   you ever look them up on the Internet, on Google streetview,

19   or anything like that?

20   A    Oh, we sometimes Zillow them and see if they're -- and

21   sometimes the SEV is on there.  It gives you a pretty close

22   idea.  But, again, if you're buying them, you know, 25

23   percent of the market, that gives you a good gauge of where

24   you're at.

25   Q    Do you concentrate on any particular area when you buy

1 properties?

2 A    No.

3 Q    How do you know -- strike that.  Is there an average

4 amount as a percentage that you would spend to rehab a house?

5 A    An average?  I would say probably from 20 percent to

6 maybe 40, 45, 40.

7 Q    Do you think it's possible to lose money in Ralph Roberts

8 Realty's investor program?

9 A    Not if you're buying it right.  I mean I bought stuff

10 before he was -- he come about, and I was buying like 50, 55

11 percent, which I thought I was doing good, and then with his

12 program at 25, 30 percent, it was like a no-brainer.

13 Q    Do you know of any investors other than these defendants

14 who say they've lost money in Ralph's investor program?

15 A    No, and I brought in probably 30 guys, probably 25 guys,

16 doctors, different people.

17 Q    Has anybody that you have brought in ever told you that

18 they're unhappy with Ralph's program?

19 A    No.

20 Q    Do you know if anybody has ever tried to negotiate a

21 different deal than the investor program you described?

22 A    Am I aware of any deals?  No, no.

23 Q    Do you know what Realty's deal with defendants was?

24 A    No.

25 Q    What's the normal split percentage?

1  A    Fifty percent.

2  Q    Turn in the book that's got the numbered exhibits -- if

3  you could turn to Exhibit 7, this is a property at 36403

4  Ledgestone.  You don't own that property, do you?

5  A    No.  I never heard of it.

6  Q    Have you ever seen this calculation spreadsheet or

7  document before?

8  A    Yes.  I saw it yesterday.

9  Q    If this was your house, what would you -- what's your

10  opinion of the expenses and the list of expenses that are

11  listed on here against defendants' costs?

12  A    Let's see.  If you buy it for 23,5, is that what --

13  Q    Um-hmm.

14  A    Okay.

15  Q    Um-hmm.

16  A    For me I would never put that much into a house.  I never

17  have put that much into a house.  Are these rentals, or are

18  these flips?  It really doesn't matter, but --

19  Q    This house was rented.

20  A    Yeah.  They seem high.

21  Q    If this was a rental house, are any of these expenses

22  entitled to be deducted against the split?

23  A    Let me just make sure.  The acquisition fee -- see, we

24  paid 5,000, so this is 2,500.  That would come off the split,

25  the acquisition.

1   Q   Nothing else?

2   A   If you're flipping, you said, or --

3   Q   No.  If this is a rental.

4   A   A rental?  Yeah.  Everything else -- everything else is

5   included.

6   Q   And why isn't -- why are none of the other expenses

7   included if it's a rental house?

8   A   Well, typically you got income coming in, and Ralph

9   doesn't get any of that, so we get that.  If we rent it for

10   five years and if it's a thousand a month, you get 60,000, so

11   there's a little pain in the beginning, but through the year

12   you end up making money off it because you end up taking

13   60,000 in where you only put so much into the house.

14   Q   Did Ralph explain the terms of the investor program to

15   you?

16   A   Yes, yeah.

17   Q   And did he explain the rental versus flip concept?

18   A   Well, at first he wanted everybody to flip a little bit,

19   and I'm not a flipper, so I told him I'm not going to flip.

20   I'm just going to rent.  And that's when he decided to do two

21   different programs, you know, for that, so --

22   Q   He did explain the credits?

23   A   Yes.

24   Q   Okay.

25   A   Everybody gets -- you know, when they come into the

1    club -- group -- if I brought a person into the group, I

2    would explain it to them, and then I would have them set up a

3    special meeting with Ralph to -- so they can understand

4    everything, so I would just bring investors in.  The people

5    that I knew and I wanted to help -- and most of them were my

6    friends in real estate that -- then I'd have them go talk to

7    Ralph to make sure they understood everything a hundred

8    percent.

9    Q    But for the people you bring in, you do explain the

10   program as well as having Ralph explain the program?

11   A    Oh, absolutely, yeah.  And then they come to a couple

12   meetings if they want, you know.  I just tell them if you

13   want to come to a couple of meetings, you can come.  It's

14   just ordinary guys that, you know, want to invest.  It's not

15   a -- it's like a no-brainer operation, you know, so --

16   Q    And you explain the difference between what happens when

17   an investor rents a property versus flipping it immediately?

18   A    Yes, yeah.

19   Q    Turn to Exhibit 9 in that same book.  And as you can see,

20   Exhibit 9 is numbered at the bottom.  Starting on Exhibit 9-

21   11, there's a residential lease agreement for this property,

22   which is 29179 Trailwood.  You don't own this property, do

23   you?

24   A    No.

25   Q    And you have no interest in it?

1    A    Never heard of it.

2    Q    If it's a rental, tell me about these expenses.  Would

3    any of them be allowable?

4    A    The acquisition is the only thing if you rent or if you

5    do a land contract, which is the same thing as renting.

6    Q    Turn to Exhibit 10.  This is a property, 7376 Engleman in

7    Center Line.  If you look down --

8            THE COURT:  I'm sorry.  I missed it.  Exhibit what?

9            MS. MCCOLLUM:  I'm sorry.  Exhibit 10.

10           THE COURT:  Thank you.

11   BY MS. MCCOLLUM:

12   Q    According to this exhibit, what was the acquisition price

13   for this property?

14   A    17,000 looks like 626.  My monovision is tough.

15   Q    If you go down on the list of expenses to repairs and

16   maintenance, what's the amount that defendants allegedly

17   spent on repairs and maintenance?

18   A    36,901.40.

19   Q    That's the total at the bottom.  If you go up to the line

20   item for repairs and maintenance --

21   A    Oh, for repairs.  I'm sorry.  Okay.  18,675.27.

22   Q    You don't own this property; correct?

23   A    No.

24   Q    You have no -- you have no interest in it?

25   A    I don't even know where it's at.

1   Q   Is there ever a situation where you would spend $18,000

2   on a property that you bought for $17,000?

3   A   There's only one time I spent money that I paid -- I

4   think it was 35, and I probably put 35 into it, but the

5   property was worth a buck and a half, so that's the only

6   time, and I gutted the house.  I mean I just totally gutted

7   it, but I would never put that kind of money into a -- in

8   this area.

9   Q   If you had put that kind of money into it, would you have

10  sold it for $28,000?

11  A   I wouldn't.  I don't know the market in -- I mean I

12  wouldn't -- I wouldn't, no, no.  It's -- no, I wouldn't.

13  Q   Would you have rented it instead?

14  A   Yeah, yeah.  You could recoup your -- I would imagine in

15  this area you could probably get 900 to a thousand, 850 to a

16  thousand rent over five years, and you could -- and then

17  the -- really, you keep the house, and by that time the house

18  goes up in value, too, so that's another way that -- when you

19  don't -- when you rent them that you can make money on the

20  house at the end when you sell them in the end.  The market

21  goes up.

22  Q   Have you ever had a tenant that you had to evict?

23  A   Yes.

24  Q   Do you do it yourself, or do you have Ralph Roberts

25  Realty help you?

1  A   I have Ralph Roberts Realty evict them.  We use a guy by

2  the name of Robert Novak, and we just hand it to them, and

3  they evict them.  If the rent is not there on the third day,

4  I start evictions right away, and I get a month and a half

5  security deposit, so I don't let them get into me.

6  Q   Do you -- who pays for that eviction?

7  A   I do.

8  Q   You don't charge it against the --

9  A   No.

10 Q   -- acquisition -- I'm sorry -- not the acquisition fee,

11 the split?

12 A   No, no, because I collect rent for the place, so I have

13 income coming in.  I don't share the rent with anybody.

14 Q   What about taxes?  Are you responsible for taxes?

15 A   Um-hmm.

16 Q   Is there anything that you're not responsible for other

17 than the acquisition fee?

18 A   No.  Pretty much that's just it, acquisition fee, but

19 ours is 500 -- 5,000.

20 Q   Do you -- are you paid interest on any of the properties

21 that you purchase through Ralph?

22 A   Paid interest?

23 Q   By Ralph Roberts Realty.

24 A   Paid interest?  What do you mean?

25 Q   If you were to sell a property, would you get any kind of

1  credit for interest, or would you receive a deduction to the

2  split you owed Ralph for interest?

3  A   No, because we go in with cash.  We buy it with cash,

4  like I said earlier.  You buy it with cash, and you go in

5  there, and that's your cash.

6  Q   So you can either invest it with Ralph, or you can do

7  something else with it?

8  A   Right; right.

9          MS. MCCOLLUM:  I have no further questions.

10          THE COURT:  All right.  Mr. Kwiatkowski.

11                    CROSS-EXAMINATION

12  BY MR. KWIATKOWSKI:

13  Q   You started in the program with Realty in June of 2009;

14  is that correct?

15  A   In Ralph's program, yes.

16  Q   Correct.  How many houses since June 1 of 2009 have you

17  purchased?

18  A   Probably about 38 of them.

19  Q   And those are all within the program?

20  A   Yes.

21  Q   And you paid an acquisition fee on each one?

22  A   Yes, I did.

23  Q   Do you have any personal knowledge of the deal that the

24  defendants had with the plaintiff?

25  A   No.

1   Q  Do you know if it was the same deal that you have or

2   different?

3   A   No.  I have no idea what the difference -- I mean I paid

4   5,000 acquisition.  This is only 2,500.

5   Q  So it's possible that the defendants' deal was vastly

6   different than the deal you've explained to the Court thus

7   far?

8   A   The percentage deal?

9   Q   Any deal.

10   A  I'm not aware of anybody else's deals.  I know what the

11   program was, you know, when we started it.

12   Q   Who started it?

13   A   When Ralph started it, and he asked me to see if I'd help

14   him, so I think we did probably -- I don't know -- maybe

15   eight houses or so.

16   Q   When was the first house you bought?

17   A   I want to say maybe in June or so of 2009.

18   Q   And you bought eight or so houses that year?

19   A   Yeah, probably.

20   Q   Do you know who the next investor was in the program?

21   A   Not off the top of my head because I had other friends.

22   I mean there could have been two, three at the same time.

23   I'm not sure.

24   Q   Explain the profit split that Realty gets upon the sale

25   of a house.

1  A    On the sale of a house?

2  Q    Yep.

3  A    If you sell a house, then you get 50 percent of the

4  profit minus the acquisition fee.

5  Q    What about expenses?

6  A    If you flip -- if you flip the house, then any expenses

7  you put into it you get to take them back.  If you rent, then

8  the tradeoff is you get all the rent for what the expenses

9  are.

