UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION

IN RE:                          .    Adv. Proc. No. 12-06131
                                .    (TJT)
RALPH ROBERTS REALTY, LLC,      .
                                .    Detroit, Michigan
               Plaintiff,       .    March 4, 2014
                                .
      v.                        .
                                .
JON SAVOY, ET AL.,              .
                                .
               Defendants.      .
. . . . . . . . . . . . . . .   .

                        CLOSING ARGUMENTS
          BEFORE THE HONORABLE THOMAS J. TUCKER
               UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff:       Law Offices
                         By:  HANNAH M. MCCOLLUM, ESQ.
                         24901 Northwestern Highway
                         Suite 444
                         Southfield, MI 48075

For the Defendant:       Goldstein, Bershad & Fried
                         By:  SCOTT KWIATKOWSKI, ESQ.
                         4000 Town Center
                         Suite 1200
                         Southfield, MI 48075

Recorder:                JAMIE LASKASKA

Transcriber:             STEPHEN C. BOWLES

Proceedings recorded by digital sound recording.
Transcript prepared by transcription service.

1          (Proceedings commenced at 9:09 p.m.)

2               MS. MCCOLLUM:  We will call the matter of

3     Ralph Roberts Realty v. Savoy, 12-6131.

4               THE COURT:  All right.  Good morning

5     everyone.

6                    Appearances, please.

7               MS. MCCOLLUM:  Good morning, Your Honor.

8               Hannah McCollum on behalf of the Plaintiff,

9     Ralph Roberts Realty.

10              MR. KWIATKOWSKI:  Good morning, Your Honor.

11              Scott Kwiatkowski on behalf of the

12    Defendants.

13              THE COURT:  All right.  Good morning to

14    everyone.

15              This is the time for closing arguments in

16    this trial, as you know.  I will say that I have read

17    the post-trial briefs filed by the parties.  I'll just

18    refer to them as "post-trial briefs" but I'll leave it

19    -- they include the proposed findings of fact and

20    conclusions of law, in some instances, of course, but I

21    have reviewed those, and so we'll hear closing

22    arguments now.

23              Ms. McCollum, as counsel for the Plaintiff

24    bearing the burden of proof in the case, you'll have an

25    opportunity for a reply closing argument if you want to

1   make one, as -- in addition to this one.  Go ahead.

2           MS. MCCOLLUM:  Thank you, Your Honor.

3           As you mentioned, we have done several rounds

4   a briefing in this case.  I will keep this argument

5   short because I do know that you have read everything.

6   I just wanted to briefly discuss the factual issues

7   that aren't in dispute, touch on the factual issues as

8   Ralph Roberts Realty see's them, and then discuss the

9   legal issues and the conclusions that we would like you

10  to draw in favor of our position.

11          Here, in this trial, unlike in the Roger

12  Roberts trial, it's not in dispute that the Savoy

13  Defendants were actually participants in the investor

14  program.  Mr. Savoy is an experienced real estate

15  professional with, I think he testified, more than 30

16  years experience and several awards, and he

17  investigated independently, all the proposed properties

18  that Ralph Roberts Realty brought to the Savoy

19  Defendants.

20          The Savoy Defendants purchased 16 properties

21  through the investor program.  The terms that the

22  parties do agree on were that Realty was to receive a

23  30 percent split upon the sale of a property, and that

24  the acquisition fee would be paid in two installments.

25          Of this 16 properties, four were redeemed

before title could be perfected by the Defendants, and those properties were Palm Beach, Ursuline and Breckinridge and Eastland Realty. Eastland is where Realty believes that everything was settled as a result of state court litigation and settlement. The Savoy Defendants dispute this, although they have not presented any evidence of the costs associated with the Eastland property.

Four of the properties that were purchased by the Savoy Defendants, were sold, and the -- a 30 percent split was paid to Ralph Roberts Realty. Those properties were Raymond, Antonia, Fox Crest and Lowell, and that bears out the terms of the parties' agreement with the 30 percent split and the commission that was paid on each of those properties.

Then four properties were sold by the Savoy Defendants and not -- and nothing was paid to Ralph Roberts Realty. That was Ledgestone, Firwood, Trailwood and Engleman.

It's also not in dispute that there are two properties that the Savoy Defendants are currently selling on land contract. That's Jimmy and Duncan, and that there are two properties, Irene and Teppert, that the Savoy Defendants still own and have not sold, both of which are currently being rented.

1        After the four properties were sold, Antonia,

2   Raymond, Fox Crest and Lowell, the relationship between

3   the parties broke down, and there was conflicting

4   testimony as to why, but there's certainly no dispute

5   that after those properties were sold, the Savoy

6   Defendants fired Mr. Roberts and ceased to do further

7   business with him.

8        Realty believes that it has demonstrated the

9   following disputed facts that it believes it has

10  demonstrated, and it should not be found to be in

11  dispute, which is that, first, when Mr. Roberts

12  developed this investor program in 2009, he testified

13  at the May 19, 2009, but I think it's pretty clear it

14  was somewhere around May or June 2009, his idea was

15  that investors were going to buy these properties, and

16  they would want to either put minimal, or perhaps a lot

17  of maintenance or repair work into the properties, and

18  immediately flip them, and what turned out to happen,

19  and this was testified by Mr. Confer and Mr. Roberts,

20  was that a number of investors, Mr. Confer first among

21  them, didn't want to flip the properties.  They

22  preferred to hold onto them and reap the stream of

23  income from rental payments which, under the terms of

24  the investor program, they did not have to share with

25  Ralph Roberts Realty.

1           So as a result of this, Mr. Roberts

2   testified, and Mr. Confer testified, as well, that

3   there became sort of two pieces to the investor

4   program, the rental piece and the flip piece, wherein

5   if you were an investor and you purchased a property

6   and you flipped it, you were entitled to credit off

7   pretty much all of the expenses that you incurred in

8   connection with that property, against the split that

9   you had to pay to Ralph Roberts Realty, and this was

10  because you didn't -- you weren't streaming any income

11  from it.  You -- The only income stream you were going

12  to get was the profit you got when you sold it, but if

13  an investor, on the other hand, decided they wanted to

14  rent the property, they did get to keep all of the

15  rental income, but as a consequence of that, then they

16  couldn't deduct all the expenses because those expenses

17  should have been and, as far as Realty knows, all cases

18  other than the Savoy Defendants, were covered by the

19  stream of income that was coming from the rentals --

20  the rental payments on those properties, and Mr. Confer

21  testified to that, that he has not flipped a single

22  property, but that what he does, he will owe Ralph

23  Roberts Realty a 50 percent split, but he will not be

24  entitled to credit off any of the expenses with respect

25  to any of his properties.

Mr. Roberts testified at trial, that he explained the terms of these programs, or his investor program, Part A and Part B, to all of his investors, although Mr. Savoy denied that he had ever had anything like that explained to him, but Mr. Confer also testified that he understood that that would -- that was the term -- those were the terms of the program if you rented your properties verses if you just immediately flipped them.

Mr. Roberts then went on to testify that his program does envision a proportional share of losses. If an investor does lose principal in this program, Mr. Roberts testified that Realty would share proportionately in that loss. So if the investor, on the upside, had agreed to a 50 percent split of the profit -- net profit with Ralph Roberts Realty, if for some reason the investor lost principal, the investor would be entitled to split 50 percent of that loss. It wasn't a, all losses got credited, it was a proportional share of the loss.

But Mr. Roberts also testified that this only came into being -- this sort of proportional loss share only came into being recently, as a response to certain other investors, not the Savoy Defendants' inquiries at his -- either his Wednesday night investor meetings or

1    as a result of meetings with these investors, but as of

2    the date of the trial, as of the date of Mr. Roberts'

3    testimony, he had not -- none of his investors, other

4    than the Savoy Defendants, had ever reported any losses

5    in connection with properties that they purchased at

6    this investor program.

7            So the Savoy Defendants are the only ones who

8    have ever said that there was a loss, and they have

9    said that there were losses with respect to, I think,

10   three out of the -- either two or three out of the

11   properties that were sold, where no money was paid to

12   Ralph Roberts Realty.

13           Mr. Roberts further testified that there was

14   no loss share with respect to the Savoy Defendants

15   because they had such a better deal with Ralph Roberts

16   Realty than any of the other investors in his program,

17   and Mr. Savoy vigorously disputed this, but Mr. Roberts

18   did testify that no other investor's ever gotten as low

19   -- he's never gotten as low of a split as 30 percent

20   from any other investor.  He's never had to pay any

21   other investor a seller's fee, in other words, a $5,000

22   fee that's sort of equal to the acquisition fee that he

23   gets, and he's never let any other investor pay the

24   acquisition fee in installments.  So he testified that

25   he did not have a loss share with the Savoy Defendants

1    because they were already getting such a good deal.

2        He further testified that he never considered

3    the idea of a loss share because he doesn't think that

4    anybody can lose money in his program, and Mr. Confer

5    testified to that, as well.