10         MR. KWIATKOWSKI:  I have no further questions.

11         THE COURT:  Any redirect, Ms. McCollum?

12         MS. MCCOLLUM:  No, your Honor.

13         THE COURT:  All right.  Thank you, Mr. Confer.  You

14  may step down.

15         THE WITNESS:  Thank you, your Honor.

16     (Witness excused at 2:29 p.m.)

17         MS. MCCOLLUM:  Your Honor, I have no further

18  witnesses, and I rest my case in chief.

19         THE COURT:  One second.  All right.  Thank you.

20  Mr. Kwiatkowski, does the -- do the defendants have witnesses

21  to present?

22         MR. KWIATKOWSKI:  Yes, your Honor.  I'd like to also

23  give an opening statement.

24         THE COURT:  Oh, that's right.  I forgot.  You

25  deferred.  Sure.  Go ahead.

1 OPENING STATEMENT

2 MR. KWIATKOWSKI: Your Honor, this is a case in

3 which the plaintiff is seeking turnover of funds relating to

4 a real estate contract with my clients, the defendants. My

5 client, Jon Savoy, Butch Hassig, also Arnold Hassig, Adam

6 Hassig, 1836 Brys, Prime, and I believe it's Adam entered

7 into numerous deals with the plaintiffs based upon the

8 expectations and representations of the plaintiff providing

9 profitable properties for my clients.

10 There is three distinct phases of this relationship.

11 First, there was the terms of the deal that were hammered

12 out, and my client will show and illustrate through testimony

13 in a course of dealings with the plaintiff that that deal

14 consisted of the acquisition fees, a profit split, and a set-

15 off or offset for any losses in the properties. My clients

16 were one of the first investors in Mr. Roberts' investor

17 program. Mr. Roberts has testified that he was desperate at

18 that time, and he struck a deal that he would never strike

19 with any other investors; that they got a different deal.

20 And I think it will be clear from the testimony of Mr. Savoy

21 that that deal allowed for a recoupment of any losses on

22 properties and also that Mr. Roberts would provide honesty,

23 integrity, and follow-up regarding each and all dealings with

24 the company.

25 Mr. Roberts has shown and we have shown the Court

1  through motion practice and briefing that he's willing to

2  advance any self-serving arguments to help sway this lawsuit.

3  This lawsuit became regarding a personal vendetta against my

4  client, not regarding him being fired, and that the profits

5  that he believed were made were not paid over.  It is our

6  position that there was no profits and that we're entitled to

7  a set-off of approximately $65,000 against any future

8  acquisition fees.  And to go beyond that, we believe that the

9  plaintiff has breached his original agreement that he would

10  provide profitable properties.  It's our contention that

11  Mr. Roberts was happy because he was receiving the $5,000

12  acquisition fees.  He was collecting the money and was

13  throwing properties at our clients with the hopes that he

14  would be able -- they would be able to buy not knowing if

15  they were profitable properties or not.  That is why my

16  clients went beyond that step to make sure in their deal that

17  they were covered.  They were putting up all the cash.  They

18  were taking all the risk, so they had to be covered in case

19  the plaintiff's expert strategies fell through, and that's

20  what happened in this case.  We've illustrated through

21  testimony that, you know, by May 25th, 2012, the only

22  comparables that Mr. Roberts had on profit splits were 12,

23  four of which were paid by my client, so there wasn't a lot

24  of profit splits to compare, not a lot of losses to compare

25  to.  We have no idea if there was 500 houses purchased and

1  sold, how many people, you know, are facing potential losses

2  going forward.  Mr. Roberts testified in an affidavit in

3  front of this -- or submitted an affidavit to this Court

4  which stated that the investor program never shares losses;

5  however, in other hearings and in other adversary proceedings

6  before this very Court, he testified quite contrary to that,

7  yes, there's losses.  Today he tries to rectify that with the

8  self-serving assertion, well, yes, we share losses now, but

9  we didn't do it with your client even though I was desperate

10  and willing to sign, willing to enter into any agreement with

11  him at that time.

12        Finally, this was only a business deal.  The

13  plaintiff is seeking a loss -- seeking a judgment against Mr.

14  Savoy, Mr. Hassig, Arnold, Mr. Hassig, Adam, and this was

15  never a personal obligation.  This was always a business deal

16  between the clients.  This was never ever a deal between Mr.

17  Savoy personally.  This was a deal between the entities and

18  the properties and the investor program.  Thank you.

19        THE COURT:  All right.  Do you have witnesses?

20        MR. KWIATKOWSKI:  Yes, your Honor.

21        THE COURT:  All right.  Your first witness, please.

22        MR. KWIATKOWSKI:  The defense calls Jon Savoy.

23       JON GILBERT SAVOY, DEFENDANT'S WITNESS, SWORN

24        THE CLERK:  If you can take a seat, please, and

25  state and spell your name for the record.

1    THE WITNESS:  My name is Jon, J-o-n, no "H."  Middle

2    name is Gilbert, G-i-l-b-e-r-t.  Last name Savoy, S-a-v-o-y.

3    THE COURT:  All right.  Good afternoon, Mr. Savoy.

4    Go ahead, Mr. Kwiatkowski.

5                    DIRECT EXAMINATION

6    BY MR. KWIATKOWSKI:

7    Q   Mr. Savoy, what is your occupation?

8    A   I am a commercial real estate broker.  I'm the president

9    of Lee & Associates of Michigan.  I've been in the real

10   estate business for 35 years, and we have 50 offices in the

11   United States.

12   Q   Have you ever won any awards related to your profession?

13   A   Quite a few over the years.  I obtained a CCIM

14   designation in 1983, which is a designation that teaches you

15   how to purchase and sell investment real estate properties.

16   I obtained the Society of Investment and Office Realtors

17   designation in 1991.  I was the Michigan commercial realtor

18   of the year in 1995.  I was the Oakland County realtor of the

19   year in 2004 as awarded by Brooks Patterson.  I have been a

20   CoStar power broker on a couple of occasions, and I was just

21   inducted into the Midwest Real Estate Hall of Fame last year.

22   Q   When did you meet the defendant?

23   A   I met the defendant in August of 2009.

24                    MS. MCCOLLUM:  You mean the plaintiff?

25                    THE COURT:  You said defendant.

1         MR. KWIATKOWSKI:  Oh, I'm sorry.  I'm sorry.

2    BY MR. KWIATKOWSKI:

3    Q    When did you meet the plaintiff?

4    A    In August of 2009.

5    Q    How did that meeting come to happen?

6    A    An associate of mine, Butch Hassig, had been talking with

7    Ralph Roberts about investing in foreclosure properties and

8    was very reluctant at first but agreed to meet with him, and

9    we met with him at Butch's office and had a face-to-face

10   meeting with him.

11   Q    Now, you stated you're a real estate broker.  Do you have

12   much familiarity with the foreclosure process?

13   A    I did not at that time, no.

14   Q    Did you seek out Mr. Roberts' advice regarding those

15   aspects?

16   A    Yes, I did.

17   Q    Describe your meeting with Mr. Roberts in August of 2009.

18   A    I was very impressed with his knowledge of the

19   foreclosure real estate arena.  He'd authored several books,

20   Foreclosure for Dummies, which I subsequently read, and some

21   other books, so he was purported to be an expert on the

22   topic -- well, by himself he was purported to be an expert on

23   the topic.

24   Q    At that time, did you strike a deal with the plaintiff

25   regarding the investor program?

1  A   We did at our second meeting, not at our first meeting.

2  We met and discussed it, and we got back together at a second

3  meeting and put together an outline of how we thought this

4  could work jointly together.

5  Q   What was the terms of that agreement?

6  A   The terms of that agreement were that Ralph, through his

7  program, would make us aware of potential properties that we

8  could purchase through a weekly e-mail list.  He would do

9  research on valuation for us, give us opinions as to what the

10 values should be, when possible meet with or go inside the

11 properties prior to us making offers on those properties, and

12 basically show us how the process worked.  I would go to

13 the -- well, I'm getting ahead of myself.  Basically, he was

14 responsible for finding property, profitable properties for

15 us.

16 Q   So it was key to you that Mr. Roberts found profitable

17 properties?

18 A   Absolutely.

19 Q   Did you discuss at the second meeting the acquisition

20 fees?

21 A   Yes.

22 Q   Can you explain to the Court what the acquisition fee was

23 regarding the defendants?

24 A   The acquisition fee was $5,000.  We agreed that the first

25 2,500 would be due when we were the successful bidder at the

1    sheriff sale and received the sheriff's deed.

2    Q    When was the second half due?

3    A    The second half was due at one of two times, either

4    upon -- when we would receive title to the property after the

5    redemption period or at the time of closing.

6    Q    Did you discuss the profit splits with Mr. Roberts at the

7    second meeting?

8    A    We absolutely did.  He was asking for 50 percent of the

9    profits, which I told him was ludicrous.  It's not like I was

10   going to put up all the money and give somebody 50 percent of

11   the profits, so we agreed that the split would be 30 percent

12   to him and 70 percent to us.

13   Q    Did you discuss any other items on the profit split at

14   that time?

15   A    Yes.  We discussed what the formula would be to arrive at

16   a calculation to determine what the profit would be on each

17   property.  That basically consisted of -- Ralph was doing

18   work for each property, so he was getting a $5,000

19   acquisition fee.  We, in turn, were doing work for each

20   property to renovate, bring the property to market, acquire

21   it, you know, have the attorneys review the documents,

22   conduct due diligence, drive around by the properties, so we

23   agreed as a credit to our LLC, whichever LLC was acquiring

24   the property, that the LLC would get a $5,000 credit against

25   the profit calculation.  In addition, because we were putting

1  up 100 percent of the cash, we agreed that we would get an

2  interest credit for the money that we were putting in, which

3  would be added. We weren't paid that interest. It was a

4  credit in the calculation. I want to be clear. There's been

5  talk that we were paid that money. We were not paid that

6  money. It's been indicated that we were paid a five -- that

7  we were paid a $5,000 credit. That's incorrect. Our paid

8  money, it was a credit to the partnership to balance that

9  out. In addition, any repairs or maintenance that were

10  required to get the property to be able to sell we would be

11  able to -- because obviously IRS Tax Code, you add that to

12  your basis. It's a tax calculation as well as a common sense

13  calculation, so any expenses, taxes that we had to pay,

14  insurance premiums, utilities because the houses were vacant,

15  city inspection fees, accounting fees, anything that was

16  necessary for each property to file an income tax return was

17  an expense to that property or would be.

18  Q   And that's the formula you always used to calculate in

19  that property?