6        Mr. Savoy testified and Mr. Roberts --

7        THE COURT:  So you, of course, saw the

8    argument in the post-trial brief filed by Defendant,

9    attacking Ralph Roberts' credibility and arguing that

10   he testified consistently on this issue of whether the

11   program included a loss -- the splitting of losses?

12       MS. MCCOLLUM:  Yes.

13       THE COURT:  I think the -- it was pointing,

14   in  part, to the affidavit of Mr. Roberts that was

15   filed in this case, in the summary judgment

16   proceedings.  I think it was Defendants' Exhibit S.

17       Now, that exhibit itself was not admitted

18   into evidence, that affidavit of Mr. Roberts, but there

19   was testimony, and it -- it was brought out during

20   testimony and cross-examination of Mr. Roberts, about

21   his -- things he -- some things he said in that

22   affidavit, including paragraph 23, the investor program

23   does not contain any provision for the splitting of

24   losses on properties.

25       Now, isn't that sworn testimony and that

affidavit by Ralph Roberts, inconsistent with his

testimony at trial on this point?

        MS. MCCOLLUM:  Your Honor, Ralph Roberts

Realty believes that it's not inconsistent, that he

testified at the Roger Roberts trial, that there was a

loss share.  He testified at this trial, I think -- If

you give me a second I'll find it in the trial

transcript.

        (Pause.)

        MS. MCCOLLUM:  He testified -- He -- We

started to testify on direct, on page 28 of the trial

transcript, starting at about line 13, when I asked him

if he had ever testified about investor losses, and he

explained that yes, he had.  He had testified in the

Roger Roberts case, and that he said that there was a

loss share.

        And then if you continue onto the next page,

I asked him if he signed an affidavit in this adversary

proceeding, and he said "Yes," and I said, "Well, what

did it say?", and he testified that yes, he did sign a

sworn statement that there were no losses in -- there

was no loss share in connection with the Ralph Roberts

Realty investor program, but that when he signed --

first, when he testified in the Roger Roberts case, he

was certainly focused on his agreement with Roger

1    Roberts, and when he wrote this -- when he swore to

2    this affidavit, he was certainly focused on his

3    dealings with the Savoy Defendants, but that he does

4    not believe those two positions are inconsistent.

5           The Roger Roberts investor relationship was

6    developed much later than that with the Savoy

7    Defendants, and there, at that point, was a loss share,

8    whereas with the Savoy Defendants, the investor program

9    did not include a loss share.  So he does not think

10   that those two -- essentially three sworn statements

11   are inconsistent at all.

12          THE COURT:  Where did he testify to that,

13   that he doesn't believe they're inconsistent, and what

14   he was focusing on, and so forth?  I don't see any of

15   that in the pages --

16          MS. MCCOLLUM:  In the --

17          THE COURT:  -- two pages you've cited in the

18   transcript, 28 and 29.

19          MS. MCCOLLUM:  He testified -- I'm sorry, he

20   testified here, 28 and 29, about the two affidavits,

21   and then he had testified that there was a loss share

22   in the Roger Roberts case, and then he comes down here

23   and he says, on line 17 at page 29, that there were no

24   -- that he didn't talk about any losses.

25          Then Mr. Kwiatkowski cross-examined him, and

1    I'm going to need to find that, and I believe that on
2    cross-examination is when he clarified that when he
3    talked about the -- when he was talking about loss
4    share and Roger Roberts, he was discussing that
5    particular investor relationship, and if you give me a
6    second --

7              THE COURT:  I'm focusing not so much right
8    now, on the Roger Roberts trial testimony of Mr. Ralph
9    Roberts, but rather on paragraph 23 of the affidavit,
10   Defendants' Exhibit S, which was filed in this case,
11   and which had -- on October 7th, and the affidavit was
12   dated October 7th, 2013.

13             Paragraph 23:

14             "The investment program does not contain any
15             provision for the splitting of losses on
16             properties."

17             That statement.

18             MS. MCCOLLUM:  Correct.

19             THE COURT:  So what about the statement?

20             MS. MCCOLLUM:  Mr. --

21             THE COURT:  Isn't that inconsistent with his
22   testimony, both in the Roger Roberts trial and in this
23   trial?

24             MS. MCCOLLUM:  No, he does not believe it is
25   because he believes that when he was -- when he signed

that affidavit, it was directed towards the Savoy

Defendants' participation in the investor program, and

that at the time that he entered into the investor

program terms with the Savoy Defendants, there was no

loss share.

THE COURT: Did he say that in his testimony

at trial, that that's his belief?

MS. MCCOLLUM: I believe that he did on

cross, and if you give me your -- a minute, Your Honor,

I can try to find that.

THE COURT: Go ahead.

(Pause.)

MS. MCCOLLUM: Yes, page 95 of the trial

transcript, starting on line 19, the first

(unintelligible) in Exhibit S.

THE COURT: Hold on one second.

(Pause.)

THE COURT: Okay. I see that place at page

95. Go ahead.

MS. MCCOLLUM: And Mr. Roberts testifies --

Mr. Kwiatkowski asks him, essentially line -- reads him

line 23, and Mr. Roberts says, "Yes."

And in response to the question of, "How is

that consistent?", and Mr. Roberts says, "It's truthful

with Jon and Butch (phonetic). That's the agreement we

had."

And Mr. Kwiatkowski says, "But that's not
what this says", and Ralph says "Yes, that's what that
-- this says, the investor program.

All right.

"When I did this affidavit, it was for this
case. I never had a splitting of losses
arrangement with Jon and Butch. I currently
now, in my program, believe that if there's a
loss, I'm responsible for 50 percent. If
there's a gain, I get 50 percent, but that
did not exist when the program was started."

THE COURT: That transcript -- That's pages
95 and over to 96 in the trial transcript?

MS. MCCOLLUM: Correct.

THE COURT: Yeah. Okay. Go ahead.

MS. MCCOLLUM: And again, in connection with
this investor program, when the Savoy Defendants joined
Realty's investor program, they were essentially, other
than Ray Confer, the only investors. So at that time
it was even more of a handshake agreement than it was
before the bankruptcy case was filed, and that's why
we're here, because none of the terms were written
down, and obviously the parties vehemently disagree as
to the terms of the program, but I would point out that

1    Mr. Roberts has been consistent in saying that if there
2    is a loss share, as has been basically, he said, later
3    developed, that loss share is proportional.

4            So the Savoy Defendants have taken the
5    position that if they have a loss on a property,
6    they're entitled to set off or credit that entire loss,
7    and Mr. Roberts and Mr. Confer both said, "No, that's
8    not the case, it would be proportional," but in any
9    event, the only investors who have ever claimed that
10   there was a loss, were the Savoy Defendants.  Nobody
11   else, out of the thousand properties that have been
12   purchased through this program, have never said that
13   they had any kind of a loss with respect to a property,
14   and that was testified to by Mr. Roberts --

15           THE COURT:  Where does the -- in the trial
16   transcript did Mr. Roberts testify and Mr.
17   (Unintelligible) testify that if there is a loss
18   sharing, it's proportional?  Do you have that citation
19   handy?

20           MS. MCCOLLUM:  Your Honor, I'm going to have
21   to find it.  So if you give me a minute I --

22           THE COURT:  Is that in your proposed
23   findings?  I don't -- I'm sure it is.

24       (Pause.)

25           THE COURT:  It's in your Proposed Findings of

1  Fact Number 38, page 5, it states that proposition and

2  it cites to the trial transcript, at page 28.

3           MS. MCCOLLUM:  Uh-huh, lines 20 to 22.

4           THE COURT:  Yeah.

5           MS. MCCOLLUM:  And it does kind of continue

6  from there.  He explains a little bit more, but

7  essentially, yes, it's a proportional loss share, just

8  like it's a proportional gain share.

9           THE COURT:  All right.  I see.  He says, at

10 page 28, lines 20 to 22, "Realty would share the down

11 side according to the percentage," that that's the idea

12 there, right?

13          MS. MCCOLLUM:  Yes.

14          THE COURT:  All right.  Thanks.  Go ahead.

15          Oh, what about Confer?  Did he -- Is -- Where

16 did he testify to that?  Do you have that?  I don't

17 think you cited to Confer's testimony.

18          MS. MCCOLLUM:  I didn't, and I may be

19 mistaken, Mr. Confer may not have testified to that.

20 Let me --

21          THE COURT:  Do you know that he --

22          MS. MCCOLLUM:  I thought he did, but until I

23 find it in the transcript, I will not be able to tell

24 you.

25          THE COURT:  You don't have it handy?

1        MS. MCCOLLUM:  I don't.

2        THE COURT:  All right.  Go -- Why don't you

3   go ahead.

4        MS. MCCOLLUM:  Okay.

5        And, Your Honor, I can look at that and bring

6   it up on reply.

7        THE COURT:  Well, I can look at it too.  We

8   have a transcript of Mr. Confer's testimony, and I have

9   my notes of his testimony too.  So, go ahead.