20  A    In addition, if there were -- you know, we would have to

21  pay for title insurance. We would have a $500 closing fee

22  because we handled our own closings. We learned very quickly

23  that Ralph Roberts' firm was pitiful on follow-up, and I

24  could not trust that things would be done properly, so I

25  attended all of the closings. And, in essence, to say I

1 didn't like Ralph -- I liked Ralph.  He just -- they did not

2 exercise the level of professionalism that I've come

3 accustomed to in my 35 years of doing this, so I like things

4 to be done properly, and so we would -- I had my in-house,

5 Kelly Savoy, that Ralph had mentioned earlier, who's been

6 doing this for 15 years.  She would handle all of the closing

7 documents with the title company.

8 Q   So did you --

9 A   If we had any legal fees to have the attorney review

10 documents for any reason, we would allocate those.  I don't

11 know if I've missed anything.

12 Q   Well, let's move on to the next crucial part of the deal

13 that you struck with Ralph.  Was there any discussion of

14 losses on properties --

15 A   Absolutely.

16 Q   -- with Ralph?

17 A   Absolutely.  We were putting up 100 percent of the cash,

18 and it was made crystal clear to Ralph Roberts that we're --

19 if you're going to participate in 30 percent of the profits

20 without putting in any capital at all after being paid an

21 acquisition fee and potentially a commission if you did your

22 job properly, there's no way we were not going to offset

23 losses.  A hundred percent of the losses was what our

24 agreement was, not a percentage.  If we lost money on a

25 property, it was his responsibility, 100 percent of that

1   loss.

2   Q   Why was it that Ralph cut a different deal for you than a

3   lot of -- like the deal that Mr. Confer just discussed?

4   A   Well, I'm interested to hear that Ray was before we were

5   because Ralph told us we were the very first investors.  I

6   subsequently came to learn that -- I knew they were friends,

7   and I knew Ray through business, as Ralph had mentioned

8   earlier, but I was told -- we were told that we were the

9   first investors in the program and that we would have a first

10  right of refusal on any properties until we said no.

11  Q   Did that happen?

12  A   No.

13  Q   When was that breached?

14  A   That agreement was breached probably in December of 2009.

15  We acquired our first property in September of 2009.

16  Q   In that meeting with Ralph, did you also discuss rents?

17  A   Yes.

18  Q   What did that discussion entail?

19  A   Basically, our agreement with Ralph was if originally we

20  weren't -- we didn't have -- you know, originally the

21  intention wasn't to discuss -- wasn't to rent the properties.

22  We were told by Ralph, oh, you can flip these like this.

23  This is a great market.  You can just -- you get these fixed

24  up, Jon, and, you know, we'll get them sold, and you can't

25  lose, and this is the greatest thing, and, you know, blah,

1  blah, blah.  So I made it clear to Ralph that if we did have

2  to rent the properties, that any of the expenses that we

3  incurred were going to be offset against any profits from

4  each property if we were forced -- we did not want to rent

5  the properties.  We were required to rent them because we

6  could not sell them unless --

7  Q   Why couldn't you sell them?

8  A   -- unless we had owner -- we had properties -- excuse

9  me -- that we could sell.  I'm referring to properties that

10 we could not sell.  Ralph's firm I thought initially did a

11 fabulous job.  We were in love with Ralph.  It was in our

12 honeymoon -- we were in our honeymoon phase.  We spent a lot

13 of time having dinners together, drinks together.  I was

14 learning a lot from him at the time about foreclosure

15 properties and the nuances of acquiring of foreclosure

16 properties, so we spent a lot of time together because pretty

17 much the first properties that we sold were all simple for

18 the most part.

19 Q   And those would be the Antonia property?

20 A   The Antonia property sold, the people that lived in it,

21 to the cousin.

22 Q   And that would be also the Raymond property?

23 A   The Raymond property was a beautiful property.  Not a

24 penny had to be put into that property.  Kelly from my office

25 sold that property for us.  We didn't even have to list the

1    property.  And we paid Ralph exactly what Ralph was supposed

2    to be paid on that transaction.

3    Q    And Foxcrest?

4    A    Same thing.  And as an aside, we always sat down when I

5    would attend the closings at Greco, and I would review the

6    profit calculation sheets face to face every single closing

7    that we had with Ralph.  He knew exactly what the numbers

8    were because we provided those, and we also e-mailed those

9    out to him prior to.

10   Q    So it's --

11   A    Now, sometimes through normal course of business, the

12   title company would not get us the closing documents so that

13   we could anticipate what our net was.  We needed our net to

14   provide -- to do the profit calculation, so if we didn't get

15   the closing papers till the day before, we didn't know what

16   the exact net was, so sometimes it would be at the closing,

17   but that was because we didn't get the closing documents any

18   sooner to be able to do that.

19   Q    Let's take a look, Mr. Savoy, at Plaintiff -- or

20   Defendant's Exhibit H.

21   A    Plaintiff's -- where would that be?

22   Q    Defendant's H.

23   A    Can you show me what that is?  These are numbered.  This

24   one?

25   Q    This book.

1    A    This book?  Okay.  Sorry.  Is this upside down?  Okay.

2    Q    Do you recognize that document?

3    A    Yes.

4    Q    What is that document?

5    A    That's for the sale of Antonia in Warren.

6    Q    And this document was provided to the plaintiff?

7    A    Absolutely.  We were at the closing together, and the

8    interesting thing about that closing was the three brothers

9    that purchased the property all had -- their names were all

10   Mohammed.

11   Q    That is interesting.

12   A    So we had three -- which was unusual for me to have three

13   buyers that had the same first name.

14   Q    And Mr. Roberts and/or his staff was aware of all of the

15   expenses, the insurance, accounting, licenses, office

16   supplies.  Those were all provided, all discussed.

17   A    Absolutely.

18   Q    Why is it your position that you're entitled to those

19   expenses?

20   A    Because if you file an income tax return when you acquire

21   or sell a property, there are expenses that you incur when

22   you're filing an income tax return.  I mean these are normal

23   costs of doing business.  He didn't put up the money.  I did.

24   We did.

25   Q    And that's why those are included in the expense and the

1   profit calc; correct?

2   A   Yes.

3   Q   Let's take a look at Exhibit I.

4   A   And I will also mention, as an aside, that on that

5   Antonia property, he made more money than we did, so --

6   because he got a $5,000 acquisition fee and 30 percent.  It

7   was a -- you know, it was a quick turnaround.  He made more

8   money than we did, and we put up the money, but that's fine.

9   That's the deal I made.

10  Q   Are you familiar with the Raymond property?

11  A   Yes.

12  Q   Plaintiff -- Defendant's Exhibit I?

13  A   Yes.

14  Q   Did you review this sheet with the plaintiff?

15  A   Yes.

16  Q   And they were satisfied with the expenses?

17  A   Yes.  This was -- I believe this was actually our very

18  first closing, and we were all very happy.  I could be wrong,

19  but I think it was our very first closing that we actually

20  had because it went very quickly.  This sold almost

21  immediately.  We actually had made an agreement while it was

22  still in the redemption period.

23  Q   Let's take a look at Foxcrest.  That's Plaintiff's

24  Exhibit -- or Defendant's Exhibit K.

25  A   Okay.

1   Q   Are you familiar with this document, Mr. Savoy?

2   A   Yes.

3   Q   What is it?

4   A   You're referring to the profit calculation worksheet?

5   Q   Correct.

6   A   This is for a property that we sold.  This was a complete

7   renovation, pretty much a gut of the property.  We completely

8   renovated the entire property, completely gutted the property

9   and redid the entire -- redid the entire house.

10  Q   Right, because you purchased the property for $42,589.79?

11  A   Yes.

12  Q   And you spent approximately $38,000 repairing the

13  property?

14  A   Yeah.  We replaced everything -- you know, pretty much

15  everything in the entire home.

16  Q   And you provided this to the plaintiff, and he never

17  objected to the repairs and maintenance?

18  A   Not at all.  Sat at the closing.  It was a young man that

19  bought that property.  We sat there together.  We would go in

20  a room at Greco Title before the closing.  I would review the

21  paperwork with Ralph and go over this, and I'd say, "You good

22  with it?"  "Yep."  "Okay.  Great."  I mean we were in love.

23  I mean it was a honeymoon.

24  Q   And can I direct you to Plaintiff's -- or I'm sorry --

25  Defense Exhibit C?

1 A   Yes.

2 Q   And do you recognize this document?

3 A   Yes.

4 Q   What is it?

5 A   This is for Lowell Court in Sterling Heights.  This was a

6 property that we purchased for $48,000.  The house was

7 absolutely in pristine shape.  The occupant of the property

8 kept the house, as Ralph had mentioned earlier, in beautiful

9 condition.  You could have eaten off the floors.  We allowed

10 her to stay in the property for a longer period of time

11 because she was cooperating and let us show the house, and we

12 didn't really require that she move out until we had -- you

13 know, had a purchaser.  We were very generous with her, and

14 we had a very nice relationship.  I got a thank you letter

15 from her after the closing.

16 Q   And you reviewed this document with Mr. Roberts before

17 the closing?

18 A   Yes.  And, you know, one of the -- one of the issues, you

19 know, for the repairs and maintenance, there was a fence that

20 had collapsed on the property, you know, that we had to

21 pretty much replace, so, as far as repairs and maintenance

22 and the testimony earlier that there would be no repairs and

23 maintenance is untrue.  But the house was vacant between the

24 time the occupant moved out and the new buyer moved in, hence

25 the utility costs, you know, legal fees, had attorneys review

1    our documents.

2    Q    Mr. Roberts never voiced an objection to any of these

3    fees?

4    A    Absolutely not.  He was thrilled.

5    Q    Because you were entitled to those fees?

6    A    Yes.

7    Q    Because it was part of your deal?

8    A    Correct.  He was also on this transaction paid a

9    commission.  I got to the closing and realized he was

10   charging me four percent, and he only -- other broker was

11   getting three, so he charged me an extra percent just

12   because, you know, he thought that he should.  He was that

13   much more valuable so he could get a commission, get an

14   acquisition fee, and get his piece of the profit, which is

15   great.  That's what we agreed to.  Happy to pay it.

16   Q    What happened with your relationship with the plaintiff

17   following the sale of these four properties?

18   A    Well, the interesting thing about acquiring these types

19   of properties is when you first purchase the properties, we

20   went through a whirlwind purchase cycle where we purchased --

21   I believe that I was involved with 16 properties between

22   September of 2009 and -- I don't have the chronology in front

23   of me, but I believe through probably the end of the first

24   quarter of 2010, so it was probably about a six- or seven-

25   month time frame that we acquired all of these properties.

1  Q    That's because of the redemption periods?

2  A    Because of the redemption period.  When you acquire a

3  property, it takes six months to twelve months to redeem, as

4  Ralph had mentioned earlier, so during that six-month time

5  frame, you've got to pay the real estate taxes.  You've got

6  to pay insurance premiums on the house because you now own

7  them, and even though you can't occupy them, you want to get

8  insurance to cover the house in case somebody burns it down.