10       MS. MCCOLLUM:  And in -- going back to the

11  sort of fluid nature and the reason that we're here is

12  that nobody wrote down the terms of the investor

13  program between the Savoy Defendants and Ralph Roberts

14  Realty, so Ralph Roberts Realty says there's no loss

15  share with the Savoy Defendants, there's no setoff,

16  there's no right of first refusal, and the Savoy

17  Defendants, of course, vigorously dispute all of that

18  and claim that all of those things were part of the

19  terms.

20       Mr. Roberts and Mr. Confer did both testify

21  that there's no right of first refusal for any

22  particular investor.  The Savoy Defendants may have had

23  sort of a defacto right of first refusal at the

24  beginning, as they were basically the only investors,

25  but the way the program works, and Mr. Roberts and Mr.

1    Confer both testified, is Ralph Roberts Realty sends

2    out an e-mail.  The first investor to respond to the e-

3    mail is first on a property.  There's usually a couple

4    behind them, so if the first drops out for any reason,

5    there's an alternate investor.  Mr. Roberts, I believe,

6    testified that sometimes the investors talk amongst

7    themselves about which -- you know, if a particular

8    investor really wants a house they may cede to another

9    investor at that point, and sort of trade houses

10   around, but there's no right of first refusal for any

11   particular investor.

12          Mr. Roberts testified that each house was a

13   separate contract, that there was no sort of aggregate

14   investor contract for all houses that an investor

15   purchased and --

16          THE COURT:  Well, that's really a legal

17   conclusion, isn't it?

18          MS. MCCOLLUM:  That is a legal conclusion,

19   Your Honor, and I --

20          THE COURT:  That he's not qualified to opine

21   about.

22          MS. MCCOLLUM:  No.  He can say that in his

23   mind he thought they were different contracts, but he

24   can't --

25          THE COURT:  Tell what his intention was,

1    perhaps, as a contracted party.

2          MS. MCCOLLUM:  Correct.  He can say -- He --

3    And I -- And he did say that he treated them all sort

4    of, in his mind, as separate contracts.  He is

5    certainly going --

6          THE COURT:  Should these be viewed as --

7    legally as something sort of akin to an installment

8    contract, where you have, just as example, for a sale

9    of goods, you have a blanket order which says, "Here

10   are the terms on which I'm going to order goods from

11   you, my supplier, that you're going to make and ship to

12   me in installments" as I -- "according to specific"

13   releases -- "purchase order or releases" --

14         MS. MCCOLLUM:  Right.

15         THE COURT:  -- "under this blanket order?"

16   The blanket order has the terms of our agreement that

17   all these future orders will be subject to price,

18   delivery, payment terms, and all of those sorts of

19   things, warranties, everything, and then orders are

20   made under that later.

21         And so there's several instalments in which

22   goods are ordered, shipped, paid for, or to be paid for

23   under that sort of master contract.

24         Isn't this like that, or analogous to that,

25   so that at least arguably, this is like an installment

contract, but it is a single contract, but rather than
suggest that these are just each separate proceeding
contracts.

MS. MCCOLLUM: Your Honor, I think Mr.
Roberts views it more as if you're going to analogize
it to sort of a customer and supplier relationship,
that -- more of a relationship between two parties,
sort of an ongoing business relationship, but not a
blanket supply contract because those are very specific
and very detailed things.

At this point Mr. Roberts -- Every time an
investor buys a house, they sign a separate piece of
paper that says, "We bought a house. We owe you 50
percent." They're -- Overall, they're members of the
investor program and --

THE COURT: They sign a separate piece of
paper?

MS. MCCOLLUM: Yes.

THE COURT: What do you mean?

MS. MCCOLLUM: Once Ralph Roberts --

THE COURT: Let's talk about this case and --

MS. MCCOLLUM: Correct.

THE COURT: -- these parties.

Where did they sign any piece of paper?

MS. MCCOLLUM: I'm sorry, Your Honor. These

1   parties didn't sign anything.

2           THE COURT:  Yeah.  Okay.

3           MS. MCCOLLUM:  Course of dealing going

4   forward, Mr. Roberts requires all those investors to

5   sign something every time they buy a house.

6           When these parties did their arrangement,

7   they bought -- The Savoy Defendants bought 16

8   properties through Ralph Roberts Realty's investor

9   program.  They didn't sign anything.

10          THE COURT:  So that this -- whatever he has

11  people sign now, that wasn't part of the agreement

12  between these parties?

13          MS. MCCOLLUM:  That's correct.

14          THE COURT:  Yeah.  Okay.  There was no

15  testimony that they signed anything, --

16          MS. MCCOLLUM:  Nope.  That's absolutely

17  correct.

18          THE COURT:  -- or were to sign anything.

19          MS. MCCOLLUM:  There was absolutely no

20  written agreement here, and that's the problem.  That's

21  what's led to this lawsuit.

22          I can just say that Mr. Roberts does not

23  treat it like an installment contract, like a master

24  contract with separate releases for different things.

25  Mr. Roberts treats it as an investor relationship, but

1    if an investor wants to purchase a property, they

2    purchased a property, and he treats that, in his head,

3    like a separate transaction, but I suspect that the

4    Savoy Defendants do not view it that way.  They view it

5    more like Your Honor views it, as sort of an

6    installment contract, where they just kind of --

7              THE COURT:  Well, I didn't say --

8              MS. MCCOLLUM:  -- buy properties.

9              THE COURT:  -- how I viewed it.  I'm asking a

10   question, "Is it like that?"

11             Of course, if -- to the extent the Court

12   finds that there were terms of the program, the

13   investor program that these parties agreed to, that

14   linked the different transactions, for example, the

15   Defendants' argument that part of the deal that they

16   had with Ralph Roberts was that losses -- if they

17   suffered losses, those could be credited against

18   profits for some other properties that were -- where

19   there was a profit, that's another example where

20   legally the contracts don't look so separate and -- the

21   individual property transactions don't look so

22   separate, they look like separate pieces of the same

23   contract, don't they?

24             MS. MCCOLLUM:  Your Honor, I can't agree with

25   you because that's not how my client views it, but I

1    can say that if that is the legal conclusion that is
2    going to be drawn, that there are several problems with
3    it, I think, because the Savoy Defendants are, I think,
4    six separate individuals and entities, and so for that
5    to work, the investor program, the sort of master
6    contract would have to be between Realty and all of
7    these entities, some of which were not in existence at
8    the time that the properties were purchased.  They were
9    formed by the Savoy Defendants later, and the
10   properties were transferred into those entities.
11           So I think that that may be a factual barrier
12   to finding this sort of master contract --
13           THE COURT:  Well, you're seeking judgment in
14   this case, jointly and severally against all these
15   Defendants, --
16           MS. MCCOLLUM:  Yes.
17           THE COURT:  -- the Savoy Defendants, for
18   everything?
19           MS. MCCOLLUM:  Yes.
20           THE COURT:  Right?
21           MS. MCCOLLUM:  Yes.
22           THE COURT:  So why -- How does that square
23   with your point that you just made, that there's six
24   separate entities?  I mean, I -- lately (phonetic) --
25   Of course they're separate entities, but I thought

1    Plaintiff's theory was they're all entered jointly into

2    this program with (unintelligible).

3              MS. MCCOLLUM:  Realty's position is that Mr.

4    Savoy and Mr. Hassig themselves entered into this

5    relationship with Ralph Roberts Realty, and that the

6    way that most investors treat the program is they

7    individually purchased the properties, and this is the

8    case with most of the properties here, they were

9    purchased -- the individual deeds -- Sheriff's Deeds

10   were purchased by Mr. Savoy, and then generally the

11   investors transferred those properties into LLCs,

12   mostly for protection, so that if something happens

13   during the redemption period, or beyond, on the

14   property, the investor is shielded from personal

15   liability.  Somebody trips and falls on the stairs in

16   an abandoned property, the LLC can be liable for it but

17   the individual investor wouldn't be.

18             So if you look at the purchase records and

19   the deed transfer records in this case, it's clear that

20   most of the properties were purchased by Mr. Savoy

21   individually, and then transferred to various LLCs, and

22   Mr. Savoy is back there disputing this vigorously, but

23   I think you can look at the exhibits that we have

24   presented, and you can look at the time line, and that

25   is what happened, although I do know that some of the

1    properties were purchased, and it's certainly in my

2    (unintelligible) findings of fact, were purchased by

3    the LLCs themselves, but to find that they were sort of

4    all blanket participants is a little difficult because

5    some of them weren't in existence when the first

6    properties were bought, just from the timing

7    perspective.

8         THE COURT:  Well, so those -- an entity that

9    wasn't in existence when the first property was bought,

10   how are they liable for any profit split on that --

11   such a property?

12        MS. MCCOLLUM:  If it wasn't in existence it

13   could be --

14        THE COURT:  In other words, I -- The larger

15   question is, how is it that all of these Defendants

16   which you've named in the case, are jointly and

17   severally liable for everything that you're claiming,

18   rather than Plaintiff -- the Court having to look at

19   them separately?