9  And, you know, in some instances we were able to get access

10 to the houses and heat them through the winter because they

11 were vacant, so there were costs associated with those homes,

12 including the acquisition fees, prior to us ever being able

13 to put them into service and do something with them with the

14 exception of the owner-occupied properties that we acquire --

15 with the exception of the owner-occupied properties that we

16 acquired, because they were -- they agreed -- as Ralph had

17 testified earlier, they agreed to stay in the property

18 from -- you know, from the time of closing.

19          And we also had situations where -- I believe it was

20 with Teppert where the occupant in the property -- in fact,

21 I'm positive it was Teppert.  The occupant of the property

22 did not pay us a dime of rent until after the redemption

23 period and then agreed to lease the property, you know, at

24 that point in time.

25 Q    After what we call the honeymoon phase, the four

1    properties that were sold quickly and splits paid to Ralph,

2    did you ascertain any problems with the service you were

3    receiving from the plaintiff?

4    A    Yes.  It really began with my staff.  I have a staff in-

5    house.  I have a CFO, Trina Bush, and then I have Kelly

6    Savoy, who works with me kind of in a COO as well as an

7    assistant capacity.  And they were in charge of keeping track

8    of all the paper mark -- paperwork excuse me -- under my

9    review, and they -- I liked Ralph.  I enjoyed spending time

10   with him.  They couldn't stand him.  They couldn't stand

11   dealing with his office, and they were complaining to me

12   constantly, they don't return calls, they don't ask us --

13   they don't give us documents when we ask for them, it's just

14   ridiculous the way they do business.  So my staff pretty much

15   brought it to my attention first, and then I started to see

16   kind of what was going on.  I think at that point Ralph had

17   built his business of selling these properties.  Our

18   relationship -- you got to realize we needed time to get

19   through the redemption periods.  And in one property,

20   Firwood, which turned out to be a 12-month redemption period,

21   despite the fact that prior to purchasing the property Ralph

22   told us it was six months, and it was only after that -- it

23   was our very first property -- "Oh, gee, Jon, it's 12," my

24   very first property.  Well, took it with a grain of salt.

25   Okay.  Stuff happens.  But I was told it was six months, not

1  twelve, so what happened was we got through that six- to

2  nine-month period where everything was going great, and

3  because we were selling these properties -- and the easy ones

4  sold, and it was just so great.  Then we had acquired some

5  other properties along the way that weren't so great.

6  Q   Which properties would those be?

7  A   Well, I would start with the property on Engleman which

8  we bought.  That was probably -- the second or third week we

9  were with Ralph we bought three properties.  That was one of

10 them.

11 Q   Well, let's take a look at Plaintiff's -- or I'm sorry --

12 Defense Exhibit E.

13 A   That property is located in Center Line, Michigan, which

14 is kind of in the middle of Warren, Michigan, kind of a mixed

15 neighborhood.  I went to school near there when I was growing

16 up, so I was familiar with the neighborhood.  And Ralph found

17 this property on Engleman and told us that he had went inside

18 and met with the owners.  They wanted to stay.  Brand new

19 kitchen.  This house is great.  We acquire the house.  All of

20 a sudden they're not going to stay anymore.  They're going to

21 leave, and they're getting divorced.  And we really cannot

22 get into the house for six months because now it's in a

23 redemption period, so during that time we're getting blight

24 notices from the City of Center Line, who we don't want to

25 aggravate, so we're trying to deal with it despite the fact

1   we don't even technically own the property yet.  We come into

2   that property, walk up to the door, and there's a sticker

3   from the City of Center Line.  They have a little thing there

4   called city certifications that our advisor did not make us

5   aware of.

6   Q   When you say "advisor," you mean Mr. Roberts?

7   A   Ralph.  How could he not know there were city

8   certifications if he's been the expert in this area for the

9   last 35 years?

10  Q   What is a city certification?

11  A   City certification is when you bring in all the

12  inspectors from the city, and they come in and they inspect.

13  They bring in an electrical inspector.  They bring in a

14  plumbing inspector, heating inspector, building inspector.

15  And they came in, and they picked that property apart.

16  Replace the electrical service, replace the majority of the

17  plumbing, replace plumbing fixtures, replace doors, fix

18  doors, fix windows, get the heating system working

19  downstairs, the boiler system.  Turns out, by the way, we

20  came to find out, the house had a Michigan basement.  How did

21  I learn that?  When I walked in for the first time, I smacked

22  my head on a beam and cut my head open because the basement

23  was only six or seven feet high.  We were not aware of that

24  because we had not been inside the house.  So we had to -- we

25  had to basically redo the entire house.  We had a painter

1  come in, gave him a deposit of $1,750, and he died,

2  unfortunately, two days later, so that was when we -- that

3  was how we found Michelle Welker to do the painting.  She had

4  been doing some commercial work, and we were able to get her

5  in the house because we were trying to get the house turned

6  around and get it renovated.

7  Q  So the Engleman transaction, for lack of a better word,

8  was a disaster?

9  A  A disaster.  All the doors -- you couldn't find locks to

10  fit the door.  The house was built in the '20's.  You

11  couldn't -- none of the doors fit.  The windows -- it was

12  just a nightmare.  The whole thing was a nightmare.

13  Q  And Ralph --

14  A  The garage was rotted.

15  Q  Mr. Roberts told you that this was a winner?

16  A  This was a winner.  "Jon, this one" --

17  Q  And you would make a profit?

18  A  "Jon, this one you can sell it for, in bad shape, 45,

19  good shape 60."  It's in the e-mails.  It's in the exhibits.

20  "But if you want to take a land contract, I'll get you" -- I

21  think it was 70 to $85,000.

22  Q  Did you have Ralph sell this property?

23  A  No.

24  Q  Why not?

25  A  At the time that we were -- that we were trying to market

1    the property, I was so fed up with Ralph Roberts Realty and

2    their services that they were providing to us that I didn't

3    want him to handle anything.  I fired him off of the listing.

4    I couldn't get a return phone call.  Ralph was building

5    this -- you know, he was gone now.  He was a superstar.  He

6    was meeting with all these 50 investors, and we were over

7    with because we hadn't been buying properties.  I was going

8    through a divorce, so I was history.  I was nothing anymore.

9    Q    What did you end up selling the Engleman property for?

10   A    Well, first we rented the property because we couldn't

11   sell it the first time around.  Came to find out when they

12   moved out we had to do the city certs all over again, and

13   they came up with another laundry list of expenses that we

14   had -- that we had.  I listed the property with Mike Kriss,

15   who's been a 40-year broker.  He sold over 2,000 houses in

16   the City of Warren.  He's the best I've ever seen.  Showed

17   the property ten or fifteen times.  It couldn't pass an FHA

18   or a VA inspection, and we had to -- we sold the property for

19   $28,000.  We had all these dogs going at the same time.  We

20   were out of cash.

21   Q    The LLC's were cash-strapped because of the --

22   A    They were cash-strapped because we had Firwood, we had

23   Ledgestone, and we had this property, and Trailwood hadn't

24   sold, so we needed to get money out of these LLC's.  You

25   know, we were running out of -- running out of cash at the

1    time, and I was going through a divorce.  I couldn't take

2    personal funds and put it back in there because I was

3    prohibited by the court to do that.

4    Q    Jon and -- referring to Exhibit E, Jon and Butch fee was

5    $10,000 in this transaction.

6    A    Yeah.

7    Q    Why is that?

8    A    Candidly, I mean our agreement that we had made with

9    Ralph was five.  After the hell I went through on this house

10   because I had to be over this house no less than 50 times

11   for -- you know, for dealing with this because we didn't --

12   we didn't charge a management fee to our partners.  We agreed

13   to do this.  We had no idea this was going to be what it

14   turned out to be, and I was over there constantly.  Butch was

15   over there constantly.  We had pipes burst because there was

16   no insulation in the house.

17   Q    So you were doing work that normally --

18   A    Constantly.

19   Q    -- contractors would be doing?

20   A    Constantly.

21        MS. MCCOLLUM:  Objection.  Leading.

22        THE WITNESS:  Constantly.

23        THE COURT:  Hold it; hold it; hold it.  Stop; stop;

24   stop.  We can't have two or three people talking at once.

25   Okay?  So, again, let me caution everybody.  Question, then

1 the answer.  If there's an objection, get it in when the

2 question is done before the answer starts, but certainly when

3 the question is done, so let's try it again.  Mr.

4 Kwiatkowski, your question is what?

5 BY MR. KWIATKOWSKI:

6 Q   Were you doing the work that contractors would be doing?

7 A    Not -- well, we would be -- if we were a building

8 contractor, we would be getting a fee for what we were doing,

9 but was I in there, you know, cleaning it out and painting

10 it?  No.  We were hiring people to do that kind of work, but

11 we did not hire a builder to do the renovations for us.  We

12 oversaw all of that ourselves.

13 Q   What was the total loss on Engleman?

14 A    Just shy of $40,000.

15 Q   Is it your position that the plaintiff owes you that

16 money?

17 A    Yes.

18 Q   Is it also -- are you entitled to a set-off for that

19 money?

20 A    Yes.

21 Q   Against what?

22 A    Well, we had an agreement on all the properties that we

23 would -- because we were acquiring so many, despite the fact

24 they were in different entities, that we would offset profits

25 against losses.  If there were losses, we would offset those.

1   Q   Was the offset dollar for dollar?

2   A   Yes.

3   Q   Is this a similar offset agreement that was in place with

4   the acquisition fees?

5   A   Yes.

6   Q   So if a property was redeemed, you were -- were you

7   entitled to a credit?

8   A   Yes.

9   Q   And could you use that credit to pay other acquisition

10  fees?

11  A   Yes.

12  Q   You've alluded to it, but let's discuss Defense Exhibit

13  F.  Do you have that in front of you?

14  A   Yes.

15  Q   Do you recognize that document?

16  A   Yes.

17  Q   What is that document?

18  A   That's the profit calculation for 32404 Firwood in

19  Warren, Michigan.

20  Q   What did you purchase that property for?

21  A   $28,286.73.

22  Q   What were you able to sell it for?

23  A   $84,900.

24  Q   However, the bottom line shows this property wasn't

25  profitable.  Is that accurate?

1  A   Yes.

2  Q   Why is that?

3  A   Well, first of all, when we originally purchased the

4  property, to restate, I was under the impression it was a

5  six-month redemption period when, in fact, it was twelve,

6  after which it took us two months to get the tenant -- we had

7  to evict the tenant, go to court, spend legal fees to evict

8  the tenant.  We finally got him to move out of the property,

9  and when we went inside of the property, we discovered human

10  and animal feces two foot high under the stairwell in the

11  basement of the property.  The occupant had not had electric

12  or heat or water for probably at least a year, so he was just

13  relieving himself and his pets underneath the stairway, so

14  the odor was staggering when we walked into the property.