20        MS. MCCOLLUM:  It's Plaintiff's position

21   that, like I said, Mr. Savoy purchased the majority of

22   the properties in his own name, and that they were then

23   transferred to the LLCs.  To the extent that the LLCs

24   then disposed of the properties and Mr. Savoy received

25   no consideration, essentially, for the transfer, then I

1   suspect that our theory is something of a fraudulent

2   transfer theory, that when Mr. Savoy bought the

3   properties and then transferred them to the LLC, the

4   LLC is, in essence, liable to him, and he is liable to

5   Ralph Roberts Realty for the profits (unintelligible)

6   that he did not pay.

7           THE COURT:  Do we have to go property by

8   property and figure out which of the Defendants --

9   assuming I agree with the Plaintiff's case, in general,

10  which I haven't decided I do yet, in this very disputed

11  matter, but assuming I do, does the Court have to go

12  individually, property by property, and figure out

13  which Defendants are liable for which property

14  transactions?

15          MS. MCCOLLUM:  It may be.  The -- My findings

16  of fact --

17          THE COURT:  Is that -- Is there any sort of

18  analysis like that yet, in your briefing?

19          MS. MCCOLLUM:  Yes.  Each of the properties

20  is discussed in my proposed findings of fact, and it is

21  -- for example, if you look at page 11 of my proposed

22  findings of fact, Number 86, it says:

23              "Defendant Jon Savoy purchased the Ledgestone

24              property."

25              So at this --

1          THE COURT:  Wait a minute.  Hold on.

2     Paragraph 86, I see paragraph 86:

3          "Jon Savoy purchased Ledgestone."

4          Yes?

5          MS. MCCOLLUM:  If you then go to page 12,

6     paragraph 95, the Firwood property Defendant Ryan

7     Residential Properties Group, LLC, purchased it --

8     purchased Firwood and then sold it.

9          Trailwood, paragraph 102 --

10          THE COURT:  So are you saying as each of

11     these properties, the proposed findings, backed up by

12     citations to the evidence, say which Defendant

13     purchased which property?

14          MS. MCCOLLUM:  Yes.

15          THE COURT:  Now, let's take an example.  Now,

16     hold on a minute.

17     (Pause.)

18          THE COURT:  Well, I'll tell you -- Let's take

19     Ledgestone as an example, okay, which you discuss on

20     page 11 and 12 of your proposed findings of fact and

21     conclusions of law, Docket Number 62.

22          Jon Savoy purchased the property, apparently,

23     you're saying, in paragraph 86.

24          Then you talk about various charges, and so

25     forth.

1          You end up, at paragraph 94, saying:

2              "The profit split owed to Plaintiff on

3              Ledgestone is $9,583.80."

4          Now, who owes that profit split, Jon Savoy,

5   Jon Savoy and others?  So which others?  All of the

6   Defendants?  And if it's more than just Jon Savoy, why?

7       (Pause.)

8          MS. MCCOLLUM:  Your Honor, I'm going to have

9   to revise these because that doesn't match the

10  Sheriff's Deed that I cite to.

11         THE COURT:  What does the Sheriff's Deed

12  indicate?  That's what --

13         MS. MCCOLLUM:  The Sheriff's Deed indicates

14  that the property is purchased by Ryan Residential

15  Properties Group, LLC, and that the warranty deed

16  transferring it to the eventual third-party purchaser,

17  although it was drafted by Jon Savoy, it was drafted by

18  him as managing member of Ryan Residential Properties

19  Group.

20         THE COURT:  Which is one of the Defendants?

21         MS. MCCOLLUM:  Correct.

22         THE COURT:  So at least with that one you're

23  now saying Ryan Residential Properties Group, LLC is

24  liable for the profit split --

25         MS. MCCOLLUM:  Yes.

1          THE COURT:  -- that's referred to in

2    paragraph 94?

3          MS. MCCOLLUM:  Yes.

4          THE COURT:  So are any other Defendants

5    liable for that, as well, to the Plaintiff, or is it

6    just that Defendant?

7          MS. MCCOLLUM:  Your Honor, to the extent that

8    Jon Savoy is the managing member, and that there is any

9    reason to hold him personally liable for this, for

10   example, if the LLC was dissolved while litigation was

11   pending and, you know, distributions were made to

12   members, then yes, Mr. Savoy, as a member, may be

13   liable, and I think is liable, for distributions

14   received when Mr. Roberts wasn't paid -- I'm sorry,

15   when Ralph Roberts Realty wasn't paid.

16         THE COURT:  Well, there wasn't any evidence

17   about any of that at this trial, was there?

18         MS. MCCOLLUM:  No.

19         THE COURT:  So there's no evidence to suggest

20   that -- even that this LLC, Ryan Residential Property

21   Group, LLC, has even been dissolved?

22         MS. MCCOLLUM:  No, and, Your Honor, standing

23   here today, I don't know whether it's been dissolved or

24   not.  I do know that there were some -- there was some

25   references in Mr. Kwiatkowski's briefs, to the fact

1    that some of these entities have been dissolved or, in

2    the alternative, have no assets such that a judgment

3    against them would essentially be futile, but standing

4    here --

5              THE COURT:  Where did he say that?

6              MS. MCCOLLUM:  I'm sorry, Your Honor, may I

7    speak with Mr. --

8              THE COURT:  Don't -- He can talk later.  I'm

9    asking you though.  If he said that, where did he say

10   that and what did he say; do you know?

11             MS. MCCOLLUM:  I don't know.

12             THE COURT:  Okay.  All right.  So, you said

13   you're going to have to revise these.

14             Are you saying you want an opportunity now,

15   to revise your proposed findings of fact to make

16   corrections, at least with respect to Ledgestone, and

17   you don't know whether others need it?

18             MS. MCCOLLUM:  Your Honor, I don't think any

19   others need it.  That's a -- That's very sloppy on my

20   part and I apologize, because the Sheriff's Deed does

21   clearly say that it was Ryan Residential Properties

22   Group.

23             THE COURT:  Well, are there errors like that

24   with any of the other properties; do you know?

25             MS. MCCOLLUM:  I don't know, but I don't

1  think so.

2          THE COURT:  Well, so getting back to the -- a

3  question I asked you a minute ago on Ledgestone, this

4  profit split that you're referring to in paragraph 94,

5  that you say is owed -- this amount that's owed to the

6  Plaintiff on Ledgestone, as an example, that -- you're

7  saying but for some possible argument that there's no

8  evidence regarding an improper dissolution of that

9  entity, and distributions of assets that's -- doesn't

10  comply with law, and which there's no evidence in the

11  trial that there's no basis for holding any of the

12  other Defendants, other than that LLC, Ryan Residential

13  Property Group, LLC, liable?

14          MS. MCCOLLUM:  Not unless Your Honor finds,

15  as you were just saying, that all of the Defendants

16  participated under sort of a master supply agreement,

17  and then individual properties were purchased, sort of

18  even allogized (phonetic) it to a release under that

19  contract or a purchase order, or that kind of a change

20  order, if that's the view of the program, that has

21  advantages to us, in that we made -- that hold

22  everybody liable, but it has disadvantages in that if

23  that's the view of the agreement, then setoffs are

24  certainly more easily permitted under that kind of

25  arrangement, than they would be if each of the

1    Defendants was separately liable for the property that

2    it purchased as a separate contract.

3                THE COURT:  Well, what is the Plaintiff's

4    view of which Defendants are liable for which

5    properties and why?

6                MS. MCCOLLUM:  I can tell you that the view

7    of Mr. Roberts is that Mr. Savoy and Mr. Hassig are

8    personally liable for all of this, and that the LLCs

9    are essentially -- and this is his opinion, not a legal

10   conclusion.  I will just -- I will preface that.  And

11   that his opinion is that the LLCs essentially don't

12   mean very much.  They're a shielding for tax reasons or

13   for liability reasons.  I realize that that is not a

14   legal conclusion, and so legally I would have to say

15   that if that's the view, you'd have to trace the

16   Sheriff's Deeds, and if, for example, Ryan Residential

17   Property Group purchased Ledgestone and sold it, then

18   Ryan Residential Property Group would be the

19   participant in the investor program, and would be the

20   one that would be liable to Ralph Roberts Realty for

21   unpaid splits.

22               THE COURT:  So the Plaintiff's view, excuse

23   me, Ralph Roberts' view, when you say that, you mean

24   the Plaintiff's view, --

25               MS. MCCOLLUM:  Right.

1              THE COURT:  -- right?  The Plaintiff's

2      contention and view is -- and view of the evidence is

3      that there is an evidentiary basis to hold Mr. Savoy

4      and Mr. Hassig personally liable, in addition to one of

5      our other Kennedy (phonetic) Defendants who are

6      involved in each property transaction, but you hold

7      those two individuals liable on all of them because

8      they agreed to that as part of their investor program

9      with the Plaintiff; is that it?

10             MS. MCCOLLUM:  Yes.

11             THE COURT:  So that was one of the terms of

12     the -- features of this investor program with --

13     between these parties?

14             MS. MCCOLLUM:  Correct.  They put in the

15     money.  They were the ones liable for the upside, the

16     30 percent split of the upside.

17             THE COURT:  Was there any testimony by anyone

18     specifically addressing this question of whether the

19     parties agreed that these two individuals would be

20     liable, even if they created entities?