15  When we came back to the property the next day, there was a

16  sticker on the property from City of Warren.  City of Warren,

17  city certifications again.  We were told nothing about that

18  by our expert consultant, Ralph Roberts, that the City of

19  Warren had a city certification program.  When we got into

20  the property, we ended up having to replace the windows, the

21  entire kitchen, the kitchen cabinets, all the plumbing

22  fixtures, the plumbing itself or probably 75 percent of it,

23  lots of electrical work.  Aluminum trim was falling off.  We

24  had to spend a lot of time on furnace work, new electrical

25  service.  We may have put a new garage door on.  I'm trying

1   to remember. Aluminum siding on the house. Did I say

2   windows and doors? Floor coverings, tile, pretty much the

3   entire house had to be completely renovated, just completely

4   gutted and completely renovated.

5   Q   Were there property taxes owing on the property?

6   A   Yes. We had to pay property taxes. It took us -- to

7   acquire, get the person out -- one of the big issues we had

8   is it took us almost six months to get the odor out of the

9   property. We brought in two companies that applied some sort

10   of something to the basement walls and basement floors. We

11   couldn't get the smell out of the house. And finally we were

12   able to get the smell out of the house. Of course, we were

13   trying to do that while we were renovating the property.

14   Q   Taking a look at Exhibit F, Roberts Realty, that's the

15   acquisition fee; is that correct?

16   A   Yes.

17   Q   Commissions. That was when you sold the property.

18   A   Yes.

19   Q   Paid a real estate agent; is that correct?

20         MS. MCCOLLUM: Objection. Leading.

21         THE COURT: That's overruled. Go on.

22   BY MR. KWIATKOWSKI:

23   Q   The insurance.

24   A   Oh, we have to have insurance on a house when you're

25   renovating it and legal fees, licenses. Candidly, I don't

1  know what that's for.  Office supplies.  You know, we have a

2  company.  At the time I had partners.  I had a real estate

3  company, and if we used products from our real estate company

4  for my personal or investments that I was with, I would be

5  cheating my other partners if I stole -- I would effectively

6  be stealing office supplies, so this huge $13 and 25 percent

7  charge that's been repeated ten times for office supplies,

8  that's what it was for.  That's why the property taxes are

9  high.  You have to pay for title insurance.  We had utilities

10  for almost two years.  We sold the house in just under two

11  years.

12  Q   Do you believe, though, just to refresh your

13  recollection, could the license fees be for rental

14  applications?

15  A   Yes, probably.

16  Q   And all -- can you take a look at Defense Exhibit P-3

17  right here?  Do you recognize those documents?

18  A   Yes.

19  Q   What are those documents?

20  A   These are the closing documents for the sale of the

21  property on Firwood, copies of all of the bills for the

22  insurance, repairs, maintenance, pretty much everything to

23  do --

24  Q   Are those the supporting documents for each entry on this

25  profit calculation worksheet?

1  A    Yes, yes.

2  Q    The deal that the defendants had with the plaintiff

3  allowed you to take each and every one of these expenses in

4  figuring your net profit to the plaintiff; is that correct?

5  A    Yes.

6  Q    Same as that was done in the earlier splits that were

7  paid; is that correct?

8  A    Yes.

9          MS. MCCOLLUM:  Objection.  Leading.

10         THE COURT:  That's sustained, and the answer is

11 stricken.  Go on, Mr. Kwiatkowski.

12 BY MR. KWIATKOWSKI:

13 Q    Why didn't you pay the plaintiff in the Firwood case?

14 A    We originally had paid the plaintiff.

15 Q    Why wasn't -- let me rephrase the question.  Why was the

16 plaintiff not paid a split on the Firwood property?

17 A    Well, because by -- when we sold this property, he

18 effectively -- based upon our agreement, he owed us -- he now

19 owed us a credit.  You know, he owed us this money, which

20 would be offset against future houses, so he was in -- he was

21 underwater with us at the time, so he wasn't entitled to it

22 pursuant to our agreement.

23 Q    So no profit, don't have to pay.

24 A    Correct.  And as it relates to the sale price of this

25 property, there was some discussion about how we arrived at a

1   value.  There's an e-mail in an exhibit where --

2   Q   I believe that's Exhibit O.

3   A   -- where we were informed by Ralph Roberts' office before

4   I fired them that the house would sell -- we should list it

5   for 79,000, and we should sell it for between 70 and 75.

6   This came from one of Ralph's salespeople, who I had been

7   trying to get out to look at the property and give me a value

8   for quite some time.

9   Q   Is that Exhibit -- are you referring to Exhibit O, Mr.

10  Savoy?

11  A   Sorry.

12  Q   Page 3?

13  A   Yes.

14  Q   Paragraph 3?

15  A   Exhibit O.  Wait a minute.  Yes.  Chris Kayne.  Should I

16  read what he said in the value?

17          THE COURT:  You should let your attorney ask the

18  questions.

19          THE WITNESS:  Okay.  I'm sorry.

20          THE COURT:  Go on, Mr. Kwiatkowski.

21  BY MR. KWIATKOWSKI:

22  Q   Mr. Savoy, is it accurate to say that you were advised

23  that the sale price of this property should be between 70 and

24  75,000?

25  A   Yes.  I was advised of that by Chris Kayne of Ralph

1  Roberts Realty on Sunday, September 13th, 2011, at 3:09 p.m.

2  Q   You actually sold it for more than that, didn't you?

3  A   Yes.

4  Q   Would there ever be a reason for you to lowball a number,

5  try to not get what you can out of a property?

6  A   Well, how would that possibly make sense?  I mean why

7  would I want to lowball and take less and cheat all my

8  partners out of their -- every property has four 25-percent

9  partners.  Why would I want to cheat my partners out of -- by

10  taking less money for a property?  No, I would never do that.

11  Q   Did your partners receive any splits on these?  Was there

12  any profit to distribute in the LLC?

13  A   No.

14  Q   Let's take a look at Exhibit J.  Have you found it,

15  Mr. --

16  A   Yes.  I've got it in front of me, the Ledgestone.

17  Q   What is Exhibit J?

18  A   Exhibit J is a profit calculation worksheet for the sale

19  of the property at 36403 Ledgestone in Clinton Township.

20  Q   What did you purchase the property for?

21  A   23,500.

22  Q   What did you sell it for?

23  A   I sold it for 69,900.

24  Q   Can you describe the services you received from Ralph

25  Roberts regarding this property?

1   A   It was awful and ridiculous.  Couldn't get him out to the

2   properties, couldn't get a return phone call.  You'd call

3   Ralph, wouldn't hear back from him.  I was begging for what's

4   called a comparative market analysis.  It's a very simple

5   document that any real estate agent would prepare when they

6   value a house where they give you the comparables and they

7   summarize the information.  I couldn't even get that.  I

8   would get a list of comparables.  Well, here, you want to

9   figure it out?  Do it yourself.  Okay.  Why would I want to

10  hire somebody and pay them a fee to sell the property they

11  can't even -- if they're too lazy to even give me a

12  comparative market analysis?

13  Q   You're talking like a real estate commission?

14  A   A real estate comparative market analysis.

15  Q   So you were getting no follow-up?

16  A   None, none.

17  Q   Was there an issue regarding the property taxes on

18  Ledgestone?

19  A   Yes.  Part of the reason that we paid Ralph Roberts

20  Realty $5,000 acquisition fees is that when you're purchasing

21  these properties, there's not time to purchase title

22  insurance or to even purchase a title search because even as

23  Ray had testified earlier, you have very little time to make

24  a decision, very little time.  You generally find out about

25  these properties on a Wednesday afternoon or a Thursday, and

1    the sale takes place at ten o'clock on Friday because we only
2    purchased in Macomb County, so -- I forgot the beginning of
3    the question.  I'm sorry.
4    Q    The property taxes.
5    A    Oh, so what Ralph would do is he would -- at least he
6    told us he would do this.  He would go to the county
7    courthouse on Friday morning and do a record search, as he
8    had indicated in his testimony, that -- you know, to
9    determine if there were any liens, you know, I want to make
10   sure you didn't get a second lien, make sure there were no
11   back taxes, you know -- you know, make sure that they were --
12   any unexpected liens against the property because when you
13   bid on them at the sheriff sale, they become yours unless
14   it's a second mortgage that can get expunged, but taxes and
15   those types of things do not become expunged after a
16   redemption period.  You're going to owe that money.
17   Q    Were there back taxes owed on Ledgestone?
18   A    Well, we owned the property for -- we paid a total of --
19   where are the property taxes here -- $9,362.20 in property
20   taxes over essentially what was -- I don't have it of when
21   exactly this was -- the date this was sold, so whatever that
22   time period was, two years, you know, so, yeah, we were stung
23   right out of the -- right out of the gate.  Within a couple
24   days after we acquired this, we had to run down to the Macomb
25   County -- I personally had to drive over to Macomb -- to

1  Mount Clemens -- excuse me -- courthouse to make the payment
2  because we were afraid we would lose the house through a tax
3  sale.  I believe --
4  Q   And this is an expense you're allowed to credit against
5  the gross; isn't that correct?
6  A   Absolutely.
7  Q   And you've always done that?
8  A   Yes.
9  Q   It was always part of the deal?
10  A   Yes.
11  Q   Is it true that today is the first time you've ever heard
12  of a different split, a rent split and a flip split?
13  A   Yes.
14        MS. MCCOLLUM:  Objection.  Leading.
15        THE COURT:  That's overruled.  Go on, Mr.
16  Kwiatkowski.
17        THE WITNESS:  Yes.  Today is the first I've heard of
18  this now whole new -- all the accusations, manipulation and
19  all these things.  This is the first I've heard of this, yes.
20  BY MR. KWIATKOWSKI:
21  Q   For you it was always one program?
22  A   Yes.
23  Q   Losses, 100 percent?
24  A   Yes.
25  Q   Acquisition fees, split 25 up front, 25 either when title

1  vests or at closing?

2  A   Yes.

3  Q   Rents.  Is Mr. Roberts entitled to rents?

4  A   No.

5  Q   Why not?

6  A   Didn't own the property, not an owner in the property.

7  He's entitled to a profit when the property sells.  He's not

8  entitled to -- it wasn't our interest to rent these

9  properties.  Renting these properties has been a nightmare.

10  Okay.  It wasn't our goal going into this thing.  We were

11  told we could sell these properties.  The last thing I need

12  is to be a landlord, so, no, it was never our goal to rent

13  these properties.  It was our goal to own these properties

14  and sell them.

15  Q   So your total investment in the Ledgestone property was

16  approximately 46,400; isn't that correct?

17  A   Yes.

18  Q   How much did you lose on Ledgestone?

19  A   $4,200.

20  Q   There was some discussion regarding the interest expense

21  about the middle of the page that there's two interest

22  expenses on this property.  Can you explain the first

23  interest expense in the middle of the page?