21             MS. MCCOLLUM:  No.  There was no testimony

22     from any of the three witnesses.

23             THE COURT:  And when you say these LLCs were

24     created, you said, "for tax reasons or to shield from

25     liability," you, of course -- I think, or you gave an

example earlier, of shielding the individuals from
liability to third parties for slip and fall on the
property, and that sort of thing, not as a shield of --
from liability to the Plaintiff?

MS. MCCOLLUM: No, that's correct, and I
think Mr. Roberts testified to this because there was a
question in this case, as to the nail -- what was Nail
Construction, and he did testify in the transcript,
that that was an entity that Ralph Roberts Realty
occasionally used to transfer these deeds into during
redemption period, to shield the investors, again, from
third-party -- or from liability to third parties, for
incidents of third parties that happened on the
premises during redemption. That was, in Mr. Roberts'
view, a fairly common practice.

So no, there's no allegation from Plaintiff,
that what the Savoy Defendants did in forming these
LLCs, or in purchasing properties in the LLCs was in
any way intended to shield the properties or the
upside, from Ralph Roberts Realty.

THE COURT: Okay. Go ahead.

MS. MCCOLLUM: One of the major issues in
this case, and it's both, I think, the legal issue and
a factual issue, is whether there are rights of setoff
here.

So first, in order to have a setoff, you have
to have a loss, and Mr. Roberts testified that he
doesn't believe Defendants lost money in all these
properties.  Defendants have vigorously disputed this.
So in -- If this Court finds that there were no losses
on these properties that were sold, for which no split
was paid, then the -- then there is no setoff question,
because it there's no losses, there's nothing to set
off.

If this Court does find that there were
losses, and there was testimony from Mr. Roberts about
the terms of the program and how rentals worked, and
there was testimony from Mr. Savoy that he didn't
believe that that was how it worked at all, and he was
entitled to credit, all of these things, if this Court
finds that there were losses, then the question is,
"What were the terms of the investor program, and did
they permit setoff?", and Mr. Roberts testified that in
his mind the investor program does not permit the
setoff of losses, but then he testified that if an
investor loses principal post his agreement with Savoy
Defendants, then that investor would be entitled to
credit those losses against future profits.

So, Mr. Roberts is, in essence, testifying
that when he entered into his relationship with the

1    Savoy Defendants, he didn't think there were losses, he

2    didn't think losses were possible, and so setoff, in

3    his mind, wasn't even an issue because he didn't think

4    that there was going to be any reason for a setoff.

5         He then testified that certainly in the future

6    -- certainly after this Savoy Defendants' participation

7    in this program, that other investors did raise that as

8    an issue, and he does envision a sharing of losses.

9         So, in essence, the issue for this Court to

10   decide, is whether Mr. Roberts credibly testified that

11   he just did not think there was a setoff, or any kind

12   of loss sharing with respect to the Savoy Defendants,

13   and this goes back to Your Honor's point about whether

14   his testimony was consistent, between his trial

15   testimony and his affidavit in this case, and he -- and

16   as I stand here, I say yes, it was, and the Savoy

17   Defendants say no, it is not, that it's wildly

18   contradictory, and we don't think it is.

19        We think he, as I said, envisioned a program

20   with the Defendants.  It was all oral and it was

21   certainly a handshake agreement, and that he did not

22   think that there was any reason that they would ever

23   have a loss, and so he did not envision a loss share,

24   and he certainly didn't envision that if there was a

25   loss, they could then set it off against future

1    profits.

2         And I don't know -- Part of the issue, like I

3    said, with a setoff, is that that is a very legal

4    issue, as well.  If Your Honor finds that there were

5    losses, and regardless of the parties' intent, because

6    the parties can't agree to the intent, that there were

7    losses, then the question is, "Can the Savoy Defendants

8    legally setoff in the circumstances of this case?", and

9    that's sort of jumping ahead to my proposed conclusions

10   of law.

11        Both Mr. Roberts and Mr. Savoy testified that

12   none of the Savoy Defendants ever filed a proof of

13   claim in this case, and Mr. Kwiatkowski and I certainly

14   have extensively briefed the legal issue as to whether

15   if a party does not file a proof of claim, they may

16   still assert setoff as a defense.  Our position is that

17   there is case law that says "No," and Mr. Kwiatkowski

18   and the Savoy Defendants say there's case law that says

19   "Yes."

20        THE COURT:  Why do you even call this a

21   "setoff," as opposed to a recoupment defense, by the

22   way?

23        MS. MCCOLLUM:  Because again, if Your Honor

24   agrees with Mr. Roberts and the Plaintiff's view of the

25   program, that sort of each property was separate, then

1   it really is a setoff issue.

2         If Your Honor believes that it was sort of a

3   conglomerate, basically, that all the Defendants

4   purchased all the properties, and it was one big

5   agreement, then it is a recruitment issue, but it

6   depends on the view of how the properties are purchased

7   and how the investors were participating in the

8   program.

9         THE COURT:  Does the Plaintiff agree or

10   concede that to the extent the Court finds that there's

11   recoupment defense as opposed to a setoff claim, which

12   seems, under the case law, to turn on whether they were

13   separate transactions or not, but if the Court finds --

14   to the extent the Court finds it's a recoupment setoff,

15   do you agree that the Defendants are entitled to raise

16   it as a defense, that their raising it as a defense is

17   not barred by either their failure to timely file a

18   proof of claim in the Chapter 11 bankruptcy case of

19   Plaintiff, or by the confirmed plan?

20         MS. MCCOLLUM:  No, we don't agree.

21         THE COURT:  You don't?  Okay.

22         MS. MCCOLLUM:  No.

23         THE COURT:  So even if it's a recoupment

24   defense, it's barred why?

25         MS. MCCOLLUM:  Because the terms of the plan

1    are pretty clear that any and all claims that any and

2    all claimants had against Ralph Roberts Realty, are

3    forever barred after the terms of -- after the time for

4    -- sorry, after entry of the confirmation order.

5              So the extent that --

6              THE COURT:  You think that can be viewed as

7    broad enough to strip away any recoupment defense that

8    any Defendant might have against any claim that

9    Plaintiff might pursue in the future, --

10             MS. MCCOLLUM:  Yes.

11             THE COURT:  -- long as the claim arose before

12   confirmation?

13             MS. MCCOLLUM:  Yes.  Realty certainly

14   intended it that way when the -- when we drafted the

15   plan.  Now, Your Honor may not agree, but that

16   certainly is what we intended.

17             THE COURT:  All right.

18             Of course, the parties, I recall, did brief

19   these legal issues, and the summary judgment motion

20   proceedings, I think you also discuss it in the post-

21   trial briefs, --

22             THE COURT:  -- as well, but I'll consider

23   both.  I didn't make any specific substantive ruling,

24   in ruling on the summary judgment motions, on these

25   legal issues or arguments.

1    So, okay.  Go ahead.

2        MS. MCCOLLUM:    Another issue that was

3    briefly touched on at trial and addressed in the

4    briefs, was the acquisition fees.  It's Plaintiff's

5    view that the Savoy Defendants owe $16,000, little over

6    -- almost $17,000 in acquisition fees.  We presented

7    evidence of our accounting for these fees and the

8    credits that Ralph Roberts Realty gave the Savoy

9    Defendants for amounts that were paid, and it's our

10   belief that the Savoy Defendants have not presented any

11   evidence to refute our accounting on this.

12        The next pieces here, essentially, are that

13   in the post-trial briefs, Plaintiff alleged the amounts

14   it believes is owing from the Defendants on each of the

15   four properties that were sold by the Savoy Defendants,

16   and for which a split was not paid.

17        The first three, Ledgestone, Firwood and

18   Trailwood, of those three, Ledgestone and Trailwood

19   were unquestionably profitable, even accounting for the

20   differences, in Plaintiff's view, of the profit, and

21   Defendants' view of the profit.

22        There was certainly testimony that the

23   agreement was a $5,000 sellers fee, and that the Savoy

24   Defendants unilaterally increased that to $10,000 in

25   presenting these, they call it these profit calculation

worksheets for these properties, and that there was
certainly no agreement by Ralph Roberts Realty to
increase that fee to 10,000.

There were also some improper calculations of
interest in some of these, but even with that,
Ledgestone and Trialwood were both profitable.
Firwood, Realty believes, is profitable, but Savoy
Defendants believe was not, and Engleman is the
property that I think is most in dispute here.

Engleman, I think Mr. Savoy testified, was
something -- I think he said it was a disaster, and
Defendants' profit calculation worksheet shows that
they lost $40,000 on that property.  Plaintiff contends
that that's not the case, that if you deduct -- or
essentially you credit back the things that Defendants
were not entitled to credit off, that the total profit
was about $5,000, so that maybe there isn't a split
owed to the Plaintiff, but there certainly wasn't a
loss on a property.