24  A   Yes.  We acquired a loan from a gentleman name Ryan

25  Farnan to acquire properties, and we were paying him -- we

1    had to pay interest on that loan.

2    Q    And the interest that is discussed at the bottom of the

3    page, interest to 1836 Brys, LLC, what is that for?

4    A    That's the interest credit that we received on all the

5    properties pursuant to our agreement.

6    Q    And you get that interest credit in every single

7    property?

8    A    Yes.

9    Q    And how is it determined?

10   A    It's determined based upon a per diem rate at seven

11   percent.

12   Q    Based upon how long your --

13   A    We own the property.

14   Q    Let's take a look at Exhibit L.  Are you familiar with

15   Exhibit L?

16   A    Eastland -- the profit calculation for 17803 Eastland in

17   Roseville.

18   Q    Now, it's the plaintiff's contention that no money could

19   possibly be owed in this case because there was a court

20   settlement.  Can you describe what happened in the Eastland

21   transaction?

22   A    I was out of town, and I had bid on properties at the

23   auction and was the successful bidder for this property.  I

24   believe it was John Selby from Ralph's office met with the

25   homeowners, got them to agree to a lease, and I'm now hearing

1    about cash for keys.  I don't know where there was any cash

2    paid for keys.  I don't have any record of that, but

3    apparently a deed was given to Nail Construction.  And the

4    homeowners of that property hired an attorney to unwind it,

5    as Ralph had testified, and we got a lawsuit in the mail

6    naming myself and -- you know, and Ralph and everything for

7    supposedly how Ralph Roberts Realty dealt with these people,

8    whom I had never met or spoken to.  And they wanted to -- you

9    know, they were going to -- they were perusing a lawsuit, so

10   rather than do that and go to court and go through all that,

11   we agreed to settle.  Ralph, of course, still got his full

12   $5,000 acquisition fee despite the fact that he said that he

13   didn't in his affidavit, and we suffered a loss on that

14   property.

15   Q   And it's your position that the loss on that property is

16   approximately how much?

17   A    $12,879.30.

18   Q   So so far we've discussed Engleman where the loss was

19   approximately 40,000; is that correct?

20   A   Yes.

21   Q   And Firwood --

22   A   Yes.

23   Q   -- where the loss was approximately 8,000?

24   A   Yes.

25   Q   Ledgestone where the loss was approximately 4,000 and

1  Eastland where the loss is approximately 12,000; is that

2  correct?

3  A    Correct.

4  Q    Based on my rough math, that's approximately $65,000; is

5  that correct?

6  A    Correct.

7  Q    Do you believe you are owed that money from the

8  plaintiff?

9  A    I believe I'm owed it in the form of an offset against

10  past profit from one house, so, yeah, I'm owed that money.

11  Q    Is the only house that made a profit after what we call

12  the honeymoon period, the four that we discussed that were

13  paid over -- that made a profit, is that the Trailwood house?

14  A    Yes.  That was a -- that was a very good -- that was a

15  very good transaction, very happy with that.

16  Q    And you made a profit in that house of approximately

17  19,000; is that correct?

18  A    Correct.

19  Q    And to determine the profit, you used the exact same

20  calculation as you've used in every single house from the

21  beginning of the inception into this program?

22  A    Correct.

23  Q    Have you ever changed your formula?

24  A    Yes.  I increased the credit from 5,000 to $10,000

25  because of the amount of work, you know, the credit --

1  seller's credit because of the amount of work that became

2  involved, you know, when you have these properties and fight

3  all this, so that would be the only change to the formula

4  that I made.

5  Q   But all the expense -- were all the expense deductions

6  the same?

7  A   Yes.

8  Q   So the Engleman, Eastland, Ledgestone, Firwood properties

9  were disasters?

10 A   Pretty much, yes.

11 Q   Who found those properties for you?

12 A   Ralph Roberts.

13 Q   Did Ralph ever make promises to you that he would only

14 find you properties that make money?

15 A   Oh, yeah, and you can't lose.  I mean this is what I

16 was -- you can't lose money.  It's not possible.

17 Q   But you lost money?

18 A   It's not possible.  You can't lose money.  You're buying

19 property -- we heard it earlier in testimony -- 20 to 25

20 cents on a dollar.  You can't lose.

21 Q   Did you lose money?

22 A   Yes.

23 Q   Were you surprised?

24 A   Yes.  At the end of it, I was surprised.  It just seemed

25 like a lot of hard work for nothing.

1  Q   You still own a property located at Irene; is that

2  correct?

3  A   Yes.

4  Q   Do you owe any money to Ralph on the Irene property?

5  A   I could if we -- if we ever get our profit and loss back

6  into equilibrium.  We haven't sold the property yet.

7  Q   What do you mean?  If Ralph paid you the $65,000 --

8  A   Yeah.

9  Q   -- you're owed?

10 A   Yes.

11 Q   So, based on the deal, there's no upside to Irene unless

12 you're paid for the downside on all these other homes you

13 lost money on?

14 A   Correct.

15 Q   Does the same hold true for the Teppert property?

16 A   Yes.

17 Q   That due to the fact that ongoing losses in unprofitable

18 properties that the expert found, you don't have any

19 responsibility on the Teppert property?

20         MS. MCCOLLUM:  Objection.  Leading.

21         THE COURT:  I'm going to overrule that.  Go on.

22         THE WITNESS:  Correct.

23 BY MR. KWIATKOWSKI:

24 Q   There's two properties being sold presently on land

25 contract.  Is that accurate?

1    A    Yes.

2    Q    What properties are those?

3    A    There's a property on Duncan in Fraser and a property on

4    South Jimmy in Chesterfield Township.

5    Q    In your second meeting with Mr. Roberts when you

6    discussed the terms of your agreement and solidified your

7    deal, did you discuss land contracts?

8    A    Yes.

9    Q    What was the agreement that was reached at that time?

10   A    The agreement was that if we sold a property on a land

11   contract, whatever the balloon payment -- the amount of the

12   balloon payment would be at the -- whatever it was -- because

13   if it amortized down for any reason, you know, if -- you

14   know, we couldn't control if somebody decided to make more

15   advance payments or, you know, additional principal payments

16   because obviously as we're accepting that revenue into our

17   partnership, we're taxed on it, so it becomes a taxable

18   event.  So the only way -- if he were unable to sell the

19   property for cash, as we were told we would be able to,

20   except for on this particular property -- we had had it under

21   contract to sell it for cash, but there were some structural

22   issues with the property that would have been too expensive,

23   and we couldn't get an FHA approval on that sale.

24   Q    Are you talking about the Duncan property?

25   A    The Duncan property.  I'm sorry.

1  Q   Which is Exhibit A?

2  A   Yes.  On the Duncan property, so we ended up selling that

3  on a land contract, and the gentleman that purchased that

4  property happened to be in the same business that was needed

5  to repair the foundation and fix the issue.

6  Q   So you sold Duncan on land contract; is that correct?

7  A   Correct.

8  Q   Do you have any responsibilities to pay Ralph Roberts on

9  Duncan?

10  A   Not at this point because he owes our partnerships money

11  right now.  If everything had been profitable, I would have

12  had an obligation to pay him a 30-percent split on the

13  remaining balloon payment after our profit calculation.

14  Q   Same profit calculation that's been used in every single

15  other property?

16  A   Every single -- on all the properties that we've already

17  sold, the same exact formula.

18  Q   So it was a no nonsense agreement with the plaintiff,

19  wasn't it?

20  A   Absolutely.

21  Q   Make money, pay money.  Lose money, get credited for

22  money.

23  A   Correct.

24  Q   You were one of the first investors in the program; isn't

25  that correct?

1  A    We were told we were the first.

2           MS. MCCOLLUM:  Objection.  Leading.

3           THE COURT:  Okay.  That's overruled.  Go on.

4           THE WITNESS:  We were told that we were the first --

5  the very first investor in the program.

6  BY MR. KWIATKOWSKI:

7  Q    Did you request any special concessions from the

8  plaintiff to become a part of the program?

9  A    I approached Ralph with the idea that I would with any

10 other of the real estate properties that I own.  I'm partners

11 in many real estate properties around town and have been for

12 years.  I'm involved in many partnerships.  Some I manage.

13 Most I don't.  I see the accounting statements every month,

14 and I know what's involved with what expenses are for

15 properties.  And I don't have any -- I don't have any

16 properties that don't charge legal fees, professional fees,

17 you know, improvement costs.  You know, I don't have any of

18 those types of partnerships --

19 Q    So --

20 A    -- so to me it made no sense whatsoever.  You're not an

21 owner in the property.  You don't own it.  It's not on your

22 tax return.  You're entitled to a fee based upon a formula,

23 you know, at the end game.  You're not participating in any

24 of this.  You don't own it.  You're not -- none of their own

25 money involved in this.

1    Q    Do you owe any acquisition fees to the plaintiff?

2    A    No.

3    Q    Is that because you're owed money?

4    A    Correct.  In addition, the accounting statements that we

5    received or have received -- one of the issues that we've

6    had -- I don't know how many employees Ralph Roberts Realty

7    has gone through.  My guess is 20 or 25.  I don't know.

8    Maybe I'm way off.  But when Kim Taylor left, you can't get

9    a -- there's nothing that comes out properly.  There's an

10   exhibit I got last night where there's -- they sent me an

11   invoice for Raymond, which was the first property we --

12   there's an invoice in here that charges -- attempts to charge

13   us for money that -- you know, that we paid.  I mean the

14   accounting is atrocious.  No clue whatsoever.  No records, no

15   signed documents.  We're the ones providing all the

16   documents.  Nothing is coming from that side.  I don't know

17   which exhibit -- oh, it's in -- excuse me.  It's in the --

18   it's in the exhibit book.  Exhibit 15, e-mail, Tuesday, March

19   15th, 2011.  They're asking for 5,096 and 906.80, which

20   doesn't add up, and they're asking for 30 percent of the

21   upside of the property, which was paid in 2009.  This is the

22   kind of crap I've been getting for the last two years, for

23   the last two and a half years, no substantiated anything.

24   Q    Because that was a closing you attended with Ralph; isn't

25   that correct?

1   A    Absolutely.

2   Q    And they were paid?

3   A    It was our very first closing.

4   Q    Another of the remaining properties is the Jimmy Court

5   property; is that correct?

6   A    Yes.

7   Q    That's being sold on land contract?

8   A    It's being sold on -- that was a zero down land contract.

9   The purchaser of that just filed -- just went through a

10  bankruptcy.  There's a five-year balloon associated with that

11  contract, but I don't believe the purchaser is going to be

12  able to meet that obligation for a couple of reasons.  One,

13  the value of the land contract is higher than the value of

14  the property, and, two, I don't believe that you can get a

15  mortgage for a certain amount of time after you file for

16  bankruptcy, but I'm certainly not an expert in that area.