And another overarching point that was made in
Mr. Roberts' trial testimony, and Mr. Confer testified
to this, as well, is that the investors, once they
purchased the property, Realty doesn't -- they can
advise, but the investor's in full control of the
property to the -- so to the extent that the property

1  was losing money, why wouldn't Defendants have

2  continued to rent it until they recouped their losses,

3  but that the Defendants were in complete control of the

4  property, and so it was -- why is it Ralph Roberts

5  Realty's fault that they overspent, they didn't rent it

6  for longer, they didn't recoup their losses?  This

7  shouldn't be something that Realty is responsible for,

8  especially when this happened after the Defendants sort

9  of fired Realty, and it had no ability to advise and

10  make its opinion known about what Defendants could do

11  to maybe mitigate whenever they were claiming was a

12  loss.

13         It's undisputed, like I said, that the Savoy

14  Defendants are selling two properties on land contract,

15  Duncan and Jimmy.  The testimony was a little

16  conflicting, but I think generally agreed that the

17  profit split on a land contract wasn't due until the

18  land contract was paid off, although Mr. Roberts

19  testified that in his view the split was due when the

20  balance of the land contract equaled the split.  So in

21  other words, they could then pay at that time, and they

22  could transfer the land contract balance over, but it

23  was certainly clear that that balance is due sort of

24  more at the end of the land contract than when the

25  properties initially sold.

1          It was also uncontroverted that Irene and

2     Teppert haven't been sold yet, and that to the extent

3     they are sold, the program provides that 30 percent of

4     the net profit would be owing to Realty.

5          THE COURT:  Now, on those unsold properties,

6     I assume you're (unintelligible) to a declaratory

7     judgment there, not any sort of money judgment yet,

8     because you don't know --

9          MS. MCCOLLUM:  Correct.  Absolutely.

10          THE COURT:  -- yet, what the -- what the

11     profit will be in them?

12          MS. MCCOLLUM:  Correct.  That's absolutely

13     right.  As of now, we think the property -- we think

14     the profits are -- I think we provided some estimates

15     in a briefing.  Defendants, I think, don't agree with

16     that, although the two parties did present fairly

17     similar views as to what the properties were worth at

18     this time, but if they're not sold today, there's no

19     way to know what that profit would be.  So yes, Your

20     Honor, we're looking for a declaratory judgment that,

21     upon sale, 30 percent of the net profit is owed to

22     Ralph Roberts Realty.

23          And we're certainly also looking for a

24     judgment in these -- with Irene and Teppert, that these

25     are rental properties, so most of the expenses aren't

1    entitled to be deducted against the split by

2    Defendants.

3            And I've -- most of the property loss and

4    profit issue was a very contentious.  Plaintiff has

5    submitted a number of exhibits, and rests on the

6    testimony of Mr. Roberts, as to what the properties

7    were worth, what they were sold for, what the

8    appropriate deductions were and warrant.

9            Mr. Savoy, obviously his testimony is in

10   diametrical opposition to everything Mr. Roberts said,

11   and this is an issue for the Court, is essentially a

12   credibility issue as to which of the two sides is more

13   persuasive on the terms of the program, and whether

14   each of these properties had gains or losses.

15           I think it's fairly undisputed at this point,

16   that Duncan and Jimmy will return a profit.  There's a

17   dispute between Plaintiff and Defendant as to what that

18   profit would be.

19           I think it's also somewhat in dispute as to

20   whether Irene and Teppert, if they were sold today,

21   would return a profit, but certainly the longer they're

22   rented, the more likely a profit would be.  Plaintiff

23   believes they're profitable now.  Defendant does not, I

24   think.

25           So, in terms of the factual issues, proposed

findings of fact, that's -- that is my argument on
those points. We believe we have met our burden to
show that these properties were profitable and the
amounts are owed. I've discussed the legal issue of
setoff and why we think that setoff is not available to
Defendants for a variety of reasons.

The Defendants, in their post-trial briefing,
raised essentially a breach of contract issue, that
they should not be liable to Plaintiffs because
Plaintiffs breached their agreement to provide
profitable investment properties, and Realty believes
that it did not breach its contract. It provided
investment opportunities to Defendants. Defendants
were under no obligation to buy any particular
property. They chose the properties they bought.

Mr. Savoy testified that he has 35 years of
experience in the real-estate market --

THE COURT: But he disputes the guaranteed
profitability, right?

MS. MCCOLLUM: Correct. Absolutely.

THE COURT: Yeah.

MS. MCCOLLUM: But this is an investor
program, and it's caveat emptor. You buy your
investment and hopefully it makes money and everybody
else has made money, but we don't -- certainly,

1    Plaintiff can't guarantee anything.  It's real estate.

2    It's inherently volatile, and in some ways it's

3    inherently more volatile than a lot of other

4    investments.

5              At this point, again, Plaintiff believes that

6    it did not breach its investor contract.  It provided

7    profitable property opportunities and didn't provide

8    any kind of guarantee that the Defendants were in full

9    control of what they bought and when, and how to manage

10   their properties, and that to the extent they did a

11   poor job of managing the properties that they had, that

12   this is not a breach of Realty's portion of its

13   investor contract, especially if losses were incurred

14   after they filed -- fired Realty, so -- and that Mr.

15   Savoy certainly is an experienced real estate

16   professional, knew of the pitfalls of real estate, that

17   properties can be damaged by tenants, that properties

18   can be in terrible shape when you buy them at a

19   sheriff's sale, that the various cities have various

20   requirements in order to sell properties, that all of

21   these things were not breaches by Mr. Roberts, that he

22   provided the information that he agreed he would

23   provide, and that the properties were all capable of

24   returning a profit.

25             And then finally, as I've touched on before,

1    Defendants have made an issue of Mr. Roberts'

2    credibility. We believe Mr. Roberts' testimony was not

3    contradictory and was consistent, and that the weight

4    of the evidence, as testified to by Mr. Confer and Mr.

5    Roberts, establishes the terms of the investor program,

6    such that Defendants are liable to Plaintiffs for their

7    participation in, and failure to pay realty profit

8    splits on the properties that were sold, and failure to

9    -- and continuous failure, I guess, to pay on the

10    properties that have not yet been sold.

11          THE COURT: All right. Thank you.

12          Mr. Kwiatkowski?

13          MR. KWIATKOWSKI: Thank you, Your Honor.

14          Your Honor, the first thing I wanted to

15    discuss for the Court, was reading at -- I guess, the

16    deal between the parties, and if there was ever an

17    actual meeting of the minds between the parties. It

18    seems that we have two very diametrically opposed

19    viewpoints on the most material terms of the contract

20    here.

21          We have the Plaintiff's proposition that net

22    profit is derived from two separate calculations, a

23    foot split, excuse me, a flip split or a rental split.

24    It's my client's proposition that there was only one

25    way, and there was always one way, and the difference,

the big difference, is the discussion of the expenses.

My client's proposition is that any and all
expenses used in the sale, disposition can be credited
against any future net profit splits. Realty, the
Plaintiff, takes a different viewpoint.

Next, the parties did agree on the
acquisition fees, and there was never a disagreement
there.

Thirdly, the parties had a dispute regarding
losses. It was discussed quite a bit by the Court and
by the Plaintiff in her closing arguments, however, the
loss is a very key point of the case. It was a key
point to my client. He's a sophisticated real estate
investor.

To let a -- You know, just to preface that,
he's a commercial real estate investor. He sought out
Mr. Roberts due to his alleged expertise in the
residential real estate and foreclosure.

My client does have 35 years of experience in
commercial leasing and commercial real estate, however,
admittedly, he was a novice in the residential and
foreclosures, and the sale and the flipping techniques
that Mr. Roberts set forth in this program. So it was
crucial to my client to discuss losses and whether or
not they were part of the program, and I think we've

1    made it clear from the beginning, that it always was a

2    part of the program, pursuant to my client, and Mr.

3    Roberts vehemently disagrees with that statement.

4         Thirdly, my client's -- a crucial part of the

5    agreement was finding profitable properties.  In this

6    case it's our contention that the Defendant did not

7    find profitable properties, and therefore, he breached

8    his agreement.

9         So we have an agreement between the parties

10   but, in essence, the most important terms, how the

11   profit is calculated, how the houses are found, there's

12   never been an agreement as to those terms, so without

13   an agreement to those terms, I don't believe there's an

14   underlying contract that can be in force there, and the

15   Court has the ability to unwind the demons and let the

16   parties stay where they are at this moment, and that's

17   what I would ask the Court to find, because there was

18   never a meeting of the minds, and it can easily be seen

19   by the completely inapposite testimony from Mr. Roberts

20   and Mr. Savoy, discussing the terms of the agreement.

21        It was clear --

22        THE COURT:  What was -- There's a conflict in

23   the evidence regarding what the parties agreed to

24   orally, isn't there?  Or you're saying there's not a

25   conflict in the evidence about what they discussed, and

1    based on what they discussed, they did not agree on

2    certain key terms, therefore, no enforceable contract.

3            MR. KWIATKOWSKI:  Correct.

4            THE COURT:  Is it the latter that you're

5    saying?