17  Q    Do you owe any money to the plaintiff based on Jimmy

18  Court transaction?

19  A    No.

20  Q    I'm going to go back a step just for a moment.  Describe

21  the circumstances when you fired Ralph Roberts Realty.

22  A    I don't know if any of the exhibits are here.  I'd be

23  embarrassed to say what I said out loud, but basically we

24  couldn't get Ralph, despite the fact I had not signed his

25  listing agreements myself -- he had signed them himself -- I

1    couldn't get him to remove them from the multi-list system so

2    I could relist with a professional real estate firm, so we

3    had quite an e-mail battle going back and forth, but finally

4    we were able to get the properties into the -- you know, into

5    a professional marketing firm's hands.

6    Q    And anytime you made money on a property, you paid the

7    plaintiff; isn't that correct?

8    A    Yes.

9    Q    Anytime you lost money, what happened?

10   A    So far.

11   Q    Anytime you lost money, what happened?

12   A    Well, the first bundle of properties all made money.

13   Like I said, it was the honeymoon phase, so those were all

14   paid.  Now we're dealing with the ugly properties we'll call

15   them.

16   Q    So based on your range of the properties that were

17   purchased, some -- did some require very little rehab and

18   maintenance?

19   A    Are you talking about some of the ones that we sold?

20   Q    Yes.

21   A    Oh, yeah.  I mean we had bought some beautiful properties

22   that required very, very -- I mean they were cleaner than

23   they would have been if we'd have done it ourselves.  I mean

24   they were in beautiful condition.

25   Q    And on the flip side, were some of the properties

1  disasters?

2  A    Yes.

3  Q    And were those found by the plaintiff?

4  A    Yes.

5  Q    And those weren't profitable properties, were they?

6  A    They were not profitable properties.  We were promised

7  profitable.  They were not profitable properties.

8  Q    You lost $65,000?

9  A    Correct.  That's correct.

10  Q    Did the plaintiff claim to be a specialist at finding

11  deals?

12  A    Oh, yes.  I mean he gave me a copy of his book,

13  Foreclosure for Dummies.  I mean he's a world-renowned expert

14  supposedly.

15  Q    The Foxcrest property, for example, you paid $38,000 to

16  rehab that property.  Did the plaintiff question that

17  whatsoever?

18  A    No.

19  Q    Why do you think he questions the rehab costs on the

20  properties where you lost money?

21  A    Because he wasn't there.  He didn't bother to go through

22  the properties, and, you know, he disappeared.  He wasn't

23  going over there and checking out and looking at the

24  properties and seeing what we were dealing with.  It was our

25  problem now.  We weren't buying -- by that -- by the time we

1   got these properties, you understand we weren't buying

2   anymore.

3   Q   So when you were buying, you were -- were you top on the

4   list?

5   A   Oh, top, dinner, I'm buying.

6   Q   Did Ralph offer -- strike that.  So once you stopped

7   buying, did the service go down?

8   A   Like the real key of the service going down -- and I

9   don't recall the exact date, but he had a really good office

10  staff, Kim Taylor, and she was great.  And when she left, it

11  just went like a waterfall off a cliff instantly.

12  Q   Follow-up, none?

13  A   None.

14          MR. KWIATKOWSKI:  I have nothing further.

15          THE COURT:  All right.  Thank you.  Ms. McCollum.

16          THE WITNESS:  Could I get some water, Scott, over

17  there, please?  I'm talking so much I'm thirsty.

18          THE COURT:  Is that water thing empty there?

19          THE WITNESS:  Yes.

20          THE COURT:  Oh, okay.

21          THE CLERK:  Do you want me to get some?

22          THE WITNESS:  That's okay.

23          THE COURT:  He can help him out if he needs it.

24                      CROSS-EXAMINATION

25  BY MS. MCCOLLUM:

1  Q   Mr. Savoy, can you please turn to Exhibit -- Plaintiff's

2  Exhibit 15, the second page?  You testified just now that

3  this exhibit, second page, dealt with property Raymond -- the

4  property on Raymond.  Can you show me where on there that

5  discusses Raymond?

6  A   Excuse me.  That was -- you got the wrong exhibit.  It

7  was on Exhibit 15-4, not 15-2.

8  Q   I see.  Okay.  Turning back to Exhibit 15-2, are we

9  talking about Eastland?

10 A   Um-hmm.

11 Q   That was sold on April 19, 2011.  That's your Exhibit P,

12 1 of 5; correct?

13 A   Do I have to look and tell you that it's correct, or can

14 we just say it's correct?

15 Q   I asked you a question.  Is it correct?

16 A   P.  P, 1 of 5, you said?

17 Q   Um-hmm.

18 A   You're talking about this whole thing, the whole --

19 Q   P, 1 of 5.  The face page of P, 1 of 5, is your --

20 A   Yes.  Okay.

21 Q   -- seller's statement --

22 A   Face, yes.

23 Q   -- for Eastland.

24 A   Yes.

25 Q   It reflects a settlement date of April 19th, 2011;

1  correct?

2  A    Yes.

3  Q    Has a line on it there for payment on court claim;

4  correct?

5  A    Yes, yes.

6  Q    Did you ever tell Ralph that you borrowed money in order

7  to buy Ledgestone?

8  A    Yes.

9  Q    When?

10  A    He knew Ryan Farnan.  He knew that Ryan was going to be

11  involved.  Had that conversation with him on multiple

12  occasions.  Ryan lives one or two streets over from Ralph.

13  Q    But you were aware that you had to purchase properties

14  through Ralph's investor program with cash; correct?

15  A    Correct.  How else would you come to the closing with --

16  or come to the sheriff sale with a certified check if you

17  didn't have cash?

18  Q    Irene and Teppert aren't ugly properties, are they?

19  A    Irene we've come to find out -- we've also now, that

20  being in the City of Warren -- thank you for asking.  We've

21  now gone through two city inspections with that property, and

22  we've come to find out that they are hoarders like on the TV

23  show "Hoarders."  So when you walk in the house, there's

24  hoarders.  There's dog feces everywhere proven, in fact, by

25  the City of Warren's report as such.  The ceiling has caved

1  in because the shower upstairs was leaking, so we have had to

2  replace the ceiling, the shower.  We've spent -- the furnace.

3  We've spent a fortune fixing that place up, and it's still

4  falling apart.

5  Q   You have renters in there; right?

6  A   Correct.

7  Q   They're paying you; right?

8  A   They're paying.

9  Q   If they're terrible, why don't you evict them?

10  A   Because I can't sell the house.

11  Q   But you could fix it and re-rent it.

12  A   I could fix it and re-rent it.  That's correct.  I could

13  fix and re-rent.  I can't sell it now because there's a lien

14  against the property, so I can't sell the property and

15  haven't been able to for the last six or eight months.

16  Q   You didn't file a claim in Ralph Roberts Realty's or

17  Ralph Roberts' individual bankruptcies, did you?

18  A   No.

19  Q   You are aware that no matter what happens today, Ralph

20  Roberts Realty's debt to you, whatever it may be, has been

21  completely extinguished by his bankruptcy; correct?

22  A   Yes.

23          MS. MCCOLLUM:  I have no further questions.

24          THE COURT:  Anything further, Mr. Kwiatkowski?

25          MR. KWIATKOWSKI:  No, your Honor.

1    THE COURT:  I had a question I wanted some

2  clarification on, Mr. Savoy, while you're there, and then, of

3  course, counsel may follow up with questions after I do that.

4  I wasn't clear what you were saying about what the terms of

5  the deal were that you had with the plaintiff here, Ralph

6  Roberts Realty, with respect to properties that you purchased

7  and later sold on land contract.

8    THE WITNESS:  Yes.

9    THE COURT:  I didn't understand what you were saying

10  there about -- specifically what I didn't get was what you

11  are saying the deal was regarding calculating a profit and a

12  profit split in a situation where the property -- you sell

13  the property on land contract.  Can you explain that to me?

14    THE WITNESS:  Yes.  On a land contract -- so that

15  I'm clear, you're asking not what a land contract is.  You're

16  asking what our deal -- our profit split would be on a land

17  contract; correct?

18    THE COURT:  Yeah.  I know what a land contract is.

19    THE WITNESS:  Okay.  What our agreement with Ralph

20  was because he's not an owner in the property, as we're

21  accepting principal payments -- for example, as we're

22  accepting the principal payments on a land contract, our

23  group is paying the tax on the principal portion of the

24  payment as well as the interest received, but on the

25  principal portion of the land contract payment, so our

 1   agreement was we signed five-year land contract agreements.

 2   And our agreement was when that -- when the balloon payment

 3   was paid, whatever the principal amount was remaining due at

 4   that time, we would do our profit calculation split and pay

 5   the proceeds out of the balloon payment.

 6           THE COURT: All right. So you didn't -- you don't

 7   calculate the split based on what the amount of the balloon

 8   payment is. You're merely saying there was a balloon

 9   payment. That's what money is used to pay the split, if any,

10   that's owing to Ralph Roberts Realty?

11           THE WITNESS: I apologize. Can you ask that one

12   more time?

13           THE COURT: I think what you just said is --

14   indicated is that you weren't -- you don't calculate -- in

15   your view of it, you don't calculate what the profit is, if

16   any, and, therefore, what the 30 percent is, if any, that's

17   owing to Ralph Roberts from what -- the amount of the balloon

18   payment, but, rather, you simply pay whatever profit split,

19   if any, that's owing to Ralph Roberts from the money you

20   receive out of the balloon payment. Is that what you're

21   saying?

22           THE WITNESS: Yes, using the same formula that we

23   would use for the exact same formula we used in the previous

24   five or six sales that we've done, yes.

25           THE COURT: So under your view of it, Ralph Roberts

1  gets paid any profit split they are owed when the vendee

2  under the land contract, the purchaser under the land

3  contract, makes their final payment due under that land

4  contract --

5          THE WITNESS:  Exactly.

6          THE COURT:  -- at which point they're entitled to a

7  deed to the property and to become owners of the property.

8  You're done with it --

9          THE WITNESS:  Yep.  Yes, sir.

10          THE COURT:  -- and the -- out of their last payment,

11  you use that money to pay whatever profit split is owning to

12  Ralph Roberts Realty?

13          THE WITNESS:  Yes.

14          THE COURT:  Is that it?

15          THE WITNESS:  Yes.

16          THE COURT:  But in terms of calculating the -- what

17  the profit split -- the profit is and, therefore, what any

18  30-percent profit split is going to Ralph Roberts Realty, if

19  any, you use the -- essentially your starting point, the

20  purchase price that you sold the property to -- the land

21  contract purchase price?

22          THE WITNESS:  No, no.  It would be the amount of the

23  land contract that -- you know, the amount of the land

24  contract loan amount, not the purchase price.