6            MR. KWIATKOWSKI:  Well, it was kind of

7    surprising to my client and myself to even know of this

8    new flip split and rental split.  So when Mr. Roberts

9    was testifying as to that, Mr. Savoy's reaction was,

10   "This is the first time I've ever heard this."  I

11   wasn't -- "That was never the deal."

12           So, if Mr. Roberts contends -- the Plaintiff

13   contends that that was the contract, then I don't

14   believe there is a contract.

15           THE COURT:  Well, the alternative would be,

16   from your perspective would be not that there's no

17   contract, but that there's a contract that does not

18   include this distinction that the Plaintiff is claiming

19   between flip splits and (unintelligible) splits, for

20   purposes of calculating the profit split.

21           MR. KWIATKOWSKI:  Potentially, yes.

22           THE COURT:  So which is it, in your view?

23   What is the Defendant -- What is the defense intending

24   on that?

25           MR. KWIATKOWSKI:  I can -- The Defendants'

1    contention is that there is no contract because there
2    was no meeting of the minds on that material term.  If
3    we're talking about how the net profit is calculated,
4    and the net profit is calculated based on the expenses,
5    and the expenses are one thing that my client has
6    always said, "These are the expenses," and the
7    Plaintiff has some diametrically opposing viewpoint,
8    there was never a meeting of the minds.
9            THE COURT:  And therefore, the Court should
10   find there is no enforceable contract at all, and
11   therefore, Plaintiff takes nothing and everybody goes
12   their separate ways?
13           MR. KWIATKOWSKI:  Correct.
14           THE COURT:  All right.  Go ahead.
15           MR. KWIATKOWSKI:  The second -- If the Court
16   is so -- is inclined to not find that, the next
17   contention from the defense, is that if there were a
18   contract, that the Plaintiff breached that contract.
19   It was absolutely crucial, testified to as by Mr.
20   Savoy, that finding profitable properties was
21   important.  The business model that the Plaintiff would
22   want the Court to believe, is that they collect $5,000,
23   when, lose or draw.  So it could be a diamond in the
24   rough or it could be the -- a house that needs to be
25   completely rebuilt and needs city certifications and

everything else, or literally a house filled with human
waste, and Plaintiff gets his $5,000, win, lose or
draw, and potentially a commission was their argument,
and then according to the Plaintiff, they don't share
in any losses, they don't have any problems.  They
collect 30 percent and move on their merry way.

I mean, dealing with a -- the investor, like
the Defendants here, that proposition doesn't seem very
good.  If I were a Plaintiff, that would be the world's
greatest deal and people should be lined up around the
blocks to do it, but I don't -- or lined up around the
blocks looking for jobs because there's no way to lose.

Plaintiff testified he's bought a thousand
homes.  That's $5 million for finding houses.  Where is
the incentive to find profitable properties?  That's
why my client --

THE COURT:  Well, I suppose one incentive for
Plaintiff to do that, and to kind of help through that
is to keep their -- the participants in the investor
program coming back, and participating and buying more
properties, and keeping it going.

MR. KWIATKOWSKI:  Could be, or it could be he
could find a mass amount of properties and find new
investors with the same spiel, and saying this is the
greatest deal on Earth and collect another $5,000 for,

in essence, working a computer, and having to do little

to nothing else except for scour Sheriff's Deeds and

send out lists. I mean, that's -- seems like a pretty

good business model, and that's why it bears to the

conscience of why would my client ever agree to such a

deal, and he didn't. My client agreed to deal with

expenses and 100 percent of loss shares. Why was that?

Why did Mr. Roberts agree to a deal, in my opinion, and

the defense contention is that he was desperate. He

testified he needed the Defendants' participation, and

that's why when we talk about Ray Confer's testimony,

really has nothing to do with the potential deals or

contacts with my client. He testified that he has no

idea what claims, what deal, what went on with my

client.

So anything that Mr. Confer says really has

nothing to do with this case whatsoever. His testimony

wasn't relevant as to the defense, so the idea that the

Plaintiff wouldn't share in any downside, and wouldn't

seek out profitable -- would only seek out profitable

properties, is something that my client was up front

and needed at the beginning, and as soon as the

acquisition fees -- and they stopped buying properties,

the level of service that they required, the honesty,

integrity, follow-up, those types of things fell off

1    the face of the Earth because they weren't paying that

2    $5,000 anymore.  There wasn't a need for it anymore.

3    The properties that they had bought were not

4    profitable, so Mr. Roberts' follow-up duty of care all

5    went out the window.

6           And at the same point is when, at the

7    beginning, which is, you know, in the evidence where it

8    was testified that Mr. Savoy and the Defendants were

9    one of the first participants, I think there might have

10   only been one other, and that was Mr. Confer, and Mr.

11   Savoy, as part of this deal said, "We wanted the right

12   of first refusal," and as soon as they stopped buying

13   and as soon as other investors were involved, the right

14   of first refusal stopped.

15          So, based on the findings that Mr. Savoy and

16   his -- the other parties, the defense here, had at

17   least four properties that they took a considerable

18   bath on, based on our calculations about $65,000, the

19   Plaintiff breached his duty because he had no incentive

20   to find profitable properties because all he had to do

21   was sit back and collect the $5 million in acquisition

22   fees.  So he breached his duty.  Therefore, the Court

23   should find that -- suspend future performance on any

24   further issues.

25          A lot has been talked about regarding the

1    testimony between Mr. Roberts which -- I believe he

2    said he had been in the real estate business since

3    1975, and Mr. Savoy, who testified he had been involved

4    in real estate for over 30 years.  There's plenty of

5    case law out there that says when two equally -- What's

6    the exact wording?  Where two equally credible

7    witnesses give contradictory testimony, that the

8    plaintiff has not met his burden.

9          In this case, even if we found that Mr.

10   Roberts was credible, which we don't believe, and I'm

11   going to just highlight a few portions in the second,

12   is that even if we found he was 100 percent credible,

13   that they still have not met their burden, and

14   therefore, you have to find in favor of the Defendants,

15   but let's just segue a little bit, into Mr. Roberts'

16   credibility.

17         One, the October 7, 2013 affidavit couldn't be

18   more clear.  The investor program has no provision of

19   sharing of losses, and it's the paragraph 23.  That was

20   signed October 7, 2013.

21         What's interesting about that date is that it

22   was before the defense filed a reply brief, I believe,

23   which, through its due diligence, went, ordered a

24   transcript from the Roger Roberts case, and found he

25   testified diametrically opposing that.  So as soon as

1  we brought it to the Plaintiff's attention that Mr.

2  Roberts had a little bit of a propensity for

3  untruthfulness, all of the sudden the story changed and

4  the wordsmith (phonetic) happened of, "Well, I really

5  didn't mean that," and, "That's not what I said," and

6  "That was for this case." It's clear, he was trying to

7  advance a position and got caught. His position was

8  always, "We didn't share losses in this case." As soon

9  as we found evidence where he asserted otherwise, lo

10  and behold, it all changed just like in the same

11  affidavit on pages -- I think paragraph 49 and

12  paragraph 53, where he discussed a lowball sale based

13  on the valuations of Realty on, I believe it's

14  Ledgestone and Firwood, and that the Defendant

15  specifically undersold those properties. However, we

16  then provided emails from the Plaintiff, that we

17  actually sold the properties for more than the

18  valuations that they gave and, lo and behold, that

19  defense was and never brought up again and never

20  discussed. It just shows the propensity for --

21          THE COURT: Well, just a minute.

22          MR. KWIATKOWSKI: -- untruthfulness. Sorry.

23          THE COURT: You're talking about paragraphs

24  49 and 53 of the --

25          MR. KWIATKOWSKI: The affidavit.

1            THE COURT:  -- October 7, 2013 affidavit of

2    Ralph Roberts?

3            MR. KWIATKOWSKI:  Yes.

4            THE COURT:  Is that right?

5            MR. KWIATKOWSKI:  I believe so.

6            THE COURT:  Did you -- As I pointed out

7    earlier, that exhibit was never -- Exhibit S was never

8    admitted into evidence in the trial of this case.

9    Rather, you -- the witness was questioned -- Ralph

10   Roberts was questioned about particular provisions in

11   that affidavit, and that's the only way that those

12   provisions had come into evidence in this trial.

13           Was there any questioning regarding

14   paragraphs 49 and 53?

15           MR. KWIATKOWSKI:  I don't think so, Your

16   Honor.

17           THE COURT:  So should I ignore what you just

18   argued regarding those paragraphs, because it's not in

19   the record, not in evidence?

20           MR. KWIATKOWSKI:  I'm trying to recall if

21   questions were specifically asked.  I don't think they

22   were.

23           THE COURT:  Paragraph 23 is because you asked

24   Mr. Roberts questions about it, and so did Ms. McCollum

25   during the trial, his testimony.

1          MR. KWIATKOWSKI:  I don't believe I asked

2     questions about 49 or 53.