25          THE COURT:  Well, in other words, when you're doing

1  a straight sale, what's sometimes called a flip in these

2  exhibits, you have a sale proceeds amount, and you have an

3  acquisition price sort of the top --

4         THE WITNESS:  Yes.

5         THE COURT:  Those are the top lines of your

6  calculation.

7         THE WITNESS:  Yes.

8         THE COURT:  The acquisition price, of course, is

9  what was paid at the sheriff sale by you --

10         THE WITNESS:  Yes.

11         THE COURT:  -- for the property to acquire.

12         THE WITNESS:  Yep.

13         THE COURT:  The sale proceeds number in the case of

14  a land contract would be whatever the total sale price is

15  that you charged to the buyer under the land contract, is

16  that correct, whether -- if they paid some money down plus

17  you financed some?  Whatever the total amount they paid for

18  the property, that's the sale proceeds number; is that

19  correct?

20         THE WITNESS:  No.  Our agreement was whether they

21  put a down -- like in one instance they put zero down.  Okay.

22  So he, you know, would be entitled to whatever that balloon

23  is.  Another case the guy put $25,000 down, so he's -- his

24  profit would be based on the remaining land contract payment.

25  You know, that was our least desirable way to sell property.

1    THE COURT:  Well, under a land contract -- in order

2  to determine the total purchase price that you sell the

3  property for to someone who buys on a land contract, you take

4  whatever the amount they pay down and you add to that

5  whatever amount you financed through the land contract, don't

6  you?

7    THE WITNESS:  Well --

8    THE COURT:  You add them together?

9    THE WITNESS:  Well, keep in mind we have to pay --

10  the reason we structured our agreement with Ralph this way

11  was because we have to pay capital gain tax, short-term

12  capital -- we had to pay short-term capital gain tax on that

13  sale.  We had a big taxable event on top of it from that

14  sale, which nobody has brought up in the profit calculation.

15  We had to pay that when we sold the property.

16    THE COURT:  In your view, does that tax liability

17  come out as an expense in the expense column, or does that

18  come right off the top of the sales proceeds number?

19    THE WITNESS:  Neither.  What I'm saying is the

20  reason we structured the agreement that we had with us of how

21  we would calculate that profit was based upon those types of

22  discussions.

23    THE COURT:  So it doesn't matter how much down-

24  payment the purchaser -- your purchaser on a land contract

25  makes.  You don't count any of that as your sort of beginning

1  point sale proceeds number in calculating the profit --

2       THE WITNESS:  Correct.

3       THE COURT:  -- is that right?

4       THE WITNESS:  Yes, because if we were going to do it

5  that way, your Honor, the only obvious way to do it is when

6  we receive the down-payment portion, we would have paid a

7  portion of it at that time because why would we pay the tax

8  on it if we're going to calculate the profit on the entire

9  amount?  We agreed that's not the way we were going to do it

10  because that was not our ideal scenario.

11       THE COURT:  All right.  I think I understand what

12  you're saying now.  Now, if I have totally confused matters

13  and muddied the waters, the attorneys can clear it up, I'm

14  sure, with their follow-up questions if they have any, so,

15  Mr. Kwiatkowski, this is your witness, so let me ask you

16  first if you had any follow-up questions in light of the

17  questions I've asked.

18       MR. KWIATKOWSKI:  I don't think so, your Honor.  I

19  think you managed to -- even though you said in light, I

20  think you've got to the right result at the end of the day.

21       THE COURT:  Ms. McCollum.

22       MS. MCCOLLUM:  I have no further questions.

23       THE COURT:  All right.  So, Mr. Savoy, that's all I

24  have, too, so thank you.  You may step down.

25       (Witness excused at 4:04 p.m.)

1          THE COURT:  All right.  Mr. Kwiatkowski, any other

2     defense witnesses?

3          MR. KWIATKOWSKI:  No other defense witnesses.  The

4     defense rests its case.

5          THE COURT:  All right.  Ms. McCollum, does the

6     plaintiff have a rebuttal case of evidence to present?

7          MS. MCCOLLUM:  Your Honor, I have no rebuttal case.

8          THE COURT:  So the plaintiff rests.

9          MS. MCCOLLUM:  Yes.  The plaintiff rests.

10          THE COURT:  All right.  Thank you all.  Now, I want

11     to talk to the parties about -- counsel about the provision

12     that's in the final pretrial order.  You might remember that

13     at the end of the final pretrial order that was entered in

14     this case at Docket 36 under Section 13 regarding briefing

15     and so forth, the parties agreed to and the Court said it

16     would entertain a post-trial briefing schedule.  Do the

17     parties still want to make -- or file post-trial briefs, and,

18     if so, do you still want to follow the schedule that's put

19     out -- that's set forth in the final pretrial order, or do

20     you want to do something different?

21          MS. MCCOLLUM:  Your Honor, on behalf of plaintiff, I

22     would like to file a post-trial brief.  This schedule is

23     acceptable.  If your Honor wants to shorten it, that's also

24     acceptable.

25          THE COURT:  Mr. Kwiatkowski.

1          MR. KWIATKOWSKI:  Your Honor, I also would like the

2     chance to file a post-trial brief.  I'm happy with the

3     schedule as is but always will take direction from the Court.

4          THE COURT:  Well, my attitude is if the parties

5     want -- post-trial briefing is fine, and what's said in the

6     final pretrial order is fine, but if the parties want to

7     agree to a somewhat shorter schedule than what the final

8     pretrial order says, that's fine with me, too.  You know, the

9     burden is on you guys to do that, so, you know, you tell me.

10    If you want to make changes that you can agree on, then just

11    tell me.  If not, we'll just stick with what's in the final

12    pretrial order.  Ms. McCollum.

13         MS. MCCOLLUM:  Your Honor, my only concern is I

14    would like to cite to the trial transcript.  I know I can get

15    an expedited transcript.  I just don't know how fast I can

16    get it.  If I can get it such that I can file a brief within

17    seven days, I'll do it.  I just don't know if I can do that.

18         THE COURT:  If you want to get a transcript, that

19    seems a bit tight to me.  Fourteen days seems a bit tight,

20    but hopefully you can do that.  That's all right.  So you

21    want to stick with what we have then.

22         MS. MCCOLLUM:  I think 14 days, given that I would

23    like a transcript, yes, that's probably reasonable.

24         THE COURT:  Well, given that then that's what we'll

25    do.  We'll stick with the schedule in the final pretrial

1   order for post-trial briefs.  One second.  So to put dates on

2   the numbers, the day numbers that are in the final pretrial

3   order, then the -- under that schedule, the plaintiff will be

4   required to file a post-trial brief no later than 14 days

5   from today, which is February 4, 2014.  That's a post-trial

6   brief which the final pretrial order says may include

7   proposed findings of fact and conclusions of law.  Then the

8   defendant's post-trial brief will be due 14 days after that,

9   which is February 18, 2014, and then seven days after that

10  each side may file a reply brief, so that's February 25, so

11  that will be the post-trial briefing schedule.

12          Now, what I've done sometimes in the past when the

13  parties have -- were going to file post-trial briefs is

14  dispensed with oral closing arguments the day of -- which the

15  evidence finishes and instead have an opportunity for oral

16  closing arguments after the post-trial briefing has all been

17  filed to give the parties a chance to say anything they think

18  they ought to say in an oral argument in a closing argument

19  setting in light of the briefing and also give me a chance to

20  ask questions that I may have after I read the briefs, so

21  that's what I had in mind now.  Does anybody have any

22  particular objection to doing it that way?

23          MS. MCCOLLUM:  No, your Honor.

24          MR. KWIATKOWSKI:  No, your Honor.

25          THE COURT:  Well, then let's pick a date for the

 1    oral closing arguments then.  I can do it on the date that is

 2    one week after the last briefs are due, so that would be

 3    Tuesday, March 4, at 9 a.m.  Now, I currently have other

 4    cases scheduled for trial that day, actually one other case

 5    scheduled for trial that day.  If that case is still going

 6    that day, what I'll do is simply delay that to start an hour

 7    later or something just so that we can fit you guys in at

 8    nine o'clock and not have to bump you, so does that date and

 9    time work on your calendars?

10          MS. MCCOLLUM:  Yes, your Honor.

11          MR. KWIATKOWSKI:  Yes, your Honor.

12          THE COURT:  All right.  All right.  So that'll be

13    the game plan.  Is there anything else that we need to talk

14    about today then, Ms. McCollum?

15          MS. MCCOLLUM:  Not from the plaintiff, your Honor.

16          THE COURT:  Mr. Kwiatkowski.

17          MR. KWIATKOWSKI:  No, your Honor.

18          THE COURT:  All right.  Then we'll conclude for the

19    day but not before I make this pitch.  You've all seen the

20    evidence come in today, and you know what happened in the

21    trial today.  The parties have already done some extensive

22    briefing of this case, the issues in the case, including

23    legal issues, in the summary judgment briefing that you

24    filed, and so, you know, you're -- both sides' counsel and

25    the principals are pretty well-aware of where this trial

1   stands at the moment.  I would like to encourage counsel to

2   have at least another conversation after today about

3   settlement.  I would encourage you to do that.  I think I

4   recall that you have -- the parties have discussed settlement

5   more than once in the past in this case.

6           MR. KWIATKOWSKI:  We've been awful close.

7           THE COURT:  Not been able to settle, but I want to

8   encourage you to have another conversation, and it doesn't --

9   probably shouldn't be today or right now.  It's just -- let

10  everybody kind of think about things that happened today for

11  a day or two or three or more, and then I would encourage

12  counsel to talk to each other and see whether there might be

13  a renewed possibility of settling this dispute, and, if so,

14  great.  If not, then, you know, you gave it the effort, and,

15  you know, I'm certainly here to decide the case, and we're

16  certainly happy to do that if you can't settle it yourselves

17  by agreement, so we'll go from there.  And if the case

18  settles, of course, you'll let us know with a stipulation or

19  proposed order, I assume, promptly, but if it doesn't, then

20  we'll see you at the oral closing argument time.  Thank you,

21  all.

22          MR. KWIATKOWSKI:  Thank you, your Honor.

23          MS. MCCOLLUM:  Thank you, your Honor.

24      (Proceedings concluded at 4:13 p.m.)

INDEX

Page

Opening Statement by Ms. McCollum          5
Opening Statement by Mr. Kwiatkowski     152

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Ralph Roberts | 8 | 80 | 128 | |
| Raymond A. Confer | 132 | 149 | | |
| Jon Savoy | 155 | 200 | | |

| EXHIBITS: | Marked | Received |
|---|---|---|
| Plaintiff's Exhibits 1-15 | | 3 |
| Defendant's Exhibits A-M, O, P, Q | | 5 |
| Defendant's Exhibit R | 84 | |
| Defendant's Exhibit S | 95 | |
| Defendant's Exhibit T | 120 | |

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    January 28, 2014
_____            _____
Lois Garrett