3          THE COURT:  All right.  Well, go on.

4          MR. KWIATKOWSKI:  I believe Mr. Savoy

5     testified regarding the valuations in Exhibit P, and I

6     believe it's Exhibit O, I don't have the cites in front

7     of me, but I believe Mr. Savoy testified that, you

8     know, they sold they sold than the properties for more

9     than the price that Mr. Roberts advised, but needless

10    to say, I believe the whole fact of Mr. Roberts'

11    conflicting testimony regarding the facts of the loss

12    split speak for themselves.  It's blatant.  It's a

13    blatant, untruthful statement.  It's a blatant,

14    untruthful affidavit with him trying to advance a

15    position until he got caught.  It was clear the way the

16    pleadings and the motions were filed in this case,

17    until I filed a pleading that brought up the facts, or

18    put Mr. Roberts on notice that I was aware of the fact

19    that he was never going to bring that up because there

20    was positions -- the program doesn't share losses.

21          Next thing I want to discuss is evidence the

22    Plaintiff submitted, or lack thereof, to hold Mr.

23    Savoy, Mr. Arnold Hassig and Mr. Adam Hassig personally

24    liable, because there was none.  I don't think Mr. Adam

25    Hassig was mentioned once in the entire trial.  I don't

1    even really know why he's a named Defendant.

2            Mr. Arnold Hassig was mentioned, that he was

3    unable to talk, so Plaintiff dealt with Mr. Savoy, and

4    Mr. Savoy made a business deal regarding properties

5    that they were purchasing.  He never personally

6    guaranteed any of -- He never personally guaranteed the

7    business deal, so Mr. Savoy should not be held

8    personally liable.  This was always a personal -- This

9    was always a business deal, and not a personal

10   obligation of Mr. Savoy.  Mr. Savoy did not make a

11   deal.  He made a business deal regarding LLCs.

12           THE COURT:  By "business deal" you mean --

13           MR. KWIATKOWSKI:  Yes.

14           THE COURT:  -- designed to be a deal between

15   a Plaintiff and some entity that Mr. Savoy had an

16   interest in?

17           MR. KWIATKOWSKI:  Correct.

18           THE COURT:  Only?

19           MR. KWIATKOWSKI:  Correct.

20           THE COURT:  Is that right?

21           MR. KWIATKOWSKI:  Correct.

22           THE COURT:  All right.  Go ahead.

23           MR. KWIATKOWSKI:  The final argument is that

24   the Plaintiffs are, I'm sorry, the Defendants are

25   entitled to a setoff.  It was always part of the deal

1   that 100 percent of the losses are able, in aggregate,

2   to be setoff against any future profits.  We don't even

3   know if there will be future profits.  Our contention

4   is, is that there's been $65,000 and some change, of

5   losses, so in the future, if there are losses, that

6   there are profits that these can be setoff against, and

7   we believe we've met all of the legal ramifications.

8   And I briefed the case law regarding filing proofs of

9   claims.  I briefed the case law in the De Laurentis

10  Entertainment Group case, which is 963 F.2d 1269,

11  discussed at length why we're entitled to a setoff.  We

12  believe that we are --

13          THE COURT:  You're referring to your --

14  primarily your summary judgment brief, right?

15          MR. KWIATKOWSKI:  Summary judgment and it's

16  in the post-trial brief also.

17          THE COURT:  Where is that in your post-trial

18  brief?  Must be near the end of it.

19          MR. KWIATKOWSKI:  Yes.  It's at -- towards

20  the end.

21          THE COURT:  Does that just cite the same

22  authorities --

23          MR. KWIATKOWSKI:  Yes.

24          THE COURT:  -- and make the same arguments

25  your summary judgment brief did?

1      MR. KWIATKOWSKI:  Yes, in essence.

2      THE COURT:  Oh, I see.  I see you cite the

3  Suncrete case, Geltzer v. Bloom.  Okay.  Yeah, I see.

4  It's pages 11 and -- through 13, I guess, of your post-

5  trial brief.

6      MR. KWIATKOWSKI:  So based upon the fact that

7  we believe that we're entitled to a $65,000 setoff, the

8  Defendants have no liability to the Plaintiffs, and we

9  would ask the Court to find in favor of the Defendants.

10      And if the Court has any questions, I'm here

11  to answer them.

12      THE COURT:  All right.  I don't have any

13  further questions.  Thank you.

14      Ms. McCollum, as I said earlier, you may

15  make, on behalf of Plaintiff, a reply or closing

16  argument if you wish to.

17      MS. MCCOLLUM:  I do, and I won't burden Your

18  Honor by being very lengthy.

19      I want to address, first, the point that Mr.

20  Kwiatkowski made, that Mr. Savoy made a business deal,

21  and he clarified that was between one of his businesses

22  and Ralph Roberts Realty.  If that was the case, then

23  why did Mr. Savoy, as the trial exhibits show, purchase

24  in his individual name, Firwood, Engleman, Duncan,

25  Jimmy, Irene and Teppert?  If that was the case, those

1  properties should have been purchased in the name of an

2  LLC, as many of the other properties were.

3          To the --

4          THE COURT:  That list of properties, again,

5  was Firwood and what?

6          MS. MCCOLLUM:  Firwood, Engleman, Duncan,

7  Jimmy, Irene, Teppert.  They were all purchased by Mr.

8  Savoy individually.  Some of them were later

9  transferred into LLCs, but his name appears on the

10  Sheriff's Deed for those properties.

11          THE COURT:  All right.  Go ahead.

12          MS. MCCOLLUM:  To the Savoy Defendants' point

13  that there was no incentive for Realty to provide

14  profitable properties, there are only 50 investors in

15  the investor program.  There's a lot of this, as I

16  think we've said, repeat customers.  People buy a lot

17  of properties.  Mr. Confer certainly has something like

18  30 properties and is still continuing to invest, so to

19  the extent that the Savoy Defendants believe that

20  Realty has no incentive to provide profitable

21  properties, that's just simply not true.

22          We also, of course, dispute that they lost

23  money and that the properties that we're talking about

24  were not profitable.  Certainly, the four that were

25  sold are profit -- the four that were sold and split

1   were profitable because Realty received a split.

2          Of the next four that were sold, at least two

3   were profitable.  One was extremely profitable, and

4   that was the condominium.  I think that's Trailwood,

5   unless I'm getting my properties confused again, which

6   is very possible.  That's right.

7          And we believe that the properties that are

8   still being sold, the ones that are being sold on land

9   contract and the ones that haven't been sold yet, are

10  profitable.  We think that there was a contract.  It

11  was borne out by the past dealings among the parties.

12  We believe that the -- as we said in the -- our post-

13  trial brief, and Your Honor asked me before whether I

14  thought that the plan language was sufficient to bar

15  recoupment defense, and I think that is on page 19 of

16  my post-trial brief, the bolded, underlined language is

17  pretty clear that all persons and entities are

18  precluded from asserting any claim obligation, right,

19  causes of action or liability that occurred prior to

20  the petition date.  So Realty certainly did intend to

21  foreclose a recoupment or setoff defense with that

22  language.

23          Otherwise, unless Your Honor has any

24  questions, I'm going to rest on my previous arguments

25  and the extensive briefing that we've all filed in this

1   case.

2             THE COURT:  All right.  Thank you.

3             MS. MCCOLLUM:  Thanks.

4             THE COURT:  All right.  Thank you all.

5   Trial then -- now has fully concluded, except for my

6   decision, of course.

7             I intend, at this point, to decide this case

8   by issuing a written opinion and an accompanying

9   judgment, then give an oral bench opinion.  If I change

10  my mind after today, and decide to do a bench opinion

11  instead, of course, then the parties will -- a notice

12  will be issued (unintelligible) notice of the date and

13  time for that.

14            The -- I do want to take some further time to

15  consider, reflect on the arguments -- the oral

16  arguments made today, and the closing arguments, as

17  well as the -- to continue considering the evidence

18  presented at trial and the arguments of the parties

19  presented before today's oral arguments, including the

20  arguments and points made in the post-trial briefs.

21            I would ask the parties one thing, and that

22  is, I don't know to what extent I'm going to use pieces

23  of these things, but I do -- I would ask the parties,

24  please, to submit by email, to my Courtroom Deputy,

25  Mary Vozniak, in Word Perfect or Word form, a copy of

1    your post-trial briefs which contain your proposed

2    findings of fact and conclusions of law.  Those may be

3    helpful to me in preparing my written opinion,

4    including for purposes of quoting from them in places,

5    as well as possibly adopting some of the -- with some

6    change, but not a lot of change, on a piece-by-piece

7    basis, depending on what the Court ends up finding as

8    part of its findings.

9              So I would ask each side to do that.  If you

10   could, some time yet this week, just send Mary Vozniak

11   an email with an attachment of your doc.

12             Is there any problem doing that?

13             MR. KWIATKOWSKI:  No, Your Honor.

14             MS. MCCOLLUM:  No, Your Honor.

15             THE COURT:  All right.  If you don't have Ms.

16   Vozniak's email address you can get it from our court

17   reporter here, but I suppose you probably do, and so I

18   would appreciate that.

19             And then in the meantime then, we're finished

20   for today and the case is taken under advisement.

21             Thank you.

22        (Proceedings concluded at 10:33 a.m.)

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/_____          October 14, 2014
STEPHEN C. BOWLES